**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| **ROBERT ROLLO,** | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Case No. 5:17-cv-0645-FB** |
| | § | |
| **GEORGE P. ESCOBEDO; CARABIN &** | § | |
| **SHAW, P.C.; CARABIN SHAW,** | § | |
| **Defendants.** | § | |

---

**APPENDIX IN SUPPORT OF DEFENDANT GEORGE P. ESCOBEDO'S
RESPONSE TO PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT**

---

Pursuant to Local Rule CV-7(d) and Federal Rule of Civil Procedure 56(c), Defendant George P. Escobedo files this Appendix in Support of his Response to Plaintiff's Cross-Motion Summary Judgment, containing the documents identified below.  This Appendix is incorporated into the Response by reference.[1]

| Exhibit | Title | App. |
|---|---|---|
| Exhibit 1 | Transcript of Robert Rollo's Deposition: ....................................................1 | |
| Exhibit 1-A | 4/9/13 Handwritten Note from Dr. Fulton (Depo. Exhibit 10) .....80 | |
| Exhibit 1-B | Mediation Agreement (Depo. Exhibit 11) ....................................81 | |
| Exhibit 1-C | Email Exchange Ending 9/17/13 (Depo. Exhibit 18) ...................82 | |
| Exhibit 1-D | Plaintiff's 9/21/13 Email to the Carrier (Depo. Exhibit 20) .........86 | |
| Exhibit 1-E | Terms & Conditions of Periodic Payments (Depo. Exhibit 21) ...88 | |
| Exhibit 1-F | Terms & Conditions of Periodic Payments (Depo. Exhibit 22) ...89 | |

---

[1] The documents are redacted to remove birth date and similar personal information.

Exhibit 1-G    Plaintiff's 9/25/13 Email (Depo. Exhibit 27) ...............................91

Exhibit 1-H    November 21, 2013 Compensation Order with Settlement
Agreement (Depo. Exhibit 35) ......................................94

Exhibit 1-I    4/11/17 DOL Letter (Depo. Exhibit 44)  ....................................180

Exhibit 1-J    4/18/11 Report from Dr. Gibson (Depo. Exhibit 45) .................181

Exhibit 1-K    6/29/11 Report from Dr. Gibson (Depo. Exhibit 46) .................182

Exhibit 2    Transcript of George Escobedo's Deposition:.........................................183

Exhibit 3    Declaration of George Escobedo: ..........................................................230

Exhibit 4    Declaration and Report of Kenneth Engerrand:.....................................232

Exhibit 5    Affidavit of Brent Lee:..........................................................................263

Exhibit 6    3/27/18 Order from the Benefit Review Board: .....................................265

Exhibit 7    6/15/17 Southern District of New York Opinion and Order .................270

Exhibit 8    Portion of Exhibit G filed by Plaintiff in the administrative claim.........277

Respectfully submitted,

*/s/ Greg K. Winslett*

_____
GREG K. WINSLETT
State Bar No. 21781900
RICHARD L. SMITH, JR.
State Bar No. 18671200
BRENT LEE
State Bar No. 24036959
QUILLING, SELANDER, LOWNDS,
WINSLETT & MOSER, P.C.
2001 Bryan Street, Suite 1800
Dallas, Texas 75201
(214) 871-2100 (Telephone)
(214) 871-2111 (Telefax)
gwinslett@qslwm.com
rsmith@qslwm.com
blee@qslwm.com

**ATTORNEYS FOR DEFENDANT**
**GEORGE P. ESCOBEDO**

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that a true and correct copy of the above and foregoing instrument is being served electronically upon all counsel of record on this 1ST day of May 2019, in accordance with the Federal Rules of Civil Procedure.

*/s/ Greg K. Winslett*

_____

GREG K. WINSLETT

1                    UNITED STATES DISTRICT COURT
2                     WESTERN DISTRICT OF TEXAS
                        SAN ANTONIO DIVISION
3

4
ROBERT ROLLO                        )
5                                   )
              Plaintiff             )NO.SA-17-CA-645-FB
6    v.                             )
                                    )
7                                   )
GEORGE P. ESCOBEDO; CARABIN &       )
8    SHAW, PC; CARABIN SHAW         )
                                    )
9             Defendants            )

10

11                        ORAL DEPOSITION

12                     ROBERT ANDREW ROLLO

13                       OCTOBER 4, 2018

14

15    ORAL DEPOSITION OF ROBERT ANDREW ROLLO, produced

16      as a witness at the instance of the Defendant

17    Carabin & Shaw, PC; Carabin Shaw and duly sworn,

18    was taken in the above-styled and numbered cause

19     on Thursday, 4th October 2018, from 8.55 am to

20    4.44 pm at 83 Princes Street, Edinburgh, Lothian

21          Region, EH2 2ER, United Kingdom, and

22     stenographically reported by Nia Davidson MBIVR

23    pursuant to the Federal Rules of Civil Procedure.

24

25

Exhibit 1                                        App. 1

Page 2

```
1
2              A P P E A R A N C E S
3  For Plaintiff
4         MICHAEL A. ROSENHOUSE
          Attorney at Law
5         510 Clinton Square
          Rochester, NY 14604
6         Telephone: 585-232-8500
7  For Defendant Escobedo
8         BRENT LEE
          Quilling, Selander, Lownds,
9         Winslett & Moser,PC
          2001 Bryan Street, Suite 1800
10        Dallas, Texas 75201
          Telephone: 214-871-2100
11
12 For Defendant Carabin Shaw
13        GARY L. FULLER
          Campbell & Associates
14        4201 Spring Valley Road, Suite 1250
          Dallas, TX 75244
15        Telephone: 972-277-8585
16
17 Court Reporter:
18        NIA DAVIDSON MBIVR for
          Optima Juris
19        18881 Von Karman Avenue
          Suite 340
20           Irvine, CA 92612, United States
21
          Notary to swear the witness:
22
          MOIRA McINNES (Senior Associate)
23        Stuart & Stuart
          25 Rutland Street
24        Edinburgh, EH1 2RN
25
```

Page 3

```
1
2                    I N D E X
3
   Deponent                              Page
4
   MR. ROBERT ROLLO
5
   Questions by MR. FULLER                  5
6  Questions by MR. LEE                    41
   MR. ROSENHOUSE (questions reserved)    300
7  Further Questions by MR. FULLER        300
   Further Questions by MR. LEE           301
8        - - - - - - - - - -
9
10    Exhibits marked during this deposition
11    Exhibit                             Page
12    1 First Amended Notice               20
      2 Rollo Affidavit and Exhibit 1      22
13    3 Emails                             81
      4 Emails                             88
14    5 Activity Entry                     91
      6 Email                             107
15    7 Emails                            110
      8 Emails                            116
16    9 Emails                            122
      10 Letter from Dr. Fulton           154
17    11 Mediation Agreement              158
      12 Email                            162
18    13 Email                            164
      14 Emails                           181
19    15 Email                            207
      16 Email                            209
20    17 Emails                           211
      18 Emails                           213
21    19 Emails                           216
      20 Email                            218
22    21 T&Cs of Periodic Payments        222
      22 As 21, but complete              223
23    23 Emails                           226
      24 Email                            228
24    25 Emails                           231
      26 Emails                           233
25    27 Emails                           238
```

Page 4

```
1  Exhibit                                Page
2  28 Emails                              241
   29 Emails                              241
3  30 Information Request Form            243
   31 Email                               245
4  32 Emails                              247
   33 Emails                              249
5  34 Emails                              251
   35 Compensation order and documents    254
6  36 Emails                              268
   37 Emails                              272
7  38 Email                               278
   39 Emails                              280
8  40 Emails                              283
   41 Email                               287
9  42 Email                               289
   43 Emails                              293
10 44 Letter                              295
   45 Letter from Surgeon Mr. Gibson      299
11 46 Further letter from Mr. Gibson      299
   47 Physiotherapist notes,medical       301
12    record and doctor's letter.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
1           THE NOTARY: Mr. Rollo, raise your right
2  hand.  Do you affirm the testimony you are about to give
3  will be the truth, the whole truth and nothing but the
4  truth?
5           THE WITNESS: I do.
6           THE NOTARY: I am a notary in Scotland
7  authorised to administer oaths in Scotland.  I have just
8  administered the oath to Mr. Rollo and he has responded
9  in the affirmative.
10          MR. LEE: Very good.  Thank you.  That is
11 it.  That is all we need.  Thank you.
12          (The Notary left the deposition)
13    ROBERT ANDREW ROLLO, having been first duly
14          sworn,testified as follows:
15          QUESTIONS BY MR. FULLER
16 BY MR. FULLER:
17          Q.    Would you state your full name for the
18 record, please, sir?
19          A.    Robert Andrew Rollo.
20          Q.    Mr. Rollo, my name is Gary Fuller and
21 I represent Carabin & Shaw, a law firm, one of the
22 defendants that you have sued in this lawsuit.  Sitting
23 to my right is Mr. Brent Lee.  He represents Mr. George
24 Escobedo, the other defendant that you have sued in this
25 lawsuit.  Do you understand that, sir?
```

Exhibit 1                    App. 2

Page 6

1    A.    Yes.

2    Q.    Have you ever had your deposition taken
3    before?

4    A.    No.

5    Q.    Do you understand what a deposition is?

6    A.    Roughly, yes.

7    Q.    Has your lawyer Mr. Rosenhouse, who is
8    sitting with you here today, explained to you what
9    a deposition is and what the effect of it is?

10   A.    Yes.

11   Q.    All right.  So you realise that you have
12   been placed under oath and you are giving sworn
13   testimony just as if you were live in front of the judge
14   and jury in this case?

15   A.    Yes.

16   Q.    You understand that, all right.  You
17   understand that your answers are sworn and the same
18   penalties of perjury apply as if you were live in front
19   of a judge and jury as well?

20   A.    Mm-mh, yes.

21   Q.    Do you understand that?

22   A.    Yes.

23   Q.    Okay.  Do me two favours today,
24   Mr. Rollo: the first is to give me a verbal response to
25   my questions rather than a nod, a shake of the head or

Page 7

1    an mm-mh or ah-ah because the court reporter cannot pick
2    that up when she is taking her stenographic record,
3    okay?

4    A.    Yes.

5    Q.    If there are periods of time during the
6    deposition where I prompt you, it will be because you
7    are giving me a nod, a shake of the head or an mm-mh or
8    an ah-ha.

9    A.    Right, yes.

10   Q.    When I ask you a question, make sure you
11   give me a verbal response to that, all right?

12   A.    Okay, yes.

13   Q.    The second favour I would ask you, sir,
14   is that the judge and jury in this case have to rely
15   upon the truthfulness and the accuracy of your answers
16   so I want you to tell me if you do not understand any of
17   my questions today.

18   A.    Okay.

19   Q.    Okay?

20   A.    Yes.

21   Q.    It is very important that you understand
22   my questions so that everybody can rely upon your
23   answers.

24   A.    Okay.

25         MR. LEE:  Any questions.

Page 8

1          MR. FULLER:  Any questions, yes.  Today
2    that includes questions from Mr. Lee as well, okay?

3    A.    Yes.

4    Q.    As long as I am asking you questions
5    today and you are answering those questions, is it fair
6    to assume that we understand one another unless you tell
7    me differently?

8    A.    Yes.

9    Q.    That you have understood my question or
10   that you have understood Mr. Lee's question unless you
11   tell us differently?

12   A.    Yes.

13   Q.    All right.  You certainly can take
14   a break any time today that you wish, Mr. Rollo, but the
15   only proviso is that you need to answer the questions
16   that are pending before you at that time, okay?

17   A.    Okay.

18   Q.    Understood?

19   A.    Yes.

20   Q.    Mr. Rollo, where did you grow up, sir?

21   A.    In Haddington, East Lothian.

22   Q.    That is here outside of Edinburgh?

23   A.    Yes -- 18 miles outside of Edinburgh.

24   Q.    Did you go to school there?

25   A.    Yes.

Page 9

1    Q.    How far did you go in school, sir?

2    A.    Up as far as fourth year.

3    Q.    What is fourth year?

4    A.    That would be 11th grade in yours?

5    Q.    Okay, so in the United States that would
6    be the equivalent, I take it, of a junior in high school
7    -- third year in high school?

8    A.    Fourth year in high school.

9    Q.    Fourth year in high school.  Did you
10   graduate from high school?

11   A.    I got some O-grade pass marks.  That is
12   all you get in the high school here.  You do not
13   graduate as such.

14   Q.    Okay.  Did you complete high school?

15   A.    Yes; I completed what was necessary for
16   the letter of the law that states you have to be there
17   until you are 16.

18   Q.    How old were you when you completed your
19   fourth year?

20   A.    16.

21   Q.    What did you do at that time, when you
22   got out of school?  Did you pursue any further
23   education?

24   A.    No.  I went straight on to be an
25   apprentice baker.

Exhibit 1                                          App. 3

Page 10

1  Q.   How long did you serve as an apprentice
2  baker?
3       A.   Two and a half years.
4       Q.   Then what did you do?  Basically, I am
5  looking for you to bring us up to date with a brief
6  factual background of your history; right?
7       A.   Yes.  From there I went to landscape
8  gardening, at which I became a foreman.  That was up in
9  Peterhead, which is north -- heading up towards Aberdeen
10 way.  I stayed there for two or three years and then
11 I went to become a grave digger, which was again
12 landscape foreman.  Then I got a call from an agency
13 asking if I would like to go over to Bosnia when the
14 first war started.  I thought they were joking, but
15 I said, yes, sure I'll go.
16      Q.   Who called you?  What year was that,
17 first of all, Mr. Rollo?
18      A.   That would be 1996, I believe.
19      Q.   Who was it that called you in connection
20 with that?
21      A.   It was an agency -- an employment agency.
22      Q.   What were they calling you to do?
23      A.   To go over as a foreman to Bosnia.
24      Q.   To do what?
25      A.   To work with the American army.

Page 11

1  Q.   Doing what?
2       A.   Erecting camps and maintaining the camps.
3       Q.   Did you do so?
4       A.   Yes.
5       Q.   How long did you do that?
6       A.   For the first three months I was there as
7  a labour foreman and then I became what they call
8  a general foreman, which was after three months.  I was
9  there for, totally, nine months in Bosnia and then
10 I went to Hungary to finish off my year's contract, so
11 I was three months in Hungary at the transition camps.
12      Q.   What was the name of your employer at
13 that time, sir?
14      A.   It was Brown & Root.
15      Q.   What did you do when you finished that
16 one-year contract with Brown & Root?
17      A.   I came back and went back to landscape
18 gardening until I got the next call to go over to Kosovo
19 in 1999.
20      Q.   Was that, again, a call from Brown &
21 Root?
22      A.   Yes.  That was a call from Brown & Root
23 direct this time.
24      Q.   All right.  Did you do that?
25      A.   Yes.

Page 12

1  Q.   How long were you in Kosovo?
2       A.   I was there for, it would have been, ten
3  months.
4       Q.   What did you do there?
5       A.   It was the same: I was general foreman.
6       Q.   Did you finish that contract?
7       A.   No.
8       Q.   Why not?
9       A.   I was due to get married and I asked
10 Brown & Root if they would give me some time off to go
11 and get married and they said no, not a chance, so
12 I said, "It is either that or I just quit and I go
13 home".  They eventually said, "Yes, we will give you the
14 time off" and I said, "Well, you're too late; I have
15 decided now, so I am going".  So I went home, got
16 married and went and had my honeymoon.  After my
17 honeymoon I came home and started doing my own business,
18 doing cleaning, house cleaning, landscape gardening,
19 painting and decorating, ironing even -- anything at all
20 that anybody wanted.  I built up quite a few constant
21 contracts for cleaning.
22      Q.   All right.  How long did you do that,
23 sir?
24      A.   I did that for two and a half years.
25      Q.   All right, and then where did you go?

Page 13

1       A.   I got a phone call to go over to Houston
2  to go through a medical and go through all sorts of
3  tests, different programmes on how to put gas
4  masks on properly, you know, spill kit -- overalls,
5  stuff like that -- that you would need to go into a war
6  zone where they were using gas and stuff like that.
7  I was over there for two weeks.  Then we got shipped
8  over to Kuwait.  I was in Kuwait for about three months
9  and then I was over in Iraq for the rest of the time.
10      Q.   During this period of time you were
11 employed by Brown & Root?
12      A.   Yes, Kellogg, Brown & Root at that time;
13 they changed their name.
14      Q.   When did you arrive in Kuwait?
15      A.   That would have been April 2003.
16      Q.   When did you leave Kuwait?
17      A.   July 2003.
18      Q.   In July 2003, where did you go?
19      A.   Into Iraq.
20      Q.   Where into Iraq did you go?
21      A.   We started off in Baghdad.
22      Q.   Again, you were still employed by Brown &
23 Root; correct?
24      A.   Yes.
25      Q.   What was your job title at that time?

Exhibit 1                                    App. 4

**Page 14**

1  A.    The minute I moved over to go into Iraq
2  I was general foreman again.
3       Q.    What were your duties as general foreman
4  in July 2003?
5       A.    I was in charge of a firm of labourers,
6  painters and decorators and plasterers that were going
7  over to build ice plants, so putting up tin buildings --
8  huge big buildings -- and then installing 40-tonne or
9  60-tonne ice machines.  We did that in all different
10 camps in Iraq.
11      Q.    How long were you doing that?
12      A.    Right up until the end of May 2005.
13      Q.    So from July of 2003 until May of 2005
14 you served as a general foreman in connection with
15 constructing those ice plants?
16      A.    Yes.
17      Q.    What happened in May of 2005?
18      A.    I had injured my foot before that and
19 I was trying my best to see if I could just walk it off,
20 just get through it.  Everybody kept telling me it was
21 just a sprain in my foot so not to worry, it will go
22 away.  By the time May came, it wasn't going away.
23      Q.    When did you injure your foot?
24      A.    On 30 January that year.
25      Q.    In January 2003?

**Page 15**

1       A.    In 2005.
2       Q.    I am sorry, in January 2005 you injured
3  your foot in ----
4       A.    I dropped a pallet on it when I was in
5  Iraq.
6       Q.    You dropped what?
7       A.    A pallet.
8       Q.    That was while you were outside of
9  Baghdad?
10      A.    That was at Al Assad air base.
11      Q.    When did you first seek medical attention
12 for your -- which foot was it?
13      A.    My left foot.
14      Q.    When did you first seek medical attention
15 for your left foot?
16      A.    The same day it happened.
17      Q.    Okay.
18      A.    I went to see the onsite medic and he
19 just said it was a sprain, nothing to worry about.  He
20 said the swelling would go down and just to take some
21 painkillers.  That was it.  I was left to get on with
22 it.  The swelling would go down at night.  I would wake
23 up in the morning and put my boots on and strap them as
24 tight as I could because I knew by the end of the day
25 that they were going to be really swollen, so I thought

**Page 16**

1  I would trap them in the boot to try to keep the
2  swelling to a minimum.  I struggled through until May
3  but then I had just had enough; I thought something is
4  seriously wrong and something has to be done about it.
5       Q.    Did you see someone in May of 2005 about
6  it?
7       A.    Yes.
8       Q.    Who was that?
9       A.    I got on a helicopter.  They took me down
10 to Baghdad where I saw Brown & Root's senior medical
11 personnel on the site.
12      Q.    What did he tell you about your foot?
13      A.    He agreed with me and said there is
14 something far wrong; it is not just a sprain.  He took
15 me to the army medical facility.
16      Q.    Did you have any specific training from
17 the time that you left high school when you were 16 with
18 respect to these jobs?
19      A.    No.
20      Q.    Did you have any further education after
21 you left high school at 16?
22      A.    No.
23      Q.    Okay.  So you had no further formal
24 education, vocational education or technical education
25 after you left high school at 16; correct?

**Page 17**

1       A.    No, just training to become a landscape
2  gardener; that was all.
3       Q.    Mr. Rollo, what documents did you review
4  today in preparation for your deposition?
5       A.    It was just a lot of emails I was looking
6  over about the mediation at the time when it was going
7  ahead.
8       Q.    When you say "a lot of emails", how many
9  emails are we talking about?
10      A.    Maybe about 15 or 20 -- round about that.
11      Q.    What period of time did these 15 or 20
12 emails cover?
13      A.    They would have covered about four to
14 five months.
15      Q.    During what year?
16      A.    2013.
17      Q.    I am sorry?
18      A.    2013.
19      Q.    Besides these 15 or 20 emails that you
20 just referenced, what other documents did you review in
21 preparation for your deposition today?
22      A.    I looked over all my medical records that
23 I had.
24      Q.    When you say "all of your medical
25 records", to what are you referring?

Exhibit 1                                                    App. 5

Page 18

1    A.    All the medical records that I had got
2  printed off over the years to send over to the insurance
3  company.
4        Q.    In connection with your foot injury?
5    A.    Yes.
6        Q.    Other than the 15 or 20 emails and your
7  medical records, what other documents did you review
8  today in preparation for your deposition?
9        A.    That was about all that I did -- that was
10  it.
11       Q.    Are you telling us that the only
12  documents that you reviewed in preparation for your
13  deposition today were about 15 or 20 emails in 2013 and
14  your medical records; is that correct, sir?
15       A.    Yes.
16       Q.    Are you telling the jury that you did not
17  review the oral deposition of George Escobedo taken in
18  this case?
19              MR. ROSENHOUSE:  Objection.
20       A.    Yes, I did.
21  BY MR. FULLER:
22       Q.    I didn't understand.  Have you or have
23  you not reviewed the oral deposition of George Escobedo
24  before your deposition today, sir?
25       A.    Yes, I did.  I am sorry, I thought you

Page 19

1  meant just documents.
2        Q.    No.  I am talking about anything,
3  including the morning newspaper.  Again, as to
4  documents, I want to make sure we are clear on the
5  record: are there any other documents that you reviewed
6  in preparation for your deposition today besides the 15
7  or 20 emails that you have mentioned, your medical
8  records and the oral deposition of George Escobedo?
9        A.    No, that was it.
10       Q.    Are you telling the jury, sir, that you
11  did not review the oral deposition of my client in this
12  case -- Mr. James Shaw?
13       A.    There was only a little bit, but
14  I included that in the other oral depositions.
15       Q.    So you are telling the jury that you did
16  review Mr. Shaw's deposition; is that correct?
17       A.    Yes; I thought it was all in one.
18              MR. ROSENHOUSE  I object to "telling the
19  jury".  There is no jury here.  This is a deposition.
20              MR. FULLER:  The jury will be here when
21  he testifies at the trial of this case.  Your objection
22  is noted.
23              Q.    Mr. Rollo, I want to make sure that we
24  are clear on the record since you are under oath and
25  this is the same as if you are testifying before the

Page 20

1  judge and the jury.  It is my understanding, sir, that
2  the only documents that you reviewed in preparation for
3  your deposition today were 15 or 20 emails, all of your
4  medical records and the oral depositions of
5  George Escobedo and James Shaw; is that correct?
6        A.    Yes.
7        Q.    You did not review any other documents or
8  anything of any nature other than what I just mentioned
9  in preparation for your deposition today?
10       A.    Not that I can remember.
11       (Exhibit 1 was marked for identification)
12       Q.    I am going to hand to you, sir,
13  a document which has been marked exhibit 1 and will be
14  attached to your deposition.  Have you ever seen exhibit
15  1 before, Mr. Rollo?
16       A.    No.
17       Q.    No one has ever showed you the notice for
18  your deposition today?
19       A.    No, not with the proper location on it.
20       Q.    That was not my question, sir.  What I am
21  asking is have you ever seen exhibit 1 before this
22  morning that I just handed to you?
23       A.    No.
24       Q.    Were you aware that you were requested in
25  exhibit 1 to bring documents with you today?

Page 21

1        A.    No.
2        Q.    Did you bring any documents today with
3  you ----
4        A.    No.
5        Q.    ---- in response to exhibit 1?
6        A.    No.
7        Q.    All right.  So the portion of exhibit 1
8  that asks you to produce any and all documents that you
9  are relying upon with respect to Carabin & Shaw, you did
10  not bring any of those documents, did you, sir?
11       A.    No.
12              MR. ROSENHOUSE:  For the record, we have
13  provided a response to the document request in writing
14  to both counsel today.  So the document request has been
15  responded to.
16              MR. FULLER:  Counsel, I am going to
17  object to that sidebar remark, but since I have an
18  opportunity, I will make my own.  For the record, I was
19  handed a pleading by Mr. Rosenhouse this morning
20  entitled, "Plaintiff's response and objections to
21  defendant Carabin Shaw's notice to produce".  Is this
22  the document that you are referring to, counsellor?
23              MR. ROSENHOUSE:  Yes.
24              MR. FULLER:  All right, and you waited 30
25  days, and after we here in the room have travelled over

Exhibit 1                                    App. 6

Page 22

1    4500 miles, to serve this upon me?
2        MR. ROSENHOUSE:  The document speaks for
3    itself.
4        MR. FULLER:  You have no documents that
5    you are going to produce on behalf of your client today
6    then, sir?
7        MR. ROSENHOUSE:  That is correct.
8        MR. FULLER:  You are basing that on this
9    pleading that you handed to me entitled, "Plaintiff's
10   response and objections to defendant Carabin Shaw's
11   notice to produce"?
12       MR. ROSENHOUSE:  Yes.  You already have
13   the documents you have requested and I told you in the
14   document how you can find them very easily.
15       MR. FULLER:  Objection to the sidebar.
16   (Exhibit 2 was marked for identification)
17       Q.    Mr. Rollo, let me hand you what has been
18   marked as exhibit 2.  Have you ever seen that document
19   before, sir?  It is entitled, "Affidavit of plaintiff
20   Robert Rollo".
21       A.    I do not believe so.
22       Q.    Let us do this, Mr. Rollo, so that we do
23   not spend a lot of unnecessary time.  I am going to ask
24   the court reporter to go off the record and I am going
25   to ask you to review exhibit 2, which is an affidavit

Page 23

1    that you executed on 31 January 2017.  I am going to ask
2    you some questions about that, so I am going to ask the
3    court reporter to go off the record and you can take as
4    much time as you want reviewing that document, sir, and
5    then we will get back on the record and I will ask you
6    some questions about it.
7        (Off the Record 09.20 - 09.26)
8        Q.    We are back on the record now, Mr. Rollo.
9    Have you had an opportunity to review exhibit 2?
10       A.    Yes.
11       Q.    What is exhibit 2?
12       A.    It is an affidavit that was signed by
13   myself and notarised by Robert McNab.
14       Q.    When was the last time that you saw this
15   document before this morning, sir?
16       A.    It would have been when it was signed.
17       Q.    You did not review this document in
18   preparation for your deposition today?
19       A.    No.
20       Q.    The last time that you would have seen
21   this document would have been January 31, 2017?
22       A.    Yes.
23       Q.    For the record, exhibit 2 consists of
24   your affidavit, which is four pages long; correct?
25       A.    Mm-mh.

Page 24

1        Q.    Yes?
2        A.    Yes.
3        Q.    It also contains 37 pages of an
4    attachment marked exhibit 1 to the affidavit of
5    plaintiff Robert Rollo dated January 31, 2017; correct?
6        A.    Yes.
7        Q.    These 37 pages consist of emails to and
8    from Mr. George Escobedo; correct?
9        A.    Yes.
10       Q.    It also consists of a contingent fee
11   contract and power of attorney; correct?
12       A.    Mm-mh.
13       Q.    Remember you need to give a verbal
14   response?
15       A.    Yes.
16       Q.    It also contains a letter from
17   a Dr. Eddie Davis; correct?
18       A.    Yes.
19       Q.    That is what comprises exhibit 2, which
20   is going to be attached to your deposition; correct?
21       A.    Yes.
22       Q.    All right, Mr. Rollo, look at paragraph 3
23   of your affidavit on the first page, if you would, sir.
24       A.    Mm-mh, yes.
25       Q.    Paragraph 3 reads:  "The printouts

Page 25

1    attached hereto are true and accurate representations of
2    emails sent or received by me, and the documents
3    appended as attachments were actual attachments as they
4    appear to be."
5        Do you know of any other emails sent or
6    received by you from either George Escobedo or anyone
7    else other than these?
8        MR. ROSENHOUSE:  Could you repeat the
9    question?
10       MR. FULLER:  Certainly.
11       Q.    I will re-phrase the question.  Paragraph
12   3 states:  "The printouts attached hereto are true and
13   accurate representations of emails sent or received by
14   me, and the documents appended as attachments were
15   actual attachments as they appear to be."  Do you see
16   that?
17       A.    Yes.
18       Q.    Are you aware of any other emails other
19   than the ones that are attached to exhibit 2 which
20   mention the name of my client Carabin & Shaw?
21       A.    I have had an awful lot of emails,
22   including from AIG itself ----
23       Q.    No, I am not talking about that.
24       A.    ---- which would have had George
25   Escobedo's name on them with his email address.  Every

Exhibit 1                                              App. 7

Page 26

1  time I had any emails from George, they had
2  carabinshaw.com on them.
3      Q.    Okay.  Are you aware of any other emails
4  other than the ones attached to exhibit 2 which bear the
5  name of my client Carabin & Shaw?
6            MR. ROSENHOUSE:  Counsel, there have been
7  hundreds.
8            MR. FULLER:  I am going to object to the
9  sidebar remark, counsel.  It is improper.
10           MR. ROSENHOUSE:  You are just trying to
11 trick my client.
12           MR. FULLER:  I object.  It is a simple
13 yes or no answer, Mr. Rollo.
14     A.    Yes, because I have seen hundreds of
15 emails and they always have George Escobedo at
16 carabinshaw.com.
17     Q.    You did not produce any other emails or
18 any of those emails today, did you, sir?
19     A.    No.
20     Q.    Let us go down to paragraph 4.  The last
21 sentence reads:  "In the course of my searches for law
22 firms on the internet, one of the attorneys I spoke with
23 said he could not help me but that there was a firm
24 named Carabin Shaw that he thought had experience
25 dealing with AIG and might be suitable."

Page 27

1      A.    Yes, that is correct.
2      Q.    Did I read that correctly?
3      A.    Yes.
4      Q.    Would you please tell the court who the
5  attorney was that you were referencing in paragraph 4?
6      A.    I have no clue who he was.  At the time,
7  I was trying to find an attorney or a lawyer, as they
8  call them over here, to represent me and every time
9  I got one on the phone I was told that they could not do
10 any work for me because it was an American insurance
11 company that I was dealing with and it would have to be
12 an American attorney that I got.  I could not find one
13 anywhere, but one out of about 40 or 50 names I had, one
14 of the Glasgow attorneys that I got on the phone,
15 mentioned that he had heard the name Carabin & Shaw and
16 they had done some work for clients of Brown & Root.
17     Q.    Are you telling the jury that the
18 attorney that referred you to Carabin & Shaw was an
19 attorney here in Glasgow, Scotland?
20     A.    Yes.
21     Q.    But you do not know that gentleman's
22 name?
23     A.    No.
24     Q.    Do you remember what the gentleman told
25 you specifically about Carabin & Shaw?

Page 28

1      A.    That was exactly what he said, that he
2  had heard of the name Carabin & Shaw and they had done
3  some work for employees of KBR so I might want to try
4  them.  He had no phone numbers or email address.  He
5  told me to do a search on Google and that I would find
6  it on there, which is exactly what I did.
7      Q.    When would it have been that you spoke
8  with this attorney in Glasgow?
9      A.    It would have been June 2005.
10     Q.    After this gentleman told you that he had
11 heard that Carabin & Shaw had represented some clients
12 in connection with KBR ----
13     A.    Yes.
14     Q.    ---- what did you then do, sir?
15     A.    I did what he suggested: I looked up
16 Carabin & Shaw in the Google search engine and it came
17 straight up with the name and phone number.
18     Q.    Okay.  You did this internet search here
19 from your home in Scotland?
20     A.    Yes.
21     Q.    And you typed in Carabin & Shaw?
22     A.    Yes.
23     Q.    What came up on your screen?
24     A.    Carabin & Shaw.
25     Q.    All right.

Page 29

1      A.    There was some other reference to
2  attorneys based in, I think it said, San Antonio, but
3  I could not be exactly 100% sure on the wordings behind
4  it.  But it had a telephone number to try, so I tried
5  it.
6      Q.    Was it a web page that you looked at for
7  Carabin & Shaw?
8      A.    Yes.
9      Q.    Do you remember anything about the web
10 page at all?
11     A.    No, I just looked at the phone number.
12     Q.    You do not remember colours?
13     A.    No.
14     Q.    You do not remember photographs?
15     A.    No.
16     Q.    You do not remember names?
17     A.    No.
18     Q.    You do not remember anything except that
19 it said Carabin & Shaw and San Antonio and it had
20 a telephone number?
21     A.    Yes.
22     Q.    All right.  What did you do then, sir?
23     A.    I phoned the number.
24     Q.    What happened when you phoned the number?
25     A.    A young lady answered the phone, said it

Exhibit 1                                    App. 8

## Page 30

1  was Carabin & Shaw and asked how she could help.  I
2  explained to her that I was looking for an attorney to
3  represent me in an injury-at-work case, to which she
4  said, yes, I will pass you on to somebody who might be
5  able to help.
6      Q.    Then what happened?
7      A.    I got George Escobedo on the phone.
8      Q.    How did he answer the phone?
9      A.    He just answered as, "Hello, I am
10 George Escobedo" and, "How may I help?"  I explained to
11 him the predicament I was in and asked whether he could
12 help or not, to which he did say that he had helped
13 quite a number of KBR personnel that were in the same
14 boat.
15     Q.    When you say "KBR", you are referring to
16 Kellogg, Brown & Root?
17     A.    Yes.
18     Q.    Let me go back to make sure that I am
19 clear and the record is clear on this.  After you spoke
20 with the attorney in Glasgow who told you that he
21 thought a firm named Carabin & Shaw might be able to
22 help you, you went to the internet and looked for
23 Carabin & Shaw; correct?
24     A.    Yes.
25     Q.    The name Carabin & Shaw came up on the

## Page 31

1  internet; correct?
2      A.    Yes.
3      Q.    You do not remember anything about the
4  web page; correct?
5      A.    Yes.
6      Q.    The only thing that you remember is it
7  said Carabin & Shaw, San Antonio and it had a phone
8  number; correct?
9      A.    Yes.
10     Q.    You then call that phone number; correct?
11     A.    Yes.
12     Q.    A young lady answered and basically said,
13 "Good morning, this is Carabin & Shaw, how may I help
14 you?"  Correct?
15     A.    Yes.
16     Q.    You explained to her who you were and
17 that you had been injured and were looking for an
18 attorney to help you; correct?
19     A.    Yes, that is correct.
20     Q.    She said, "I will pass you on to somebody
21 who may be able to help"; correct?
22     A.    Yes, that is correct.
23     Q.    Did you have any other conversations with
24 that young lady?
25     A.    No.

## Page 32

1      Q.    Did you ever speak with anybody again
2  when you called to San Antonio?
3      A.    No.
4      Q.    All right.  The only time that you spoke
5  with anyone in San Antonio was the conversation that you
6  just related to the jury with the young lady who passed
7  you along to Mr. Escobedo; correct?
8      A.    Yes.
9      Q.    All future communications that you had
10 with Mr. Escobedo were by email?
11     A.    Yes, or phone.
12     Q.    I am sorry?
13     A.    Or phone.
14     Q.    Or phone?
15     A.    Yes.
16     Q.    All right.  I am sorry, I think maybe you
17 misunderstood my question.  I am interested in knowing
18 how many times did you speak with anyone in San Antonio
19 by telephone?
20     A.    Apart from George Escobedo, nobody.
21     Q.    Okay.  You never spoke with that young
22 lady again; correct?
23     A.    Correct.
24     Q.    You never spoke with anybody at Carabin &
25 Shaw again; correct?

## Page 33

1      A.    No, correct.
2      Q.    The only person you ever spoke to after
3  that brief conversation with the young lady was Mr.
4  George Escobedo; correct?
5      A.    Yes, correct.
6      Q.    Have you ever gone back and looked at the
7  Carabin & Shaw website?
8      A.    No.
9      Q.    The only time that you ever saw it was
10 back in 2006; correct?
11     A.    Correct, yes.
12     Q.    Mr. Rollo, do me a favour, sir, and turn
13 in exhibit 2 to the contingency contract and power of
14 attorney.  (Pause) I think you have passed it.  It is
15 near the very beginning, sir.  Is this the contract that
16 you signed with the law office of George P. Escobedo PC?
17     A.    It certainly looks familiar, yes.
18     Q.    All right.  Do you see at the very
19 beginning on the first page it states:  "By this
20 contract, the Law Office of George P. Escobedo, PC
21 (hereinafter ATTORNEY), is hereby employed to represent
22 Robert Rollo (hereinafter CLIENT)."  Do you see that?
23     A.    Yes.
24     Q.    Do you know how many times the law office
25 of George P. Escobedo was mentioned throughout this

Exhibit 1                                        App. 9

Page 34

1  document?
2      A.      No, I have no idea.
3      Q.      Let me just say this.  I have counted
4  through this, Mr. Rollo -- and you are certainly welcome
5  to do so yourself, sir -- but it appears to me that the
6  law office of George P. Escobedo PC is referenced 25
7  times throughout this contingency contract.
8      A.      Okay.
9      Q.      Would you agree with that?
10     A.      Yes -- something like that, yes.
11     Q.      The name Carabin & Shaw is mentioned once
12  on the third page, paragraph 12.  Take your time if you
13  wish to read that, sir.
14     A.      Yes, okay.
15     Q.      I am going back to your affidavit and
16  your reference to paragraph 12.  You say, and I quote on
17  page 2 of your affidavit:  "One can see there, on page
18  3, the very same paragraph 12 referring to Carabin &
19  Shaw, PC, as the holder of funds that I might recover."
20  Mr. Rollo, this paragraph 12 does not say anything about
21  Carabin & Shaw being the holder of funds that you might
22  recover, does it, sir?
23     A.      No.
24             MR. ROSENHOUSE:  Objection.  The document
25  speaks for itself.

Page 35

1  BY MR. FULLER:
2      Q.      When you read Mr. Escobedo's oral
3  deposition in preparation for your deposition today,
4  sir, did you see in there where Mr. Escobedo testified
5  that paragraph 12 was an error on his part to include
6  this language in his contract?
7      A.      No, I cannot remember seeing that.
8      Q.      You do not remember seeing that?
9      A.      No.
10     Q.      Are you sure?
11     A.      Yes, I am sure.
12     Q.      All right.  You are not saying that
13  Mr. Escobedo did not testify that way, are you?
14     A.      No.
15     Q.      All right.  In view of the fact that
16  Mr. Escobedo testified that it was an error for him to
17  put paragraph 12 in the contingency contract that you
18  signed with him, do you have any basis for your
19  contention that paragraph 12 should be included in this
20  contingency contract.
21             MR. ROSENHOUSE:  Objection.  That calls
22  for a legal conclusion.
23  BY MR. FULLER:
24     Q.      You may answer the question, sir.
25             MR. ROSENHOUSE:  Could you repeat the

Page 36

1  question?
2             MR. FULLER:  I'll have the court reporter
3  repeat it.
4             (The Reporter read back as requested)
5             MR. ROSENHOUSE:  Objection.  You can
6  answer the question.  The document speaks for itself and
7  you are asking for a legal conclusion.
8             MR. FULLER:  Objection.  I want to object
9  to the sidebar.  I think the Federal rule is pretty
10  clear.  You can object to form and that is it.
11  BY MR. FULLER:
12     Q.      Mr. Rollo, do you understand the
13  question, sir?
14     A.      No, not really.
15             MR. FULLER:  Let us read it back to you
16  again.
17             (The Reporter read back as requested)
18             MR. ROSENHOUSE:  Objection.  He did not
19  contend that paragraph 12 should be included in the
20  contingency contract.  There is no basis for that.
21             MR. FULLER:  Objection to counsel's
22  sidebar remark and, subject to a motion with the court,
23  he can object to form and that is it.
24     A.      I don't understand what you mean by
25  "contention".

Page 37

1      Q.      Go back to your affidavit that you swore
2  under oath, sir, on page 2.  Go back and look at your
3  affidavit on page 2.  Let us make sure we are clear on
4  this because I want to make sure that you understand
5  this question.  Do you see where it says at the bottom
6  of page 2 in paragraph 5 you state, "One can see there,
7  on page 3, the very same paragraph 12 referring to
8  Carabin & Shaw, PC, as the holder of funds that I might
9  recover."  Do you see that?
10     A.      On page 2?
11     Q.      Of your affidavit -- page 2 of your
12  affidavit at the bottom of paragraph 5.
13     A.      Right, yes, I have it.
14     Q.      I asked you a moment ago whether or not
15  that paragraph said anything about Carabin & Shaw being
16  the holder of funds that you might recover and you
17  answered no.  Do you remember that?
18     A.      Yes.
19     Q.      All right.  My question to you is you say
20  that you read Mr. Escobedo's deposition and you do not
21  recall seeing anything in his deposition where he
22  testified that it was an error on his part to put in
23  paragraph 12 on the contingency contract; correct?
24     A.      Correct, yes.
25     Q.      My question to you, sir, is do you have

Exhibit 1                                    App. 10

Page 38

1  any reason to believe or do you contend that paragraph
2  12, in view of Mr. Escobedo's deposition testimony,
3  should have even been included in the contingency
4  contract.
5          MR. ROSENHOUSE:  I object on the
6  additional grounds that you are speaking from your own
7  recollection of Mr. Escobedo's deposition testimony, so
8  there is not ----
9          MR. FULLER:  Counsel, I am going to
10 objet.  You can object to form all you want, but I think
11 the court is going to take a dim view on speaking
12 objections.  The question is yes or no, sir.
13     A.     I will say yes.
14 BY MR. FULLER:
15     Q.     Yes what?
16     A.     That it should be there.
17     Q.     Despite Mr. Escobedo's deposition
18 testimony?  I am going to represent to you that
19 Mr. Escobedo testified in his deposition -- in fact, for
20 the court's purposes and the jury's purposes, because
21 they will have Mr. Escobedo's deposition available to
22 them, Mr. Rollo -- on page 23 that "It was an error" on
23 his part to include paragraph 12 in the contingency fee
24 contract.  I want you to assume that with me, all right?
25     A.     All right.

Page 39

1      Q.     Assume that is the case, assume that is
2  the truth and that Mr. Escobedo testified that way,
3  okay?
4      A.     Okay.
5      Q.     Do you have any reason to contend or
6  believe that paragraph 12 should have been included in
7  the contingency fee contract when Mr. Escobedo
8  specifically stated under oath that it was an error?
9          MR. ROSENHOUSE:  I object.  You are
10 badgering the witness now.  You are asking for
11 conclusions, putting facts in evidence and you are
12 badgering the witness.  You keep repeating the same
13 question.
14         MR. FULLER:  I am not getting an answer.
15     A.     No.  That is the answer you want.
16     Q.     I am looking for the answer that you want
17 to give under oath, sir, and that is, no, you have no
18 reason to believe or contend that this should be
19 included assuming that Mr. Escobedo testified that it
20 was an error; correct?
21     A.     Correct.
22     Q.     Was Carabin & Shaw, my client, ever paid
23 any referral fees from Mr. Escobedo in connection with
24 his representation of you, sir?
25     A.     I have no clue.

Page 40

1      Q.     Was Carabin & Shaw ever paid any type of
2  legal assistant fees, secretarial fees or administrative
3  fees in connection with Mr. Escobedo's representation of
4  you?
5      A.     I have no clue.  Nobody would ever tell
6  me something like that.
7      Q.     You have ----
8      A.     I am not privy to what people get paid
9  within Carabin & Shaw's company.
10     Q.     What does the term "PC" mean after the
11 law office of George P. Escobedo?
12     A.     I have no clue.
13     Q.     What does the term "of counsel" mean?
14     A.     That he was representing me as my
15 counsel.
16     Q.     Do you have any other understanding of
17 what the term "of counsel" means other than what you
18 have just testified to?
19     A.     No.
20     Q.     Did you ever discuss the terms "PC" or
21 "of counsel" with Mr. Escobedo?
22     A.     No.
23     Q.     Did you ever discuss the relationship, if
24 any, between Mr. Escobedo and Carabin & Shaw?
25     A.     No.  He never mentioned anything.

Page 41

1          MR. FULLER:  I will pass the witness.
2          MR. LEE:  Are you okay to continue, sir,
3  or do you need to take a break?
4      A.     No, I am fine -- if I could just take
5  a quick taste of my medicine.
6          (Off the record 9.57 - 9.58)
7          EXAMINED BY MR. LEE
8      Q.     Sir, my name is Brent Lee.  We have not
9  met or spoken prior to this morning just before the
10 deposition; is that true?
11     A.     That is true, yes.
12     Q.     Did you bring any notes or materials with
13 you today?
14     A.     No.
15     Q.     You have had an opportunity -- and I am
16 not going to ask you about the content, but you have had
17 an opportunity -- prior to this discussion or deposition
18 today to meet with your attorney or discuss with your
19 attorney; is that true?
20     A.     Yes.
21     Q.     Did you speak with anyone else about
22 today's deposition in preparation for the deposition
23 today?
24     A.     No.
25     Q.     Have you ever been a party to any other

Exhibit 1                                    App. 11

Page 42

1 lawsuits?
2       A.      No.
3       Q.      I think you testified this morning you
4 have not testified under oath before; is that true?
5       A.      That is true.
6       Q.      Have you had any other work injuries
7 besides the injury that forms the basis of this lawsuit?
8       A.      No.
9       Q.      When we are talking about "injury" or
10 "incident", can we have an agreement that we are talking
11 about the injury to your left foot that you suffered in,
12 I think it was, January 2005?
13      A.      2005, yes.
14      Q.      January 2005.  If I refer to "injury",
15 "the injury" or "the incident", will you understand that
16 I am talking about the injury to your left foot in
17 January 2005?
18      A.      Yes.
19      Q.      You understand you are still under oath?
20      A.      Yes.
21      Q.      How did you get here today?
22      A.      The wife drove us up to the hotel, then
23 we got a taxi from the hotel over to here.
24      Q.      When you travel somewhere, are you able
25 to drive yourself or does your wife or somebody else

Page 43

1 drive?
2       A.      No, my wife has to drive everywhere.
3 Have you seen the boots I have got on?
4       Q.      Now I do.  When you travel somewhere, do
5 you get out of your wheelchair into the factory seat of
6 the vehicle?
7       A.      Yes.
8       Q.      I guess I am just trying to distinguish:
9 there are vehicles where people enter the vehicle in
10 their wheelchair and are strapped into a van, but that
11 is not what you do.
12      A.      No.  I transfer from the wheelchair into
13 the front seat using my crutches.
14      Q.      I am going to ask you some questions
15 I think I know the answer to today but I have to have it
16 on the record to make sure I understand.  The education
17 level that you achieved we would call high school.  What
18 do you call it here?
19      A.      It is high school.
20      Q.      Do you have any post-high-school
21 education certifications or credentials?
22      A.      No.
23      Q.      Are you a member of any professional
24 associations?
25      A.      No.

Page 44

1       Q.      You are not an economist?
2       A.      No.
3       Q.      Are you qualified to determine present
4 value or future values?
5       A.      No.
6       Q.      Are you qualified to select a discount
7 rate to be applied to a future value?
8       A.      No.
9       Q.      Do you have any medical training or any
10 medical degrees?
11      A.      No.
12      Q.      Do you have any legal training or any
13 legal degrees or licences?
14      A.      No.
15      Q.      Do you speak any languages or than
16 English?
17      A.      I'd better say no.
18      Q.      English is your native language?
19      A.      Yes.
20      Q.      You read English and write English.
21      A.      Yes.
22      Q.      Approximately how many years, or, if it
23 is easier for you, how many months, have you worked
24 foreign with Kellogg, Brown & Root or any other
25 contractor?

Page 45

1       A.      How do you mean -- for any contractor for
2 a length of time?
3       Q.      Let me specify.  You have talked today
4 about working in Kosovo, Iraq and some other places;
5 true?
6       A.      Yes.
7       Q.      I am trying find out how many months or
8 years, whatever is easiest for you, you have worked
9 outside of Scotland doing that type of work?
10      A.      Right, no.  That is only three places:
11 Bosnia, Kosovo and Iraq.
12      Q.      How many months or years total is it if
13 you combine all those places?
14      A.      Three years and ten months.
15      Q.      Since high school, how many years did you
16 work?  I understand you stopped working in 2005; is that
17 true?
18      A.      Yes.
19      Q.      From high school to 2005, how many years
20 did you work?
21      A.      All the time.
22      Q.      How many years is that?
23      A.      I am trying to think: 21 years.
24      Q.      You worked foreign because the pay was
25 substantially higher; is that true?

Exhibit 1                                    App. 12

Page 46

1    A.    Yes.
2        Q.    After your contract to work in Iraq had
3    terminated or exhausted, did you have further plans to
4    work foreign?
5        A.    Yes.  Well, the job was ongoing.  We had
6    several camps that we could have transferred to once we
7    finished the plant that we were on in Al Assad.
8        Q.    Were those other camps also in Iraq?
9        A.    Yes.
10       Q.    Was it your intention to continue working
11   in Iraq until that work dried up?
12       A.    Yes.
13       Q.    Do you have any idea when the work did
14   try up?
15       A.    No.  I believe it went on for at least
16   another year and a half.
17       Q.    Did you have any thought about what you
18   intended to do after the work in Iraq dried up?
19       A.    Yes.  I was going to continue doing
20   landscape gardening but starting my own business up.
21       Q.    Here in Scotland?
22       A.    Yes.
23       Q.    As I understand it, that is what you did.
24   You had had experience doing that type of work before.
25       A.    Yes.  I am qualified as a landscape

Page 47

1    gardener.
2        Q.    I just need general numbers: what was the
3    yearly salary or income that you received doing
4    landscape gardener work?
5        A.    If it was through employment for a firm,
6    you would be looking at £35,000 a year.
7        Q.    That is in pounds?
8        A.    Yes.
9        Q.    You have not worked since the incident --
10   well, I guess that is not quite accurate.  You continued
11   working for a while after the incident until it was
12   discovered that you had a more serious foot injury; is
13   that right?
14       A.    Yes.
15       Q.    Was that in 2005, when you stopped
16   working?
17       A.    Yes.
18       Q.    Since stopping work in 2005, have you
19   worked an hour since then?
20       A.    No.
21       Q.    Have you received or had any other
22   injuries, work injuries, outside of the incident?
23       A.    No.
24       Q.    Prior to the incident, had you had neck,
25   back or spine pain or injury?

Page 48

1    A.    No.
2        Q.    Prior to the incident, had you been
3    treated for neck, back or spine pain or injury?
4        A.    No.
5        Q.    Prior to the incident, were you regularly
6    on any medications?
7        A.    No.
8        Q.    Prior to the incident, had you taken or
9    been prescribed any prescription medications for pain?
10       A.    No -- not for pain, no.
11       Q.    Reference was made earlier today to the
12   Escobedo deposition.  When the Escobedo deposition was
13   being taken you listened by phone; is that right?
14       A.    Yes -- part way.  For some reason, the
15   phone connection cut off.
16       Q.    Okay.  You listened until there were
17   phone connection issues.
18       A.    Yes.
19       Q.    Do you know how long it was that you were
20   able to listen?
21       A.    It was probably about half an hour.
22       Q.    Did you take any notes of that
23   deposition?
24       A.    No.
25       Q.    Up to that half hour or so that you were

Page 49

1    able to listen, did you disagree with any of the
2    testimony that you heard from Mr. Escobedo?
3        A.    No.  It was very difficult to make out on
4    the phone.
5        Q.    The connection was not very good?
6        A.    No, it was not.
7        Q.    Since then, you read the deposition of
8    Mr. Escobedo; is that right?
9        A.    I skimmed through it, yes.
10       Q.    When did you undertake the review of
11   Mr. Escobedo's deposition?
12       A.    It was probably a week afterwards.
13       Q.    A week after the deposition?
14       A.    After his -- yes.
15       Q.    Okay.  Did you review any documents with
16   the deposition -- in other words, exhibits thereto?
17       A.    No, not really.
18       Q.    It was just the deposition transcript
19   itself ----
20       A.    Yes.
21       Q.    --- where there are questions by your
22   attorney of Mr. Escobedo and Mr. Escobedo's responses?
23       A.    Yes.
24       Q.    Do you recall having any disagreement
25   with any testimony by Mr. Escobedo?

Exhibit 1                                    App. 13

**Page 50**

1  A.  Not that I can remember, no.
2  Q.  I want to transition now to a different
3 topic about some of the background communications with
4 Mr. Escobedo.  We were produced -- let me back up and
5 make this a little more logical.  In connection with
6 this case, did you provide all the emails or
7 communications you had with Mr. Escobedo to your lawyer?
8  A.  Yes.
9  Q.  Were those saved on your hard drive or
10 how ----
11  A.  Yes.  They are still on there.
12  Q.  Was it your practice to just keep all
13 those emails?
14  A.  Yes.
15  Q.  You had communications with Mr. Escobedo
16 by email?
17  A.  Mm-mh.
18  Q.  Is that a yes?
19  A.  Yes.
20  Q.  We need verbal responses so the reporter
21 can take it down.  That is normal, so I will try to
22 remind you.  Did you have any communications with
23 Mr. Escobedo by letter -- mail?
24  A.  On the odd occasion, yes.
25  Q.  Did you retain those?

**Page 51**

1  A.  Most of the time I would take copies of
2 the letters.
3  Q.  Did you provide those to your lawyer?
4  A.  Yes.
5  MR. ROSENHOUSE:  Objection -- privilege.
6  A.  Yes.
7  MR. LEE:  Are you asserting a privilege
8 as to whether he provided communications to you?  I want
9 to make sure I understand this.
10  Q.  I am not asking for communications
11 between you and your lawyer in terms of this suit.  I am
12 asking about if you have any communications or letters
13 from Mr. Escobedo: did you provide those to your lawyer?
14  A.  Oh, yes.
15  Q.  Then you also had communications with
16 Mr. Escobedo that were telephonic; is that right?
17  A.  Yes.
18  Q.  Do you know approximately how many
19 telephone conversations you had with Mr. Escobedo?
20  A.  Oh, no -- too many to remember.
21  Q.  That was going to be my next question.
22 It was quite a few?
23  A.  Yes.
24  Q.  Then you had some in-person
25 communications with Escobedo but that was probably just

**Page 52**

1 at the mediation?
2  A.  Yes.
3  Q.  Or before the mediation?
4  A.  Just before; we only had half an hour
5 because he was there with his wife and they had been out
6 shopping so I had seen him for half an hour before the
7 mediation.
8  Q.  Was that on the day of the mediation?
9  A.  Yes.
10  Q.  Did you have any in-person conversations
11 with Mr. Escobedo before the mediation?
12  A.  No.
13  Q.  If I asked you how many email
14 communications you had with Mr. Escobedo, it would be
15 lots; is that true?
16  A.  Yes.
17  Q.  I want to make sure I have addressed some
18 of these other people who communicated with you
19 regarding your claim.  One is a Robyn Bookhammer?
20  A.  Yes.
21  Q.  Was her name changed to Tydelski?
22  A.  Her name was Robyn Tydelski and then she
23 got married and became Robyn Bookhammer.
24  Q.  Who was Ms. Bookhammer?
25  A.  She was the case provider for my claim

**Page 53**

1 through the insurance company.
2  Q.  So she was an insurance company
3 representative or associated with the insurance company?
4  A.  Yes.
5  Q.  I have seen email communications that you
6 had with her.
7  A.  Yes.
8  Q.  Did you have any telephone conversations
9 with her?
10  A.  Oh, yes -- yes.
11  Q.  Then I saw a Donna Besch?
12  A.  Yes.
13  Q.  Who is Donna Besch?
14  A.  She is a senior nurse.  She is a director
15 of her own company.  She was the nurse in charge of any
16 of my needs that I had.
17  Q.  Would she co-ordinate, I guess, medical
18 appointments that you had?
19  A.  Yes, which was a bit difficult with her
20 being over in the States.
21  Q.  Were you friends, or are you friends with
22 Ms. Besch?
23  A.  No.  We were close, I suppose, in the way
24 that we could talk about the state of her garden or any
25 work she was getting done to the house, things like that

Exhibit 1                                    App. 14

## Page 54

1  -- just passing the time of day.
2       Q.    So you had personal communications with
3  Ms. Besch?
4       A.    Yes.  The same with Robyn Tydelski.
5       Q.    Did you speak with Ms. Besch by
6  telephone?
7       A.    Yes.
8       Q.    What I want to do on this question is
9  limit it to times after the amended compensation order
10 was issued by the Department of Labor.  Do you know what
11 I am talking about?
12      A.    Is that when the Department of Labor
13 decided that there could be a case to answer to?
14      Q.    Do you recall that at some point around
15 late 2013, after the mediation, that the Department of
16 Labor approved the settlement agreement?
17      A.    Yes.
18      Q.    We will look at it later, but I just
19 don't want to bog us down in it yet.  I want to use that
20 time when the Department of Labor approved the
21 settlement agreement ----
22      A.    Right.
23      Q.    ---- as the start time for my next
24 question.
25      A.    Right, okay.

## Page 55

1       Q.    Since the Department of Labor approved
2  that settlement agreement, have you had any
3  communications with Ms. Besch?
4       A.    Yes.
5       Q.    Have you had any communications with
6  Ms. Besch this year?
7       A.    No.
8       Q.    Do you know if you had any communications
9  with Ms. Besch last year in 2017?
10      A.    No.  The last time I spoke to Ms. Besch
11 was 2013.
12      Q.    I want to transition again to another
13 topic and briefly discuss your treatment.  Do you still
14 receive treatment from Dr. Fulton?
15      A.    No.  We do not know if he has retired or
16 whether he has got a serious illness that has kept him
17 off his work for quite a few months now.
18      Q.    When was the last time you saw
19 Dr. Fulton?
20      A.    It would have been maybe six or seven
21 months ago.
22      Q.    As I understand it, Dr. Fulton was your,
23 do you call it, general practitioner here?
24      A.    Yes.
25      Q.    You have seen him for quite a few years.

## Page 56

1       A.    Yes.
2       Q.    Did you start seeing him prior to the
3  incident?
4       A.    Yes.  I have seen him for about 20 years.
5       Q.    Is he the person, if you have any sort of
6  ailment, that you first go to?
7       A.    Yes, unless, of course, he is booked up
8  for the day and it is something that I need to see
9  someone about; then, I will get one of the other
10 practice doctors.
11      Q.    I see.  Who are you seeing now as
12 a general practitioner?
13      A.    It is Dr. Campbell.
14      Q.    What is Dr. Campbell's first name, if you
15 know?
16      A.    I have no idea.
17      Q.    Does he practice in the same office as
18 Dr. Fulton?
19      A.    Under the same practice, yes.
20      Q.    Did you see Dr. Fulton and do you see
21 Dr. Campbell under, I guess, is it, a national health
22 system?
23      A.    Yes.
24      Q.    Can you generally describe: how does that
25 work?  Do you just go in and sign something saying you

## Page 57

1  are a Scottish citizen?
2       A.    No.  You are already registered with your
3  national insurance number, and you are given that.  When
4  you are born you are given a medical card with your
5  medical number on it and that number is kept on your
6  records from the start of your life, basically.
7       Q.    I see.  So if you go in, do you provide
8  the medical provider with that medical number?
9       A.    No.  It is already down in your notes.
10 You phone up, make an appointment, you go down and you
11 go and see the doctor.  You do not sign anything.
12      Q.    When you saw Dr. Fulton or when you see
13 Dr. Campbell, is there any cost to you associated with
14 that?
15      A.    No.
16      Q.    Do you know if Dr. Fulton had any
17 specialties or specific certifications, like orthopaedic
18 certification?
19      A.    I believe he had orthopaedic
20 certification.
21      Q.    What is your belief based upon?
22      A.    He had a lot higher knowledge than, for
23 example, Dr. Campbell has.
24      Q.    Do you know whether Dr. Fulton held
25 himself out as an orthopaedic specialist?

Exhibit 1                                    App. 15

Page 58

1    A.    No.
2    Q.    When you had an orthopaedic problem,
3  would Dr. Fulton refer you to an orthopaedist?
4    A.    An orthopaedic surgeon, yes.
5    Q.    Who was that?
6    A.    It varied.  The first time it was
7  a Mr. Campbell and then there was a Mr. McKinley.  Who
8  is the next one?  The next one was New York -- Dr.
9  Tejwani.  Then it was back over to see Mr. McKinley, but
10  he passed me on to Professor Simpson, who is the
11  orthopaedic specialist.
12    Q.    You had mentioned a Dr. Campbell as an
13  orthopaedic specialist.  Is that different than the
14  Dr. Campbell who is the general practitioner that you
15  see now?
16    A.    Yes.  There are two Dr. Campbells; that
17  is in my notes.  One is orthopaedics; he is in the local
18  hospital.
19    Q.    Okay.  Who is the last orthopaedic
20  surgeon or specialist that you have seen?
21    A.    Mr. McKinley.
22    Q.    When did you last see him?
23    A.    It would be about eight months ago.
24    Q.    What was the purpose of that visit?
25    A.    I had been referred from Dr. Fulton to go

Page 59

1  up and see him because he was not happy that there is
2  still something wrong with the foot, so he had referred
3  me back up to get x-rays and get his opinion.
4    Q.    Let us address that topic briefly right
5  now.  You are still wearing the boots.
6    A.    Yes.
7    Q.    Has the condition of your feet changed
8  since 2013?
9    A.    Not really, no.  There is still
10  a non-fusion in the left foot.  There are two screws
11  that are holding the foot steady just now, but he said
12  they will not last for much longer.  But there is still
13  a gap between the bones, so there is a non-fusion, as
14  they call it, in the left foot.
15    Q.    When you travelled to New York for
16  treatment, were you in a wheelchair when you travelled?
17    A.    Yes.
18    Q.    I understand at some point that you were
19  diagnosed with high blood pressure?
20    A.    Yes.
21    Q.    When was that?
22    A.    That was between the time of the accident
23  happening and when I first went to the hospital to get
24  my pre-op assessment done.  That is when I found out
25  I had high blood pressure, so the first surgery was

Page 60

1  cancelled because of it.
2    Q.    Do you know what year that surgery was
3  cancelled?
4    A.    That would have been 2006.
5    Q.    Have you been diagnosed with arthritis?
6    A.    Not diagnosed with it, no.
7    Q.    Are you aware of any physician saying
8  that you have arthritis?
9    A.    I have heard one of them saying that it
10  might be arthritis that is in my back, but not in my
11  foot.
12    Q.    Who was the physician that said you might
13  have arthritis in your back?
14    A.    That was Dr. Campbell.
15    Q.    Do you remember what year Dr. Campbell
16  made that statement?
17    A.    That was only last year, because I still
18  have a lot of problems with my lower back.
19    Q.    To this day, are you still having back
20  problems?
21    A.    Yes.
22    Q.    Have you ever had a back surgery?
23    A.    Yes.
24    Q.    What year was that?
25    A.    That would have been 2011, I believe.

Page 61

1    Q.    You also had neck surgery; is that right?
2    A.    Yes.  That was a year before.
3    Q.    In 2010?
4    A.    Yes.
5    Q.    Have you had any other surgeries to your
6  back or neck other than those that we have discussed
7  just now?
8    A.    No.
9    Q.    Have you received any opinions from
10  anybody that you need to have a future back or neck
11  surgery?
12    A.    The surgeon that did the back and the
13  neck -- Mr. Gibson -- said that I may need further
14  surgery in the lower back.  The neck is in a cage now so
15  it supposedly cannot get any worse.
16    Q.    Is Dr. Gibson an orthopaedic surgeon as
17  well?
18    A.    Yes.
19    Q.    When have you last seen Dr. Gibson?
20    A.    It has been about two years now since
21  I saw him.
22    Q.    Are you still having neck or back
23  problems?
24    A.    Yes.  I am still having back problems.
25    Q.    If you can, generally describe the

Exhibit 1                                    App. 16

Page 62

1  problems you are having in your back and neck?
2       A.    It is if I sit in one position for too
3  long I get like a dull pain that goes through the base
4  of my back; just moving my hips very slightly one way or
5  another does the same.  If I try to lie flat, like if
6  I go for an MRI scan, which I do quite regularly,
7  I cannot lie on the flat bed because the back is too
8  straight, so they have to prop it up with pillows to get
9  me in there.
10      Q.    It sounds like you still use crutches
11 sometimes; is that right?
12      A.    Yes.
13      Q.    How frequently or what kind of duration
14 during a day do you use crutches?
15      A.    It is a very small amount.  You could be
16 talking, maybe if it is in the house, maybe a total of
17 30 or 40 metres a day.
18      Q.    Have you received in the past
19 a suggestion from your health care providers to limit
20 your use of crutches?
21      A.    Yes.
22      Q.    Do you try to do that?
23      A.    Yes.  That is why they gave me the
24 wheelchair, because I was not keen on going in the
25 wheelchair.  I thought, well, that is a sign you are

Page 63

1  getting worse instead of getting better, which they did
2  say, "Well, you are getting worse", and that is why they
3  put a wet-room in the house so that I can get wheeled in
4  on a waterproof chair into the shower.  I have had the
5  doors widened so I can get the wheelchair in.  I have
6  a track and hoist to go up three stairs at the end of
7  the hall.
8       Q.    So you have a hoist for the stairs now?
9       A.    Yes.
10      Q.    Can you get throughout your house now?
11      A.    Yes.
12      Q.    When was that work done?  You mentioned
13 some work -- the widening of doors and the hoist; when
14 was that done?
15      A.    That was only done maybe six years ago --
16 six or seven years ago.
17      Q.    Did you pay for that or was that paid for
18 by somebody else?
19      A.    No.  It was paid by the local council --
20 what are they called?
21      Q.    I do not need a name.  I am not going to
22 press you on that.  I know we will get to this later,
23 but there was a certain amount of money -- I think
24 $50,000 -- for home improvements.
25      A.    Yes.

Page 64

1       Q.    Do you know what I am talking about?
2       A.    Yes.
3       Q.    We will talk about that a little bit
4  later but right now I am trying to understand: did you
5  use any of that $50,000 to modify the house?
6       A.    Yes.  We used that to put a sun-room on
7  the back of the house so that I could get round and out
8  of the doors on to the flat patio at the back, because
9  when I was going through the kitchen there was a big lip
10 at the door.  What Robyn Tydelski was wanting me to do
11 was get rid of the three stairs at the end of the hall
12 and put a ramp in, but, between the three stairs and the
13 cupboard door, there is only like about a metre, or
14 a metre and a half, so to try to fit to ramp in there
15 for a wheelchair was just impossible.
16      Q.    The sun-room was an alternate for you to
17 get to another portion of the house?
18      A.    It was so that I could get out of the
19 house in a wheelchair.
20      Q.    Did you use all $50,000 for that
21 modification to the house?
22      A.    Yes, because the doors had to get widened
23 at that end of the house as well.
24      Q.    Did that modification with the sun-room
25 exceed $50 ,000 in cost?

Page 65

1       A.    No.
2       Q.    I saw at least a reference in some
3  medical records some time ago about a potential
4  amputation, or at least raising the issue of amputation.
5  Do you remember that?
6       A.    Yes.
7       Q.    Was there any further discussion or
8  assessment of whether amputation would be helpful to you
9  or not?
10      A.    Well, it was mentioned to AIG's own
11 doctor that they had -- Dr. Richmond.  He came over to
12 Scotland to examine my feet one time.  That was before
13 I went to New York for the surgery.  It was him that
14 mentioned amputation.  He said, "If you were my patient,
15 this is the first thing I would have thought about.
16 Because of what it is, it would have been amputation".
17      Q.    Did he say why?
18      A.    Just in case there were any further
19 problems.  I had just had my second surgery, I believe,
20 before he came over, which had failed.  He was told it
21 had failed; he had seen the x-rays.  So he said, "Well,
22 because of that, if you are going to have future
23 complications, amputation would certainly be a subject
24 we would have to broach".
25      Q.    Was it ever discussed again, to your

Exhibit 1                                                App. 17

## Page 66

```
1  knowledge?
2       A.    No.
3       Q.    Was his thought process -- or did he
4  mention to you -- that it would improve your mobility?
5       A.    It would improve my mobility, but it
6  would not get rid of my pain.  Don't ask me why he came
7  to that conclusion; I have no idea.  It was something
8  about phantom pains that you get.
9       Q.    I am not going to tie you to a specific
10 week or month, but, generally now, how frequently do you
11 get out of the house?  I am not talking about just to
12 your pavement outside the house but do you actually
13 travel somewhere?
14      A.    Maybe two or three times a week, as the
15 wife forces me to get into the car and we will just
16 drive somewhere.  You know, if she is going to the
17 shops, she will take me with her.  If she is going to
18 take the dogs for a walk up the hills, she will take me
19 with her, but all I can do is sit in the car.  At least
20 I am getting out and seeing different things; I am not
21 festering in the house just sitting watching TV in the
22 dark.
23      Q.    When you go to, for instance, a visit to
24 your doctor, do you take the crutches from your car to
25 the doctor's office, or do you get out of the car with
```

## Page 67

```
1  your crutches and transfer to a wheelchair?
2       A.    Yes; wheelchair, yes.  We have the
3  wheelchair in the back of the car wherever we go.
4       Q.    There is a reference to a Disneyland
5  trip.  I think that was prior to the settlement of the
6  claim; is that right?
7       A.    Yes.
8       Q.    When I am referring to "the claim", I am
9  talking about the claim before the Department of Labor;
10 do you understand that?
11      A.    Oh, right, no.  It was not before the
12 claim to the Department of Labor, no; it was after that.
13      Q.    Let me just make sure as I may not have
14 been clear.  You had a claim before the Department of
15 Labor and that claim settled and was approved by the
16 Department of Labor in 2013; right?
17      A.    Right.
18      Q.    So was the Disneyland trip before that
19 approval?
20      A.    Yes; it was before that, yes.
21      Q.    That wasn't Disneyland in Anaheim,
22 California; was that Disneyland, Paris?
23      A.    Paris, yes.
24      Q.    How many days was that?
25      A.    We were only there for four days.
```

## Page 68

```
1       Q.    Did you yourself go to Disneyland?
2       A.    Yes; I was there.
3       Q.    You were not riding rides?
4       A.    Oh, no.
5       Q.    But you were inside the park?
6       A.    Yes.
7       Q.    You went with your family?
8       A.    Yes.
9       Q.    Were you using a wheelchair at that time?
10      A.    Yes.
11      Q.    Did you travel to Paris by plane or
12 train?
13      A.    Yes, by plane.
14      Q.    Have you been out of Scotland since that
15 time?
16      A.    No.
17      Q.    You live in the vicinity of Edinburgh; is
18 that right?
19      A.    Yes.
20      Q.    I may not be pronouncing it right, but
21 I am doing my best.  In what county or province are we
22 in now?
23      A.    We are in Midlothian.
24      Q.    Have you been outside of this county or
25 province since your settlement of the DoL claim?
```

## Page 69

```
1       A.    I have been in West Lothian, but that is
2  just another 30 miles to the west.
3       Q.    What was the purpose of that trip?
4       A.    My daughter's boyfriend stays through
5  there.
6       Q.    Did you just go there one time?
7       A.    No; we have been through several times.
8       Q.    Is that by car with your wife driving?
9       A.    Yes.
10      Q.    Have you been outside of west, or are we
11 in, did you say, Midlothian?
12      A.    We are in Midlothian, yes.  I stay in
13 East Lothian, which is only 18 miles away.
14      Q.    Let me expand it beyond the Lothians.
15 Have you been outside the Lothian areas since the
16 settlement of your Department of Labor claim?
17      A.    No.
18      Q.    I saw some reference that leading up to
19 the mediation you visited, or spoke with at least,
20 a couple of psychologists; is that right?
21      A.    Yes.
22      Q.    One of whom her name is Simpson,
23 I believe?
24      A.    Yes.
25      Q.    I am sorry, but I don't remember the
```

Exhibit 1                    App. 18

Page 70

1  other one off the top of my head.  Do you know the name
2  of the other one?  Was it somebody in the States?
3       A.     It was somebody in the States.  It was
4  two females.
5       Q.     Outside of these two sets of
6  psychologist, prior to mediation, had you seen or talked
7  to any other psychologist?
8       A.     Prior to?  I think there was one
9  psychiatrist I had seen before that.
10      Q.     Do you know the name or where that person
11 practised?
12      A.     It was in her flat she practised and it
13 was a Sally -- I cannot remember her surname.
14      Q.     That's okay.  We can identify her as
15 Sally.
16      A.     Yes.
17      Q.     You believe she is a psychiatrist?
18      A.     Yes.
19      Q.     Was she here in Edinburgh?
20      A.     No, in Haddington.
21      Q.     Where you live?
22      A.     Yes.
23      Q.     Do you know when approximately you met
24 with or visited the psychiatrist named Sally?
25      A.     I cannot really remember, no.

Page 71

1       Q.     But this was before the mediation?
2       A.     I think it could have been before or it
3  was just after -- one or the other.
4       Q.     What was purpose of visiting psychiatrist
5  Sally?
6       A.     Dr. Fulton had referred me up there
7  because he thought I had post-traumatic stress disorder.
8       Q.     Did Dr. Fulton diagnose you with
9  post-traumatic stress disorder?
10      A.     He thought that is what it was; that is
11 yes sent me up to see her.
12      Q.     Approximately when did he say or assess
13 that he believed you had post-traumatic stress disorder?
14      A.     It was just one time that I went in to
15 see him and he did not think I was looking my usual self
16 and he gave me this simple sheet of paper with about 20
17 questions on it and just said "Answer them quickly".  It
18 was a multiple choice, so I answered them and he scored
19 it and said I need to make an appointment to go to see
20 Sally Wray; that was her name.  So I went up to see her
21 and she tried all sorts of different things to get into
22 my mind, but she said there was nothing there.
23      Q.     I am just going to ask you some questions
24 about that.  You visited her, you believe it was around
25 the time of mediation -- maybe before, maybe after?

Page 72

1       A.     Yes, it was round about that time.
2       Q.     You visited the psychiatrist -- this was
3  in person?
4       A.     Yes.
5       Q.     How many times?
6       A.     It would have been eight or nine times.
7       Q.     Did you believe this was all in 2013?
8       A.     Yes.
9       Q.     It sounds like you engaged in some
10 counselling with her?
11      A.     Yes.
12      Q.     Did she prescribe any medications?
13      A.     No.
14      Q.     Did she not think it was helpful or did
15 you not think it was helpful?
16      A.     She thought it was helpful; I didn't
17 really think it was very helpful.
18      Q.     And so you decided to just not go back?
19      A.     No.  She just said that she had taken it
20 as far as she could go.  She recommended to Dr. Fulton
21 that I should go and see a different psychiatrist, that
22 I should be put on medication for it, but she was not in
23 a position to prescribe medication.
24      Q.     Did you see any other psychologist or
25 psychiatrist after seeing the psychiatrist Sally Wray?

Page 73

1       A.     Yes.
2       Q.     Who was that?
3       A.     It was Dr. Campbell.
4       Q.     Is this a different Dr. Campbell?
5       A.     No, I am sorry -- what was the name of
6  the other doctor I said?
7       Q.     Don't ask your lawyer anything.
8       A.     I'm sorry -- I didn't know was.
9       Q.     That's alright.  If you don't remember
10 his name, that is fine.  How many times did you see him?
11      A.     I see him once every three or four
12 months.
13      Q.     Okay, so this is ongoing?
14      A.     Yes.
15      Q.     Does he prescribe medication to you?
16      A.     Yes.
17      Q.     What medication is that?
18      A.     He started off with amitriptyline.
19      Q.     Say that again?
20      A.     He started off with amitriptyline.
21      Q.     Is it something else now?
22      A.     Yes.  It is duloxetine.
23      Q.     How often do you take that?
24      A.     Every day.
25      Q.     Is that for anxiety?

Exhibit 1                                    App. 19

Page 74

1    A.    It is for depression.
2    Q.    When do you take that -- morning or
3 evening?
4    A.    Morning.
5    Q.    Did you take one this morning?
6    A.    I took three this morning.
7    Q.    Is that typical?
8    A.    Yes.  I take three every day; that is
9 what is prescribed.
10    Q.    I want to circle back to the Simpson who
11 was a psychologist.  Did you see her just once?
12    A.    Yes.
13    Q.    And the purpose of that: did you have
14 communications with George Escobedo about developing
15 reports to use at mediation?    A.    No.  I was told that I had to go and see
16                                       her.
17 her.
18    Q.    By whom?  Who told you?
19    A.    Sally Wray mentioned that it would be
20 beneficial for me to go and see this Mrs. Simpson.
21    Q.    So that was Sally Wray who referred you
22 to Simpson?
23    A.    Yes.
24    Q.    I see.  How many times did you see
25 Simpson; was it once?

Page 75

1    A.    Once, yes.
2    Q.    You received a report.  The Simpson
3 psychologist provided that to George Escobedo; is that
4 right?
5    A.    Yes.
6    Q.    Then you spoke with a psychologist who
7 was located in the States prior to mediation?
8    A.    Yes.
9    Q.    Did you understand that the purpose of
10 that was to develop a report for use at mediation?
11    A.    Yes, I believe so.
12    Q.    The purpose of the reports was to show
13 that you could not work; is that right?
14    A.    Yes.
15    Q.    The person you spoke with in the States,
16 was that one person?
17    A.    There were two.  I spoke to one first and
18 later on had to phone back and speak to the other one.
19    Q.    Okay.  So were these two both females?
20    A.    Yes.
21    Q.    As to these two female psychologists that
22 you had spoken with in the States, did you speak to each
23 one once?
24    A.    Yes.
25    Q.    Then the report was generated.

Page 76

1    A.    Yes.
2    Q.    You never met with them in person.
3    A.    No.
4    Q.    There is a Dr. Eddie Davis; does that
5 name sound familiar to you?
6    A.    Yes.
7    Q.    He was a foot doctor; is that right?
8    A.    Yes.
9    Q.    Did you understand he is also located in
10 the States?
11    A.    Yes.
12    Q.    He was somebody who George Escobedo had
13 identified to use as an expert; is that right?
14    A.    Yes.
15    Q.    The purpose of Dr. Davis's retention and
16 developing a report was for use at mediation; is that
17 right?
18    A.    Yes.
19    Q.    To strengthen your negotiating position
20 at mediation?
21    A.    Yes.
22    Q.    You never met with Dr. Davis?
23    A.    No.
24    Q.    Did you ever speak with Dr. Davis?
25    A.    No.

Page 77

1    Q.    So Dr. Davis's report was based on
2 medical records; was that your understanding?
3    A.    Yes.
4    Q.    Have you ever received any further
5 treatment from the two psychologists in the States or
6 Dr. Davis in the States?
7    A.    No.
8    Q.    I may have asked you this already, but
9 did you ever see a physician or medical provider for
10 back or neck injury or pain prior to your injury to your
11 left foot?
12    A.    Prior to it, no.
13    Q.    We already spoke about, generally, who
14 you saw for back and neck pain after the date of the
15 incident; right?
16    A.    Yes -- Mr. Gibson.
17         (Break 10.45 - 10.55)
18    Q.    I am not going to go through all your
19 medical treatment.  We've got medical records from you.
20 I want to talk more generally about your claim before
21 the Department of Labor.  You understood at some point
22 during the pendency of your claim that the duration of
23 the compensation that you would receive would depend on
24 whether your back and neck was injured; is that right?
25    A.    Yes.

Exhibit 1                                    App. 20

Page 78

1    Q.    And if it was only a foot injury, the
2    compensation would last for a shorter time than if there
3    was a finding that you were permanently disabled due to
4    a back or neck injury; is that correct?
5                MR. ROSENHOUSE:  Objection -- legal
6    conclusion.
7        A.    No.  It was put to me that it was always
8    going to be the age I was at taken up to the age of 82,
9    I believe it was.  So it was like 34 years as what it
10   started off as, and then somehow it went from there to
11   28 years and then, when I finally got the pension
12   review, it was down to 25 years.
13   BY MR. LEE:
14       Q.    When you are talking about the pension,
15   is that the annuity?
16       A.    Yes.
17       Q.    I want to talk about the basis first for
18   the determination.  Did you understand that there was
19   a possibility of a finding that you were not totally and
20   permanently disabled?
21       A.    No.
22       Q.    Your understanding was that that was not
23   even an issue; is that right?
24       A.    Yes.
25       Q.    That you were totally and permanently

Page 79

1    disabled and that there is no contention by the carrier
2    that it would be anything less than total and permanent
3    disability through a date far into the future?
4        A.    Yes.
5        Q.    Did you ever see anything or become
6    apprised of any arguments by the carrier that your
7    work-related injury was limited to your foot?
8        A.    I had seen an email.  Robyn was always
9    saying on the phone that she was trying her best to get
10   me covered for the right foot, the neck and the lower
11   back.  Eventually she game back and sent an email out to
12   everybody that all body parts were covered.  So it was
13   made clear to everyone that that is what they had to
14   work on, so get on with it and get things sorted out.
15       Q.    So prior to the day of that email -- the
16   "all body parts covered" email is what I will call it --
17   was there a dispute or question as to whether all body
18   parts were covered?
19       A.    The company did not want to pay out on
20   everything but Robyn Tydelski said in her opinion it
21   should be covered -- everything should be covered --
22   under it.
23       Q.    And with "everything", you are talking
24   about the back and the neck, not just one or two feet?
25       A.    Two feet.

Page 80

1        Q.    Okay.  So I will re-phrase the question.
2    When you said "everything", you were talking about the
3    back and the neck in addition to the feet?
4        A.    And the feet, yes.
5        Q.    At some point, was there a question as to
6    whether only the feet were covered as opposed to the
7    feet, the neck and the back?
8        A.    I remember seeing an email from her
9    attorney that he was not happy about the situation and
10   he was wanting to get it changed.  Whether he did or
11   not, I have no idea.
12       Q.    Outside of that email from the carrier's
13   lawyer, are you aware of any discussion or issue as to
14   whether the back and neck would be covered?
15       A.    No.
16       Q.    So as far as you were concerned and
17   understood, all body parts were covered.
18       A.    Yes.
19       Q.    And you had that understanding in 2013?
20       A.    Yes.
21       Q.    In 2012?
22       A.    Yes.
23       Q.    And 2011?
24       A.    Yes.
25       Q.    You felt that, under the law, you should

Page 81

1    be receiving compensation for all body parts.
2        A.    Well, the law over here would have stood
3    as that, but the law over in the States is totally
4    different.
5        Q.    Did you have an understanding as to what
6    kind of compensation you should receive if all body
7    parts were covered?
8        A.    No, I did not have any idea of any values
9    to put on to it.
10   (Exhibit 3 was marked for identification)
11       Q.    I have just handed you exhibit 3.  Before
12   we address exhibit 3, let me just ask some background
13   questions.  At the top of exhibit 3 it says, "from:
14   "George P. Escobedo", and that is the defendant, who was
15   your lawyer in connection with the Department of Labor
16   claim; is that right?
17       A.    Yes.
18       Q.    It shows his email address as
19   "gescobedo@carabinshaw.com".
20       A.    Yes.
21       Q.    Is that the address at which you
22   communicated with George Escobedo?
23       A.    Yes.
24       Q.    Did you communicate with Mr. Escobedo
25   through any other email addresses?

Exhibit 1                              App. 21

---

**Page 82**

1   A.   No.

2   Q.   Then the "To" is "Robert Rollo" and in
3  parentheses it says "bobrollo65@yahoo.co.uk". Is that
4  the email address you used to communicate with others?

5   A.   Yes.

6   Q.   Is that an email address that you
7  control?

8   A.   Yes.

9   Q.   Does anybody else control that email
10  address?

11   A.   No.

12   Q.   All right. There is going to be a number
13  of exhibits that have email strings but if you look
14  through this exhibit, if you go to the second to the
15  last page, it looks like it starts from Robyn Tydelski;
16  do you see that?

17   A.   Yes.

18   Q.   Is that the same Robyn Tydelski or
19  Bookhammer that we talked about earlier today?

20   A.   Yes.

21   Q.   Her email address looks like
22  "Robyn.Tydelski@chartisinsurance.com". Is that the
23  email address through which you communicated with
24  Ms. Bookhammer?

25   A.   Yes.

---

**Page 83**

1   Q.   Would you often -- is it your practice --
2  if you have an email forward it or respond to somebody
3  else and so it develops into a string?

4   A.   Yes.

5   Q.   Let us go back to the front of the
6  exhibit again. Is exhibit 3 a true and correct copy of
7  an email string that you had with George Escobedo, and
8  it began with Ms. Tydelski?

9   A.   Yes.

10   Q.   The first full line there of the email on
11  the first page from Mr. Escobedo to you states:
12  "A settlement has 2 parts: 1. Loss of wages/earning
13  capacity and 2. Cost of present and future medical
14  costs." It continues from there, but did I read that
15  portion correctly?

16   A.   Yes.

17   Q.   So is this an email where in 2011
18  Mr. Escobedo was telling you about how a settlement of
19  a Department of Labor claim works?

20   A.   Yes.

21   Q.   He is telling you there are two parts to
22  it; right?

23   A.   Yes.

24   Q.   One is lost wages or loss of earning
25  capacity and the second is all medical costs?

---

**Page 84**

1   A.   Yes.

2   Q.   If we go down to the fourth line it
3  states: "The amount mentioned covers for the lost wages
4  ASSUMING you will never be able to earn an income, thus
5  work, again." Did I read that sentence correctly?

6   A.   Yes.

7   Q.   So you understood, at least by 2011, that
8  your compensation under a Department of Labor claim
9  depended on whether you would be able to work again; is
10  that right?

11   A.   Yes.

12   Q.   Is it fair to say that in 2011 you did
13  not believe you would ever work again?

14   A.   Yes.

15   Q.   The same was true in 2013; is that right?

16   A.   Yes.

17   Q.   Was that based upon the aggregate of the
18  injuries that you had?

19   A.   Yes.

20   Q.   Between your feet, your back and your
21  neck, you did not think you would ever work again?

22   A.   Yes.

23   Q.   In the same exhibit, sir, turn the page.
24  You will notice at the very bottom of that page there is
25  a stamp RR 0027502. I will just represent to you that

---

**Page 85**

1  that is what we call a Bates label and that is for our
2  purposes so that we can easily identify a document.

3   A.   Right, okay.

4   Q.   On this page that I just referenced, that
5  is an email from Mr. Escobedo to you, again in 2011; is
6  that right?

7   A.   Yes.

8   Q.   He is talking about the carrier is
9  assigning settlement of value; is that true?

10   A.   Where are you?

11   Q.   If you go down to see the line that
12  starts with "Bob"?

13   A.   Yes.

14   Q.   Go two paragraphs below that, "Regarding
15  a settlement..." He is talking about settlement, and
16  I do not want to read the whole thing, but he identifies
17  future medical costs, again loss of earning of wages or
18  earning capacity; is that right?

19   A.   Yes.

20   Q.   So under that item number 2, were you
21  receiving at that time $1047 per week?

22   A.   Yes.

23   Q.   You had been receiving that since 2005;
24  is that true?

25   A.   Yes.

---

Exhibit 1                                    App. 22

Page 86

1    Q.    He says: "If I multiply that times 34
2    years (assuming you're going to live to 80 years old)
3    then that equals: $55,000 per year x 34 years = $1.9
4    million Future Value." Did I read that correctly?
5        A.    Yes.
6        Q.    The paragraph continues: "Discounting
7    that amount to the present equals $695,485. So this is
8    roughly the amount they should pay you which is the
9    present value of 1.9 million." Did I read that
10   correctly?
11       A.    Yes.
12       Q.    So at least by 2011 there was some
13   discussion of future value and present value; is that
14   right?
15       A.    Yes.
16       Q.    In fact, at the bottom of that page there
17   is a present value calculator; do you see that ----
18       A.    Yes.
19       Q.    ---- and how that is calculated? Have
20   you ever run a present value calculation yourself?
21       A.    No.
22       Q.    So in discussions with present value,
23   were you relying on Mr. Escobedo in his discussion with
24   you about what future value and present value is?
25       A.    Yes.

Page 87

1        Q.    At the time that you settled your claim,
2    you had a general understanding that future value is
3    just adding up all the amounts that were going to be
4    paid over time; is that right?
5        A.    Yes.
6        Q.    Then present value is a lesser amount of
7    that?
8        A.    Yes.
9        Q.    The specifics as to the discount rate or
10   the interest rate, that is not something you have
11   a specialty in; right?
12       A.    Yes.
13       Q.    But you understand that there is some
14   mathematics that goes into it, because money today is
15   worth more than money in the future.
16       A.    Yes. It was never clear then; it is
17   still not clear.
18       Q.    Did you have an understanding in 2013
19   that money given to you at that time was worth more than
20   money given to you 20 years into the future?
21       A.    No. I mean, if I had been given the
22   whole amount at the time of the mediation, then I could
23   see how that would be worth more by the end of the 34
24   years.
25       Q.    Okay, so you understand generally the

Page 88

1    concept of investing, that money should gain value over
2    time?
3        A.    Yes.
4        Q.    Just taking it to a very simple level, at
5    the time of mediation if somebody offered you $100,000
6    that day or $100,000 20 years in the future, you would
7    want it today.
8        A.    Yes.
9        Q.    I think that is all we have for exhibit
10   3. You can set it aside. Just so you know, at the end
11   of the day, the court reporter is going to collect up
12   all these exhibits, so we need to keep them together and
13   not mingle them with other documents.
14       A.    Okay.
15   (Exhibit 4 was marked for identification)
16       Q.    I have handed you exhibit 4. Again, is
17   this an email string between you and Mr. Escobedo on
18   November 24, 2010?
19       A.    Yes.
20       Q.    On the top of the document is an email
21   from you to Mr. Escobedo. It concludes with your
22   signature, or electronic signature, "Robert Rollo". Do
23   you see that?
24       A.    Yes.
25       Q.    Is that automatically included in your

Page 89

1    email or do you type that in?
2        A.    No, I type that in.
3        Q.    Do you commonly do that in your emails?
4        A.    Yes.
5        Q.    If you will go to the second page, or the
6    back page of the document, which has a couple of Bates
7    labels, and I will use the one on the right -- RR
8    0025289 -- if you look at the first full paragraph of
9    that side of the exhibit, do you see where it says "At
10   some point"?
11       A.    Yes.
12       Q.    If you go down to the third line, the
13   sentence starting, "Regarding the findings of the MRIs,
14   a lot of it is degenerative in nature, meaning you had
15   it before the work injury and it's age-related, however,
16   we'd have to prove it use the use of the crutches that
17   SOMEHOW aggravated or exacerbated the age-related
18   conditions or discreetly caused the disc
19   protrusions/herniations." Did I read that correctly?
20       A.    Yes.
21       Q.    So is this, in this discussion, George
22   conveying to you about how to strategy-in including the
23   back and neck injury in with the foot injury; is that
24   right?
25       A.    Yes.

Exhibit 1                                    App. 23

Page 90

1    Q.    The strategy was to receive compensation
2  for the back and the neck, not just the foot; is that
3  right?
4    A.    Yes.
5    Q.    If you will go to the front page of the
6  document, sir, do you see about a third of the way down
7  the paragraph starting with "I didn't like"?
8    A.    Yes.
9    Q.    If you go down to the third from the
10  bottom line, there is a reference to "impressive
11  arthritis". Do you see that?
12    A.    Yes.
13    Q.    I am just going to try to find out from
14  you -- but it looks like -- was Dr. Tejwani in New York
15  the one who referenced "impressive arthritis"?
16    A.    He must have been yes.
17    Q.    Feel free to review that paragraph. I am
18  just trying to understand who said that, if you
19  remember.
20    A.    Yes, because he was the one who mentioned
21  the prescription for support bracing for the right foot
22  because it was showing "impressive arthritis", yes, that
23  is correct.
24    Q.    Do you remember anything else about what
25  Dr. Tejwani said or any other discussions about

Page 91

1  arthritis in the right foot?
2    A.    Just that it had to be supported before
3  something seriously went wrong with it, which it did
4  eventually.
5    Q.    Ultimately, as I understand it, you had
6  how many surgeries on the right foot?
7    A.    Just one on the right foot.
8    Q.    Are you still having problems with your
9  right foot today?
10    A.    Yes.
11    Q.    Are the problems you are having with your
12  right foot similar to the problems you are having with
13  your left one?
14    A.    Yes.
15    Q.    That is all we need for exhibit 4. You
16  can set that one aside.
17    (Exhibit 5 was marked for identification)
18    Q.    I am handing you exhibit 5. You may or
19  may not have seen this, sir. This is a record entry in
20  a file from Mr. Escobedo. I am going to ask you
21  a couple of questions, but the first one is generally do
22  you recognise seeing a form like this before?
23    A.    No.
24    Q.    The second question I am going to ask you
25  is, do you see the bottom paragraph, it states:  "On

Page 92

1  your numbers, the only thing you have to do is get
2  a present value of the future value."
3    A.    Yes.
4    Q.    Did I read that correctly?
5    A.    Yes.
6    Q.    We looked at earlier about an email about
7  present value and future value that you had with
8  Mr. Escobedo. Were there also telephone discussions you
9  had with Mr. Escobedo where he discussed what present
10  value and future value is?
11    A.    Yes.
12    Q.    How many discussions, approximately, do
13  you believe you had where present value and future value
14  were discussed?
15    A.    We must have had about three.
16    Q.    This was before mediation?
17    A.    Yes.
18    Q.    He further says, and the grammar is not
19  quite right: "You numbers talk about how much you would
20  get over the course of the rest of your life... and
21  that's why one has to convert the future value of that
22  number into a present value." Did I read that
23  correctly?
24    A.    Yes.
25    Q.    Do you believe that you had that

Page 93

1  discussion with Mr. Escobedo where he said that you
2  cannot just take the future value, you have to convert
3  that to a present value to really see how much money
4  that is?
5    A.    Yes. He tried to explain it, but I still
6  did not understand it.
7    Q.    Did you ask follow-up questions with
8  Mr. Escobedo?
9    A.    Yes.
10    Q.    Did he have further discussions with you
11  about future value and present value?
12    A.    Yes.
13    Q.    As you sit here today, do you understand
14  future value and present value?
15    A.    No.
16    Q.    What is your understanding today as to
17  what present value is?
18    A.    I have no clue. To me, if you are given
19  an amount and it is worked over, like it was worked
20  over, 34 years, if you get that amount now, then how can
21  the present value be less than what you would get for
22  the full value?
23    Q.    That is the question you have in your
24  mind?
25    A.    Yes.

Exhibit 1                              App. 24

1    Q.    On a fundamental level, though, you
2  understand that you could receive some payment now and
3  there can be some portion of the payment that is paid
4  over time.
5    A.    Yes.
6    Q.    That is what happened in the settlement;
7  is that right?
8    A.    Yes. Basically, yes.
9    Q.    Prior to the settlement, you had had
10 a mortgage on your house; right?
11   A.    Yes.
12   Q.    Have you ever had a car loan before?
13   A.    No. It was only mortgage.
14   Q.    So you had a mortgage and you did not pay
15 your mortgage back all at once, right?
16   A.    Yes, we did.
17   Q.    When you bought your house?
18   A.    Yes.
19   Q.    You signed papers for a loan?
20   A.    Yes.
21   Q.    Did you understand that the mortgage
22 company or lender paid the seller who you bought the
23 house from whatever the price of the loan was?
24   A.    Yes.
25   Q.    You did not pay your mortgage back all at

1  once?
2    A.    No, we paid 99% of it back. We left one
3  payment to come off, so that we did not get the full --
4  I think it was 25 years that was still left on the end
5  of 20 years, that was still left on the mortgage, that
6  you would have to pay interest on that if you paid it
7  all off at once.
8    Q.    Okay. What year did you get the
9  mortgage?
10   A.    We got the mortgage in, it would be,
11 2004/2005 -- round about there.
12   Q.    When you started paying the lender or the
13 mortgage company, however it works, were you paying
14 monthly payments?
15   A.    Yes.
16   Q.    So there is a certain amount you paid
17 each month?
18   A.    Yes.
19   Q.    And you would write the cheque and send
20 it in?
21   A.    It came off direct debit.
22   Q.    Electronic, okay. So you electronically
23 paid each month.
24   A.    Yes.
25   Q.    Over a number of years?

1    A.    Yes.
2    Q.    And then at some point it sounds like you
3  pretty much paid off your mortgage?
4    A.    Yes.
5    Q.    And you paid it off early.
6    A.    Yes.
7    Q.    But up to that point you had been making
8  monthly payments?
9    A.    Yes.
10   Q.    Was there interest on top of the
11 principal amount that you borrowed?
12   A.    Yes.
13   Q.    So you understand that over time you paid
14 back more than was lent to you?
15   A.    Mm-mh.
16   Q.    Is that a yes?
17   A.    Yes.
18   Q.    You do not have to hold that exhibit any
19 more, thank you. Going back to the foot versus the back
20 and the neck, you understood or you believed that your
21 back and your neck pain was caused by your foot injury?
22   A.    Yes -- well, not caused by, but
23 aggravated by the foot injury.
24   Q.    How do you see a difference there? What
25 is your understanding of the difference between "cause"

1  and "aggravation"?
2    A.    I had not had any back or neck issues
3  before, but when Dr. Richmond explained it, he said
4  because you are putting all your weight through your
5  elbow crutches, basically your gait that you walk with
6  is causing your lower back to get aggravated and because
7  you are stooping over your neck is also getting
8  aggravated by trying to keep it up. In his opinion, as
9  long as I was using elbow crutches, I was always going
10 to have that problem, until I came off the elbow
11 crutches, at which he said it should clear up, but there
12 was no guarantee.
13   Q.    Did he say, from a bone or tissue
14 perspective, did he get into the details about how or
15 what stooping over is doing to the specific vertebrae in
16 your neck or the muscles?
17   A.    No.
18   Q.    He recommended that you limit your use of
19 crutches; is that right?
20   A.    Yes, that is right.
21   Q.    Did you do that after his recommendation?
22   A.    Yes.
23   Q.    Did your symptoms improve at all when you
24 reduced the use of your crutches?
25   A.    No.

Exhibit 1                              App. 25

Page 98

1    Q.    In fact, to this day you are still having
2  those problems even though you use your crutches very
3  little; is that right?
4    A.    Yes.
5    Q.    Did anyone disagree with an assessment or
6  opinion that use of crutches is causing the back or the
7  neck injury?
8    A.    No.
9    Q.    Was there ever a medical provider who
10  disagreed and said that he or she did not think that the
11  use of crutches was causing the neck or the back pain or
12  injury?
13    A.    No.
14    Q.    Prior to mediation, what was it that you
15  hoped to achieve from the mediation?
16    A.    A fair settlement for the injury that
17  I had.
18    Q.    In your mind, what was the range of
19  numbers that was a fair settlement?
20    A.    Well, there was the go-between man, was
21  it, a Mr. Doolittle?
22    Q.    I am going to stop you just to save time
23  because we are going to talk about that, but what I want
24  to talk about is prior to the mediation, before you even
25  stepped into the mediation.  You did not talk to

Page 99

1  Mr. Doolittle before mediation, did you?
2    A.    No.
3    Q.    So in the weeks, months or days leading
4  up to the mediation, did you have in your mind -- you
5  said a fair settlement -- what that might look like?
6    A.    Yes, I was thinking round about a $1
7  million.
8    Q.    You understood that any settlement was
9  going to be in dollars, not in pounds; right?
10    A.    Yes.
11    Q.    You were paid in dollars and then had to
12  convert that to pounds; is that right?
13    A.    Yes.
14    Q.    I do not need great detail, but how did
15  it work?  Were dollars electronically deposited into
16  your bank account?
17    A.    Yes.
18    Q.    You received -- I cannot remember -- was
19  it $1047 a week?
20    A.    Yes.
21    Q.    So you received $1047 in your account.
22  Then what did you do with that?
23    A.    The bank automatically transferred it
24  into pounds ----
25    Q.    All right.

Page 100

1    A.    ---- at whatever the exchange was.
2    Q.    So you were subject to the exchange rate
3  just by nature of being a Scottish citizen.
4    A.    Yes.
5    Q.    Did you understand that regardless of
6  whether the case went to trial or whether it settled,
7  compensation was going to be in dollars, not in pounds?
8    A.    Yes.
9    Q.    So your idea, in your mind, was that
10  a fair sum was around $1 million?
11    A.    Yes.
12    Q.    Was that a $1 million, one-time payment?
13    A.    Yes.
14    Q.    How did you arrive at that figure?
15    A.    It was just thinking of how much money
16  I had lost wage-wise from the job I was doing and
17  looking at a few bits of the Longshore and Harbor
18  agreement.  It was giving phrases like you had to get
19  paid at the same value as your last job.  So that is
20  just what I was going by over however many years were
21  left.
22    Q.    In your prior job you were paid, was it
23  about, $106,000 per year?
24    A.    Yes, I think it would be about that.
25    Q.    Because the $1047 that you are receiving

Page 101

1  per week was substantially less than what you were
2  receiving when you were working in Iraq.
3    A.    Yes.
4    Q.    You mentioned the Longshore and Harbor
5  Workers' Compensation Act; is that right?
6    A.    Yes.
7    Q.    So you had looked at, I assume, online
8  some provisions in the Act?
9    A.    Yes.
10    Q.    How did you do that?  Did you go to the
11  US Department of Labor?
12    A.    Yes, or I just put into Google "Longshore
13  and Harbor agreement" and it brought it up.
14    Q.    So prior to mediation you did some of
15  your own research or investigation.
16    A.    Yes.
17    Q.    I am sure you do not remember what
18  specific provisions you read.
19    A.    No.
20    Q.    Do you know how many times you got on the
21  internet to look at the Department of Labor materials?
22    A.    It may be about twice, if that.
23    Q.    And that was prior to mediation?
24    A.    Yes.
25    Q.    I assume you had your own laptop that you

Exhibit 1                                    App. 26

<table>
<tr><td>

**Page 102**

1  could use?
2       A.     Yes.
3       Q.     And I assume you were able to type and
4  find your way with online?
5       A.     Yes.
6       Q.     So you had calculated in your own mind
7  that you thought about approximately a $1 million
8  payment was a fair settlement.
9       A.     Yes.
10      Q.     Did you understand that a settlement
11  would likely be for less than you could potentially
12  receive if you had been assigned full and total
13  disability?
14      A.     How do you mean?
15      Q.     Let me make it more general.  In
16  a general nature, do you understand that generally
17  a settlement is less than what somebody believes they
18  are entitled to?
19      A.     Yes, but I didn't think I was entitled to
20  any less than that.
21      Q.     You believed you weren't entitled to any
22  less than $1 million?
23      A.     Yes.
24      Q.     Did you think that if you tried the case
25  that you would be entitled to more than $1 million in

</td><td>

**Page 103**

1  value?
2       A.     I was warned off trying to take it to
3  a trial.
4       Q.     Is this before mediation or after?
5       A.     During.
6       Q.     During mediation.
7       A.     Yes.
8       Q.     Okay.  I want to talk about before right
9  now, prior to mediation.  Was there any discussion with
10  Mr. Escobedo prior to mediation about a settlement value
11  you might expect?
12      A.     No.
13      Q.     You understood that you did not have to
14  settle your claim at mediation?
15      A.     No, I thought I had to settle it there
16  and then.
17      Q.     You thought you had to, that it was
18  required?
19      A.     Yes.
20      Q.     Did you ever have any discussion that you
21  could take the case to trial or a proceeding before the
22  Department of Labor outside of a settlement?
23      A.     No.
24      Q.     Was that discussed at any time, not just
25  before mediation?

</td></tr>
<tr><td>

**Page 104**

1       A.     No.  The only time I heard anything about
2  mediation was the final email from Robyn Bookhammer,
3  that she said "You must go and settle this claim",
4  underlined and highlighted.  And in a telephone
5  conversation that I had with her to ask her why she had
6  put that down, I said, you know, all I am looking for is
7  $4,188.64 cents that I was getting on a four-weekly
8  basis and would that be a fair number, because I could
9  live with that by the time you transfer that it into
10  pounds and go through all the expenses.  But she said,
11  no, you can get that $4,000 out of your head completely.
12      Q.     That was $4,000 per month approximately?
13      A.     Yes.
14      Q.     I just want to make sure I understand.
15  We will talk about the Bookhammer email in just
16  a second.  Prior to mediation, you believed that it was
17  required to come to an agreement as to a settlement
18  value at the mediation?
19      A.     Yes.
20      Q.     You did not know or understand, and
21  nobody had told you prior to mediation, that you did not
22  have to settle?
23      A.     That is correct -- nobody.
24      Q.     Nobody told you prior to mediation that
25  you had the opportunity to reject any offer and take the

</td><td>

**Page 105**

1  claim to the Department of Labor?
2       A.     No.
3       Q.     So prior to mediation, you just
4  referenced an email from Robyn Bookhammer where she says
5  you must settle your claim?
6       A.     Yes.
7       Q.     Did she say why you must settle your
8  claim?
9       A.     She did not say on the email, but in the
10  telephone conversations she said, "We really like you
11  but it is getting a bit dragged out, this case, so we
12  want to get you from under our feet, so go settle this
13  claim".
14      Q.     So your understanding of the word
15  "settlement" at that time was that it was something that
16  was required, not something that you chose to do?
17      A.     Yes.
18      Q.     Did you ask Mr. Escobedo whether you were
19  required to settle your claim prior to mediation?
20      A.     No.
21      Q.     Did you ask Mr. Escobedo about
22  Ms. Bookhammer's statement that the claimant, you, must
23  settle your claim and what she meant by that?
24      A.     I believe I asked him, but I never got an
25  answer.

</td></tr>
</table>

Exhibit 1                                    App. 27

Page 106

1   Q.   Do you believe you asked verbally, like
2   by telephone, or through email?
3       A.   It was just verbally.
4       Q.   As I understand it, leading up to the
5   mediation, you understood that the claim was going to be
6   settled that day and there was going to be no further
7   pursuing of the claim.
8       A.   Yes.
9       Q.   Did you have an understanding prior to
10  mediation of who a mediator was or the role that
11  a mediator played?
12      A.   No.
13      Q.   Did you have a discussion with
14  Mr. Escobedo prior to mediation about, generally, the
15  procedure of mediation and how a mediation works?
16      A.   Yes.
17      Q.   What did Mr. Escobedo tell you?
18      A.   Basically that we sit in one room, the
19  opposition lawyer sits in the other room and there is
20  like a go-between who takes a value from one end and
21  puts it over into the opposition's end, and they come
22  back with a counteroffer and you keep going until it is
23  settled.
24      Q.   Did you ask him, well, what happens if
25  you do not agree to the number the other side presents?

Page 107

1       A.   No.
2       Q.   Did that cross your mind about "What if
3   I do not agree to what the carrier is saying"?
4       A.   No, not at the time.  I thought that
5   George would know what he was doing and jump in and say
6   something at some time.
7       Q.   Were there any other discussions prior to
8   mediation with Mr. Escobedo regarding the mediation?
9       A.   No.
10      Q.   So prior to the mediation, we talked
11  about earlier that efforts were made to gather certain
12  reports to support your position in mediation; right?
13      A.   Yes.
14  (Exhibit 6 was marked for identification)
15      Q.   I am handing you exhibit 6.  I am going
16  to back up on a question I meant to ask earlier.  We
17  talked about you providing your emails to your counsel,
18  right, the emails between you and other parties related
19  to this case?  You provided those to your lawyer?
20      A.   Yes.
21      Q.   Prior to providing those to your lawyer,
22  you did not alter those in any way; is that fair?
23      A.   No, never.
24      Q.   So whatever you provided to your lawyer
25  was true and correct copies or digital copies of the

Page 108

1   emails that you had saved?
2       A.   Yes.
3       Q.   I am handing you exhibit 6.  Is this an
4   email from you to Mr. Escobedo dated 30 November 2010?
5       A.   Yes, it must be.
6       Q.   You do not have any reason to disagree
7   that this is a true and correct copy of that
8   communication?
9       A.   No.
10      Q.   If you look at the second paragraph,
11  starting with, "I" I am going to read that:  "I have
12  been looking for some other opinions to the aggravation
13  to the neck and back with using elbow crutches but have
14  got no where as yet but might hear back from the Laser
15  Spine Institute later this week?"  Did I read that
16  correctly?
17      A.   Yes.
18      Q.   You in 2010, at least by then, were
19  looking for opinions to support the argument that the
20  neck and the back had been aggravated by the foot
21  injury; is that right?
22      A.   Yes.
23      Q.   Understood that was beneficial to your
24  case, to connect the back and neck pain to the foot
25  injury?

Page 109

1       A.   Yes.
2       Q.   Generally, do you remember who you were
3   looking for opinions on the aggravation issue?
4       A.   I was looking to the Spire private
5   hospital professionals to try to find out if they knew
6   of any connection.
7       Q.   I guess I do not understand.  Who
8   specifically?  Are there local providers who you are
9   calling or visiting?
10      A.   Yes.  It is a private hospital who have
11  their own private surgeons.
12      Q.   I see, so you are trying to talk to them
13  to get an opinion that the neck and the back are being
14  aggravated by the foot.
15      A.   Yes.
16      Q.   But you hadn't had any success.
17      A.   No.
18      Q.   Did you ever have any success with them?
19      A.   Not with them, no.
20      Q.   Who did you have success with?
21      A.   Dr. Fulton.  He knew straightaway that
22  "The only thing that has changed from when you first
23  went over there to now is the fact that you are using
24  crutches.  That is the only thing that has changed due
25  to your foot injury, so there is no other way you could

Exhibit 1                                              App. 28

## Page 110

1  get a back and a neck aggravated with anything else".
2      Q.    So is that what he told you?
3      A.    Yes.
4      Q.    Are you aware of him putting that in
5  writing anywhere?
6      A.    No.
7      Q.    Your back and your neck pain did not
8  commence at the same time as your foot pain; right?
9      A.    No.  It was years after.
10     Q.    I think we are finished with that
11 exhibit, sir.
12     (Exhibit 7 was marked for identification)
13     Q.    I am handing you exhibit 7.  This is one
14 page of what appears to be an email string; correct?
15     A.    Yes.
16     Q.    I will represent to you for purposes of
17 this deposition that, to minimise paper, if there is
18 only one page I want you to look at, I just have that
19 page copied and this page is Bates labelled RR 0030623?
20     A.    Yes.
21     Q.    At the middle of the page begins an email
22 from you to Ms. Besch dated August 30, 2013; correct?
23     A.    Yes.
24     Q.    I am not going to read all this.  August
25 30, 2013 is just before mediation; is that right?

## Page 111

1      A.    Yes.
2      Q.    We will get the mediation agreement later
3  and the dates and so forth, but I am just trying to put
4  this in perspective.  On August 30, 2013 you are
5  reporting to Ms. Besch that you have some doctors'
6  reports, specifically a report from a San Antonio doctor
7  and two, I think you say "physiologists" in here, but
8  I think you meant psychologists; is that right?
9      A.    Yes, it would have been -- yes, "2 full
10 psychologist reports".
11     Q.    Then it talks about the highest figure
12 your attorney thinks you could get.  When you said the
13 highest figure your attorney believes you can get as
14 opposed to some other figure, what did you mean by
15 "highest"?
16     A.    That is just in his opinion the highest
17 that I could have got.
18     Q.    So you had an understanding that there
19 may be a range in value of the settlement and it may be
20 this highest figure or it may be something less than
21 that.
22     A.    Yes.
23     Q.    Then in the next paragraph below you
24 referenced the amount you would like to get and the lump
25 sum in a lump-sum payment; correct?

## Page 112

1      A.    Yes.
2      Q.    You can set exhibit 7 aside.  I am sorry,
3  I forgot to ask you a question on this.  There is
4  a reference in exhibit 7 to Dr. Richmond, and you
5  referenced the San Antonio doctor issuing a report that
6  "basically trashed all what Dr. Richmond said".
7      A.    Yes.
8      Q.    You understood that Dr. Richmond had some
9  unfavourable opinions for your position; correct?
10     A.    Not unfavourable; he just changed his
11 mind too often.
12     Q.    You felt like he changed his mind too
13 often?
14     A.    Yes.
15     Q.    But you felt like some of those opinions
16 offered by Dr. Richmond were unfavourable to your
17 position.
18     A.    Yes.
19     Q.    Specifically whether the back and neck
20 were in fact aggravated by the foot injury; right?
21     A.    Yes.  He was the first one who said that
22 it would have been aggravated by the use of the
23 crutches.  So he also said some favourable things.
24     MR. LEE:  I am going to object as
25 non-responsive on the last part.  That is for the judge

## Page 113

1  to decide.
2      Q.    Let us go ahead.  We are finished with
3  that exhibit.  What do you receive yearly now?
4      A.    Yearly, $24,500, which, at the present
5  exchange rate, is about 18,500.
6      Q.    Pounds?
7      A.    Pounds, yes.
8      Q.    So before, if you were earning $1047
9  a week, that is, I think, approximately $55,000 a year?
10     A.    Yes.
11     Q.    That you were receiving while your claim
12 was pending.
13     A.    Yes.
14     Q.    Then after the settlement you are now, on
15 a yearly basis, receiving less than half that, at
16 $24,500?
17     A.    Yes.
18     Q.    As to the $1047 that you were receiving
19 a week, did you expect those payments to continue for
20 your life?
21     A.    Yes.
22     Q.    Why did you expect those payments to
23 continue for your life?
24     A.    Well, I got told that they were coming
25 from the Department of Labor.  That is what they had set

Exhibit 1                                        App. 29

Page 114

1  down as the maximum that they could pay out going on
2  what wage I was earning when my accident happened, which
3  was roughly half the wage I was getting.  So there was
4  not any reason why it could not have carried on that
5  way, but Robyn Tydelski just said, "No, that is not
6  going to happen.  Get that figure out of your head" ----
7      Q.    Did you ----
8      A.    So it was halved again.
9      Q.    I'm sorry, I didn't mean to cut you off.
10     A.    No, that's okay.
11     Q.    Did you conclude your answer?
12     A.    Yes.
13     Q.    I apologise.  I do not mean to step on
14  you, and, just to keep the record clear, we try not to
15  so I apologise for that.
16         Did you have an understanding prior to
17  mediation that if you went to the Department of Labor
18  with the claim that there may be a finding that you are
19  not entitled to compensation for the rest of your life?
20     A.    No, I never thought it that way.
21     Q.    And you never considered that when you
22  reviewed the provisions on the Department of Labor
23  website relating to the Longshore and Harbor Workers'
24  Compensation Act?
25     A.    No.

Page 115

1      Q.    Prior to mediation, did you have an
2  understanding of what would happen to the payments,
3  whether they would cease or not, if you died?
4      A.    Prior to that, Robyn Tydelski had come
5  out with two offers of settlement if I would take it
6  there and then from her: one, which was a larger
7  payment, would pay me for 32 years and then cease, or if
8  I died a year after it would cease; but the smaller
9  amount would carry on for 32 years and again after
10  I was dead, so my wife would still get that money.
11     Q.    Those were settlement offers that were
12  made to you, well before the mediation, by
13  Ms. Bookhammer; is that right?
14     A.    Yes.
15     Q.    You rejected those.  You did not think it
16  was adequate.
17     A.    No.  I did not think it was adequate at
18  all.
19     Q.    George did not think it was adequate
20  either?
21     A.    No.
22     Q.    I am switching back.  "Mr. Escobedo" is
23  George; right?
24     A.    Yes.
25     Q.    I want to focus on not the offers that

Page 116

1  were made to you but your understanding of what would
2  happen to your payments under your Department of Labor
3  claim when you died?
4      A.    I thought they would stop.
5      Q.    Is that something that somebody told you
6  or something you researched on your own?
7      A.    No.  It was just the feeling I had in the
8  back of my head that that is what would happen.
9      Q.    Okay.  So that was your assumption based
10  on you being the one who was hurt and you receiving the
11  payments?
12     A.    Yes.
13  (Exhibit 8 was marked for identification)
14     Q.    I am handing you exhibit 8.  Is exhibit 8
15  an exchange that you had with Mr. Escobedo?
16     A.    Yes, okay.
17     Q.    It looks like on the first page that you
18  are sending.  It says "bobrollo65@yahoo.co.uk"; do you
19  see that in the middle of the page?
20     A.    Yes.
21     Q.    So you are sending information.  That is
22  you forwarding information or replying to an email; is
23  that right?
24     A.    That is me replying to an email.
25     Q.    You say, "Also this wee bit!!??", and you

Page 117

1  refer to the "National Average Weekly Wages".  Do you
2  see that?
3      A.    Yes.
4      Q.    Is that information that you sent to
5  Mr. Escobedo prior to the mediation?
6      A.    Yes.
7      Q.    The purpose of that was you had been
8  doing some research from the Department of Labor site;
9  is that right?
10     A.    Yes.
11     Q.    This chart shows the national average
12  weekly wage and that is relevant to your compensation
13  under the Department of Labor claim; correct?
14     A.    Yes.
15     Q.    Is this what you believed you should be
16  receiving and should continue receiving?
17     A.    Yes.
18     Q.    Then if you go up to the top email, that
19  is from George.  He is responding to you; correct?
20     A.    Yes.
21     Q.    And this is a true and correct email from
22  him to you dated August 30, 2013; right?
23     A.    Yes.
24     Q.    He says: "No where in the Act does it
25  say that an insurance company must settle with you, much

Exhibit 1                                    App. 30

Page 118

1  less state a formula for settling with you.  I'll do my
2  best to maximize the money for you."  Did I read that
3  correctly?
4       A.    Yes.
5       Q.    So he is telling that you the insurance
6  company does not have to settle with you; is that right?
7       A.    Yes.
8       Q.    Did you not understand that you,
9  likewise, do not have to settle with the insurance
10  company?
11       A.    No.
12       Q.    Did you ever ask George, or Mr. Escobedo,
13  if you had to accept a settlement or offer from the
14  insurance company?
15       A.    No.
16       Q.    That was an assumption you had in your
17  mind that you had to accept an offer?
18       A.    Yes.
19       Q.    What if they came in and offered you $5?
20  Did you feel like you had to accept that if that was all
21  they were willing to pay?
22       A.    I'm sure I would have had questions to
23  ask if they had offered that, but, yes, the way
24  everybody was going on about it, that was the American
25  way of doing things, which is totally different from the

Page 119

1  way they do it over here.  So I had no other reason to
2  think anything different.
3       Q.    Let me follow up with that in just
4  a second, but going back to my original question: if the
5  insurance company offered just an absurd amount -- just
6  completely absurd, whether it be $5 or $100,000,
7  whatever is absurd to your mind -- did you feel like you
8  had to accept that money?
9       A.    Yes.
10       Q.    If you had to accept the absurd amount,
11  why would they offer you anything more than an absurd
12  amount?  Did you think about that?
13       A.    Not really, no.
14       Q.    Then you made reference to the way things
15  are done over here.  Have you had a workers'
16  compensation claim over here in Scotland?
17       A.    No.
18       Q.    Are you familiar with the workers'
19  compensation process over here?
20       A.    Yes.  I have known people who have gone
21  through it.
22       Q.    Okay, so that is how you are familiar
23  with the procedure over here, hearing from other folks
24  who have been injured on the job?
25       A.    Yes.

Page 120

1       Q.    Generally, what is your understanding
2  with the compensation procedure or method over here?
3       A.    It normally does not go to a mediation.
4  It goes straight to a court proceeding.  It does not
5  have to be the High Court; it can just be the lowest
6  court that you have got in the country and then you put
7  forward the two cases and then the judge decides what
8  you get.  If you do not like it, you can argue the case
9  and see if you can get it changed, but it is usually
10  done all on the same day.
11       Q.    Okay.  There are a couple of things
12  I want to address there.  One is you said if a judge
13  issues a decision and you do not like it, do you have an
14  understanding of whether that is by an appeal or some
15  other method?
16       A.    Yes, by an appeal.
17       Q.    An appeal to a higher court?
18       A.    You can appeal it to a higher court, yes.
19       Q.    Then you talked about the two cases or
20  the two sides are presented to a judge at some level;
21  right?
22       A.    Yes.
23       Q.    So presumably there is a disagreement:
24  the carrier or the employer wants to offer or provide
25  less than the injured worker wants.  Right?

Page 121

1       A.    Yes.
2       Q.    Then the judge decides.  Do you have an
3  understanding or have you had experience with people
4  saying that "I wanted more" or "I did not get as much as
5  I feel like I should have gotten"?
6       A.    Yes.
7       Q.    So there is some risk to that proceeding?
8       A.    Yes.
9       Q.    As to the risk involved, were some people
10  found not disabled, or do you know the details of why
11  they did not get as much as they wanted?
12       A.    Not really.  Some of them -- like one of
13  them was trying to get compensation for a broken toe.
14       Q.    For what?
15       A.    For a broken toe.
16       Q.    I see.
17       A.    His toe had actually healed and was
18  completely in working order before he even went for the
19  compensation.  He was wanting thousands and was not
20  given thousands and he was not very happy about it.
21  But, as I said, you know, it is a broken toe, it has
22  already healed; you don't deserve any more than that.
23       Q.    Your understanding of the procedure here
24  in Scotland is there can be a dispute as to the extent
25  of injury or the compensation to be paid for a specific

Exhibit 1                                      App. 31

Page 122

1  injury.
2      A.      Yes.
3          Q.      You can set exhibit 8 aside.
4      (Exhibit 9 was marked for identification)
5          Q.      I am handing you what has been marked as
6  exhibit 9.  Is exhibit 9 another email exchange or set
7  of exchanges between you and Mr. Escobedo?
8      A.      Yes.
9          Q.      Let us start at the back, which would be
10 the oldest email, if you go to the page that has RR
11 0030411.  I believe it is that one, yes.  This one is an
12 email from you to Mr. Escobedo dated August 27, 2013;
13 correct?
14     A.      Yes.
15         Q.      It says: "STATE OF NEW YORK WORKERS'
16 COMPENSATION BOARD MEDICAL GUIDELINES June 1996."  It
17 looks like that is a title you had included?
18     A.      Yes.
19         Q.      You say, "Hey George," and we are not
20 going to read all of it, but you have a couple of
21 paragraphs there that you include to George; right?
22     A.      Yes.
23         Q.      If you go to the next page, which is RR
24 0030412, you say:  "P.S.", that is post script, right?
25     A.      Yes.

Page 123

1          Q.      "Got the UK version off the Attorney but
2  they only deal with people injured in Afghanistan and
3  Iraq only because they have a better idea on how much it
4  should be costing the American insurance company due to
5  the difference between the $ and the £", and the
6  sentence continues; correct?
7      A.      Yes.
8          Q.      Who was the UK version of the attorney
9  that you spoke with?
10     A.      That I cannot remember.
11         Q.      Did you pick up the phone and call
12 somebody?
13     A.      No.  That was done online.
14         Q.      That you communicated by email?
15     A.      No.  I found attorneys who deal with
16 people injured in Afghanistan and it came back saying
17 Afghanistan and Iraq.
18         Q.      Why were you searching online for
19 attorneys who deal with injuries out of Afghanistan and
20 Iraq?
21     A.      It was something that George had asked
22 that I could look at to see if I could find some
23 comparisons to go on.
24         Q.      George asked you to get online to look at
25 comparisons?

Page 124

1      A.      Yes.
2          Q.      Comparisons of what?
3      A.      The difference in the rates.
4          Q.      Oh, you are looking at exchange rate
5  differences?
6      A.      Yes.
7          Q.      Okay.  Then down below it says: "P.P.S.
8  Donna Besch sent the details off the law firm mentioned
9  above:", and that references a Charles Russell in
10 London, England?
11     A.      Yes.
12         Q.      That is probably the website that you had
13 visited?
14     A.      Yes.
15         Q.      You are looking at exchange rate
16 information.
17     A.      Yes.
18         Q.      Okay.  Then if we go to the beginning of
19 the exhibit, that first page reflects that you had sent
20 an email to George Escobedo on August 30, 2013 at 4.25;
21 right?
22     A.      Yes.
23         Q.      You provide a link and that is to the
24 Department of Labor website.
25     A.      Yes.

Page 125

1          Q.      Then below there it talks about injury
2  benefits, medical care and disability compensation on
3  the next page; right?
4      A.      Yes.
5          Q.      Is this more research that you had been
6  doing?
7      A.      Yes.
8          Q.      George responds to you:  "Thank you...
9  I'm very familiar with this information."
10     A.      Yes.
11         Q.      Okay, you can set that page aside.  Did
12 George, or Mr. Escobedo, ever ask you if you wanted to
13 participate in mediation?
14     A.      No.  It was just -- apart from what came
15 up, it was the insurance company that said that it was
16 time for mediation.
17         Q.      So you understood the insurance company
18 wanted to mediate?
19     A.      Yes.  They had decided that, from
20 Dr. Richmond, I believe it was, I had reached maximum
21 medical improvement, even though I had further surgery
22 to my left foot already scheduled for four months after
23 the mediation date.
24         Q.      Who was that surgery scheduled with?
25     A.      Professor Simpson.

Exhibit 1                                          App. 32

Page 126

```
1        Q.      Here in the UK?
2        A.      Yes.
3        Q.      Did that surgery ever take place?
4        A.      Yes.
5        Q.      What month and year was that?
6        A.      That would be just after Christmas,
7  I believe, in 2014.
8        Q.      Mediation was in 2013.
9        A.      Yes.
10       Q.      So did the surgery not take place in
11 2013?
12       A.      It was just at the start of 2014.
13       Q.      Okay, the beginning of 2014.
14       A.      Yes.
15       Q.      That surgery consisted of what?
16       A.      Further surgery, taking out screws and
17 putting in new screws into my left foot to try to
18 stabilise it.
19       Q.      Is it fair to say that none of those
20 surgeries had ever been successful on your left foot?
21       A.      Almost none of them, yes.  This one is
22 holding just now, but it is not perfect.  It has not
23 fused the bones, so it is going to give way again at
24 some time.
25       Q.      Have we exhausted your recollection of
```

Page 127

```
1  communications with Mr. Escobedo regarding how mediation
2  works, what mediation is, what you are required to do
3  there?
4        A.      Yes, I think so, because I honestly did
5  not have any clue about what happened at mediation.
6  I had the rough outline that you were in two separate
7  rooms with some guy running between and that was it.
8  Whatever the settlement came to was the end of the story
9  and that is what you had to accept.
10       Q.      Did you have any questions that you had
11 posed to Mr. Escobedo prior to mediation that were not
12 answered?
13       A.      No.
14       Q.      Let us talk about the mediation itself.
15 Do you remember where mediation took place?
16       A.      It was in Edinburgh, but ----
17       Q.      That is fine.  That is pretty much all
18 I need -- the general location.  You are arrived by car?
19       A.      Yes.
20       Q.      And your wife took you there?
21       A.      Yes.
22       Q.      Do you remember what time mediation
23 started?
24       A.      No.
25       Q.      Who all was at mediation?
```

Page 128

```
1        A.      There was myself, my wife,
2  George Escobedo, Mr. Doolittle, Michael Murphy and Glenn
3  Patterson.
4        Q.      Who is Glenn Patterson?
5        A.      He is the one from the pension and
6  annuities place.
7        Q.      Okay.  Did you hear the words "structure
8  broker"?
9        A.      No.
10       Q.      Or "annuity broker"?
11       A.      I heard something about annuity.
12       Q.      In any event, you understood that he was
13 there to work with the annuity or run numbers?
14       A.      Yes, but I did not know what annuity was,
15 so....
16       Q.      Did you know that annuity is related to
17 a pension somehow or is similar?
18       A.      That is just what I was told, that it was
19 to do with the pension, like the break down of a
20 pension.
21       Q.      Prior to mediation, you said you met with
22 Mr. Escobedo?
23       A.      Briefly.
24       Q.      Did you meet at the location of the
25 deposition?
```

Page 129

```
1        A.      No.  We met at the hotel where he was
2  staying.
3        Q.      Was that the day of the mediation?
4        A.      Yes.
5        Q.      How long did you meet with Mr. Escobedo?
6        A.      It was not any more than half an hour.
7        Q.      Tell me about what you remember about
8  that discussion?
9        A.      Not much really because he and his wife
10 had just been out shopping, so I think he had his mind
11 more on that than on what was going on at mediation.
12       Q.      Did you guys talk about shopping?
13       A.      He just talked about how nice the shops
14 were and about the old buildings and stuff like that.
15       Q.      Small talk.
16       A.      Yes.
17       Q.      Was there a discussion about mediation
18 itself?
19       A.      No, just that we would be going there and
20 seeing what they have got to say.
21       Q.      Do you remember in Mr. Escobedo's
22 deposition him talking about discussions that he had
23 with you regarding mediation?
24       A.      No.
25       Q.      So if Mr. Escobedo testified, or
```

Exhibit 1                                          App. 33

Page 130

1    testifies in the future, that he had a discussion with
2    you prior to mediation where he told you that you did
3    not have to accept an offer or settlement from the
4    carrier, you would disagree with that?
5        A.    Yes.
6        Q.    Did you have any discussion with
7    Mr. Escobedo at any time prior to mediation regarding
8    risks if you proceeded with your claim to the Department
9    of Labor?
10       A.    No; it was just during that we had that.
11       Q.    It sounds like during the mediation there
12   was some discussion about risk to you if you decided to
13   proceed to the Department of Labor with your claim; is
14   that right?
15       A.    Yes.
16       Q.    What was the nature of that discussion?
17   What risks were raised if you decided to take your claim
18   to the Department of Labor?
19       A.    It was AIG's insurance -- the insurance
20   company's -- attorney, Michael Murphy.  He had said "You
21   don't want to see me in a trial situation and if you go
22   to trial", he says, "I will stop your payments".
23       Q.    So Mr. Murphy -- this is during the
24   mediation?
25       A.    Yes.

Page 131

1        Q.    Was it directly to your face or was it
2    communicated through somebody else?
3        A.    No, it was directly to me.
4        Q.    So Mr. Murphy -- and I have not met him
5    in person, but you were with him in person?
6        A.    Yes.
7        Q.    He said to you that you, Mr. Rollo, do
8    not want to see Mr. Murphy at trial; right?
9        A.    Yes.
10       Q.    If you choose to take your claim to
11   trial, what did he say would happen?
12       A.    That he would get my payments stopped.
13       Q.    Did he reference specific payments?
14   I guess the payments you were receiving ----
15       A.    The payments I was receiving at the time.
16       Q.    The $1047 per week?
17       A.    Yes.
18       Q.    His position in mediation is if you do
19   not accept a settlement and go before the Department of
20   Labor on your claim, the insurance company would then
21   stop your payments.
22       A.    Yes.
23       Q.    Do you remember the exact phrase he used
24   or, as best you recall, is it what you already told me?
25       A.    Just what I have told you there.

Page 132

1        Q.    Did that cause you some concern about
2    deciding to go to the Department of Labor on your claim?
3        A.    Yes; of course it did, yes.
4        Q.    Did Mr. Escobedo or the mediator say
5    anything about the insurance company's ability to stop
6    your payments?
7        A.    No.
8        Q.    Did anybody ever say whether that was
9    proper or not under the law?
10       A.    No.
11       Q.    Did Mr. Murphy, in connection with that
12   statement, refer to whether such stopping of payments
13   would be consistent with the law?
14       A.    No.
15       Q.    Did he say that they would do whatever
16   they could under the law to stop your payments?
17       A.    Yes, I believe he did say something about
18   when he stopped the payments it would be legal the way
19   he had done it.  It wouldn't have made much difference
20   to me, but he did say it was the highest case he had
21   seen, or settlement he had seen, for a left-foot injury.
22       Q.    Do you have any reason to disagree with
23   his statement that this was the highest settlement he
24   had ever seen for a left-foot injury?
25       A.    Not really, no.

Page 133

1        Q.    I want to go back to what you said here
2    just a second ago in your response.  You said something
3    about it would not have made much difference to you.
4    What did you mean by that?  Whether the payments were
5    stopped legally or not, it sounded like you were saying
6    it would not make much difference to you?
7        A.    No.  We would have managed to survive if
8    it was going to go to trial.  We would get money from
9    somewhere to make sure, you know -- savings, loans from
10   the wife's father and things like that, so we would
11   manage to survive until we went to trial.  But we never
12   had any idea that we could, so it was never brought up.
13       Q.    My understanding from your statement is
14   that if you would have had to go to trial without the
15   continued payments from the insurance carrier, you would
16   have found a way to make it.
17       A.    Yes.
18       Q.    So Mr. Murphy's statement to you about
19   stopping payment was contingent on whether you decided
20   to pursue your claim or not to the Department of Labor?
21       A.    Yes.
22       Q.    If you agreed to settle, then he would
23   not stop the monthly cheques, at least not immediately;
24   is that right?
25       A.    Yes, that is right.

Exhibit 1                                        App. 34

Page 134

1    Q.    Or weekly I guess it was?
2    A.    It was monthly.
3    Q.    It was monthly?
4    A.    Yes.
5    Q.    So it was $1047 a week but paid on
6  a monthly basis?
7    A.    Yes.  It was $4,188.64 cents.
8    Q.    On the alternative, if you decided to
9  take the settlement or agree to the settlement, then
10 your cheques would continue for some period of time?
11   A.    Yes, until such time as the payment was
12 ready from the settlement.
13   Q.    So at mediation itself, you understood
14 that there were potentially two routes to take?
15   A.    I was under the impression that it was
16 only one route that I could take, and that was take the
17 settlement.
18   Q.    How could there be only one route to take
19 if, as we have discussed, you could choose not to accept
20 the settlement but they would stop the payments?
21   A.    That was after they had come through
22 about the settlement payments.
23   Q.    This happened at mediation, right?
24   A.    Yes.
25   Q.    So these discussions we have had, that

Page 135

1  was all during the mediation?
2    A.    Yes.  It was after they had come through
3  with the settlement all drawn up -- the settlement
4  figures.
5    Q.    Okay.  Let me make sure I have this
6  right.  Let me back up.  What other risks were discussed
7  if you did not accept the settlement or the offer of
8  settlement?
9    A.    There were no other risks.
10   Q.    No risk was addressed or raised by
11 anybody about the potential that the back and the neck
12 would be determined by the Department of Labor to not be
13 aggravated by the foot?
14   A.    No.  There was no discussion about
15 anything like that.
16   Q.    Did you understand that that was
17 a possibility or a potential if the claim was tried at
18 the Department of Labor?
19   A.    No.
20   Q.    Was that not the purpose of getting the
21 reports from the doctor, to tie your back and your neck
22 to the foot?
23   A.    Yes, it was, but I had no idea whether
24 this settlement was taking into account the neck and the
25 back, which I thought they were, but it was only

Page 136

1  afterwards that I was told, no, it was only for the left
2  foot.
3    Q.    Your belief is that the settlement was
4  only for the left foot?
5    A.    I thought it was for the left foot, the
6  right foot, the neck and the lower back.
7    Q.    I think we are speaking past each other,
8  but I think I understand.  Let me clarify.  At the time
9  you settled you thought it was for the back, the neck
10 and both feet?
11   A.    Yes.
12   Q.    Today, you understand that the settlement
13 was only for the foot?
14   A.    Yes.
15   Q.    Why do you believe today that the
16 settlement was only for the foot?
17   A.    I got told afterwards.
18   Q.    By whom?
19   A.    Robyn Tydelski, and then Mr. Quezada from
20 the Department of Labor.
21   Q.    Has anybody told you that if you settled
22 only your foot injury that the compensation to be paid
23 for a foot injury alone would be far less than the
24 amount that you received through the settlement?
25   A.    No.

Page 137

1    Q.    Do you have that understanding or do you
2  know one way or the other what a left-foot injury is
3  worth?
4    A.    No; I have no idea.
5    Q.    I want to make sure, chronologically,
6  that I understand what happened in mediation.
7  I understand who was there, and we had some discussions
8  previously about what Michael Murphy said.
9    A.    Yes.
10   Q.    But I want to go back to the beginning.
11 So you show up in, I guess, a conference room?
12   A.    Yes.
13   Q.    You have explained who is there.  What
14 happens next?
15   A.    Glenn Patterson stood up, gave a speech
16 about who he was and what he represented.
17   Q.    Let me ask you, and I am sorry to
18 interrupt, for clarity: who was that -- the claims
19 person?
20   A.    Glenn Patterson.
21   Q.    So Glenn Patterson, okay.
22   A.    So he said his bit, he sat down and
23 Michael Murphy got up and then he did the same.  He gave
24 a statement about who he was, what his qualifications
25 were, who he was representing, and, for some reason, he

Exhibit 1                                              App. 35

---

**Page 138**

1  got on to me for interrupting his opening speech, as to
2  which not a word was spoken, so I don't know where he
3  got that from.
4       Q.     What do you mean?  He gave an opening
5  statement and talked about who he was.  You understood
6  he represented the carrier; right?
7       A.     Yes.
8       Q.     He was the carrier's lawyer, not your
9  lawyer?
10      A.     Yes.
11      Q.     And you just said something about "he got
12  on to you".  When was this?
13      A.     During the speech; he got quite irate
14  about being interrupted during his opening speech.
15      Q.     Your position is that you never said
16  anything during his speech.
17      A.     Nobody had said anything, but for some
18  reason he just got it into his head that somebody had
19  said something and he was not happy.
20      Q.     Did he say to "stop interrupting" or what
21  did he say about that?
22      A.     Yes, "Don't interrupt my opening speech".
23      Q.     Were you talking to him or was somebody
24  talking to somebody else?
25      A.     Nobody was talking.

---

**Page 139**

1       Q.     He gives a speech about, I assume, the
2  carrier's position and their case as to why they believe
3  you are entitled to a little money?
4       A.     Yes.
5       Q.     Then who spoke?
6       A.     Nobody spoke.
7       Q.     Did George Escobedo present his case?
8       A.     No.
9       Q.     So did the mediator say anything?
10      A.     The mediator just said that he was going
11  to put people into a separate room and we will start the
12  mediation.
13      Q.     Do you know whether Mr. Escobedo planned
14  on speaking at that time, giving an opening statement or
15  anything?
16      A.     I do not believe so.  When he turned up
17  at the mediation he did not have a notepad or any papers
18  -- nothing -- with him.
19      Q.     Did the other side have papers?
20      A.     Yes.
21      Q.     What sort of papers did they have?
22      A.     They had papers, a laptop -- just things
23  like these.  They had all the information in front of
24  them.
25      Q.     Did they use that during their speech?

---

**Page 140**

1       A.     Not during their speech, no.
2       Q.     So it was just oral presentation?
3       A.     Yes.
4       Q.     Did you feel like Mr. Escobedo, at that
5  time, was unprepared?
6       A.     I thought he would have had something
7  with him; he was defending me.  I thought he would have
8  had at least something that he could have thrown in
9  their face to say, "Right, well, you want him to be
10  a security TV monitor.  Well, there is the reason why
11  he cannot be", and just give them a list of the
12  medication I was on, for one, which would have been
13  enough.  But he had nothing.  I don't even know if he
14  had a pen with him or not.
15      Q.     Do you know whether during the course of
16  that day he generated any documents?
17      A.     No, I do not believe so.
18      Q.     Did you ever see Mr. Escobedo write
19  anything down?
20      A.     No.  He had nothing to write with or
21  write on.  He had no notepad, not even post-it stickers
22  or anything.
23      Q.     He did not come with any documents?
24      A.     No.
25      Q.     Did you see him write down any offers

---

**Page 141**

1  that had been made during the course of the day?
2       A.     No.  He had nothing to write it on.
3       Q.     If Mr. Escobedo says he has anything or
4  wrote something down that day, you have not seen it?
5       A.     No.
6       Q.     Were you with him all day?
7       A.     Not all day, no.
8       Q.     That was not a good question.  During the
9  mediation, were you with him the entire time?
10      A.     Until I took a bad turn and I suddenly
11  became really cold and clammy, sweaty, and I thought
12  I just needed to get out and get some air.  So I closed
13  my folder, because I had a folder full of everything,
14  closed my folder up and I went to go to the window just
15  to get some fresh air.  Mr. Doolittle ran next door with
16  a raised voice -- I mean, I could hear him as it was
17  only a glass panel -- saying to Mr. Murphy that "He is
18  packing up, he is going to leave, you need to do
19  something about this".  So then they came through with
20  a revised offer, which was about double of where they
21  were at the time.  He said, "That is what the insurance
22  company have said I can go up to and no more than that".
23      Q.     So according to what the mediator was
24  saying, and you are hearing the mediator, he is
25  concerned that you are going to walk out and leave the

---

Exhibit 1                                    App. 36

Page 142

1  mediation.
2      A.    Yes.
3      Q.    And just be done with it.
4      A.    Yes.  If I had kept on feeling the way
5  I was feeling, I would have done.
6      Q.    Okay.  I want to go back to make sure
7  chronologically I have it right.  We talked about the
8  opening meeting where everybody is together and at some
9  point do you break out into two groups?
10     A.    Yes.
11     Q.    Was your wife there during the beginning
12  session?
13     A.    Yes.  She was there all the time.
14     Q.    Did this have a video camera or an audio
15  communication?
16     A.    No.
17     Q.    It was just people talking around
18  a table?
19     A.    Yes.
20     Q.    Did you record it or did your wife record
21  that?
22     A.    We tried to record it, but whatever she
23  had done to the phone, I have no idea, but it just came
24  up with a garbled sound.  There was no audio that you
25  could make anything out of.

Page 143

1      Q.    So it was a failed attempt.
2      A.    Yes.
3      Q.    You could not make out anybody's words?
4      A.    No, nothing.
5      Q.    When did you discover that?
6      A.    When we were going home in the car and
7  I tried to play it back and I said, "What's this?", and
8  she says, "I don't know what's happened".
9      Q.    Why did you try to play it back in the
10  car that day?
11     A.    Just to hear if there was anything
12  I missed when I went through for a breath of fresh air.
13     Q.    So you break out into two groups, and
14  what happens?  Just generally describe the process at
15  that point.
16     A.    Well, Mr. Doolittle asked what figure we
17  wanted to start with.
18     Q.    Your opening demand?
19     A.    Yes, and I said, "Well, just start at
20  a million.  Why not?"
21     Q.    I'm sorry, I did not hear the number?
22     A.    A million.  But Mr. Doolittle said "No,
23  they will not accept that.  You will have to try
24  a different figure".  So I said, well, try 900,000 then.
25  He said, "That is better".  He went through and came

Page 144

1  back saying they would offer, I think it was, 300,000,
2  and then he says that a good gesture would be to take
3  100 off, so we took 100 off and went back with 800,000.
4  They sent back with 325,000.  So I thought, if they are
5  going up by 25s, why are we going down in hundreds?  It
6  went like that until we are almost passing each other
7  with figures.
8      Q.    With "passing", what do you mean?
9      A.    As in, we were just about to go lower
10  than what their offer was.  If we took another 100 off,
11  and I think they were up to about 400, we would have
12  gone down to 400 and then they would have either
13  accepted there or offered 425,000.  So we were getting
14  to that stage where it would have crossed over, which
15  did not make any sense to me at all.
16     Q.    Was there actually an offer or a demand
17  issued by your side or on your behalf that was lower
18  than the last offer by the carrier?
19     A.    No, but it was going in that direction.
20  I don't know if that is what set me off; I have no idea.
21     Q.    So at some point you get irritated.
22     A.    Yes.  It was down to the medication.  It
23  happens quite a lot, as I said to you earlier.  I could
24  be sitting here talking one minute and the next minute
25  I am sound asleep.

Page 145

1      Q.    So you were feeling tired?
2      A.    It is just with the amount of medication.
3  It can make you just drop off.
4      Q.    Okay.  I am just trying to understand
5  your thought process and where you talked about the
6  demand and the offers and you were upset.
7      A.    Yes.  I was getting agitated about it.
8      Q.    Because you felt that the money was not
9  there like it was supposed to be?
10     A.    Yes.  It was just that to me everything
11  was a muddle; it was not an organised type of thing that
12  I was expecting.
13     Q.    What were you expecting?
14     A.    I was expecting to, one, be getting
15  proper offers getting sent back and forward instead of
16  this Mr. Doolittle saying, "Well, take another $100,000
17  off and that would be a good gesture and will show them
18  that you mean business".  Well, it's not, when they are
19  only putting $25,000 and sending it back.  It didn't
20  make sense to me at all.
21     Q.    So when Mr. Doolittle was suggesting
22  taking another $100,000 off as a good gesture, as a good
23  gesture of what -- that you intend to settle that day?
24     A.    Yes.
25     Q.    So if you didn't take $100,000 off, did

Exhibit 1                                        App. 37

Page 146

1  you understand that that would be a gesture that you had
2  no interest in settling that day?
3      A.    No.  I just thought that he would know
4  better, he has been doing this for a number of years, so
5  I had just got to go on what he says.
6      Q.    Did you understand that Mr. Doolittle
7  represented claimants for a living before that?
8      A.    No.
9      Q.    You did not have an understanding one way
10 or the other as to what he did?
11     A.    No.
12     Q.    Do you remember anything else
13 Mr. Doolittle said in connection with these offers going
14 back and forth?  It sounds like risks were not discussed
15 at that time; is that right?
16     A.    No, there were no risks discussed.
17     Q.    This sounds like this is the type of
18 mediator who just focuses on the money?
19     A.    Yes.
20     Q.    His focus was on the money and the
21 demands on your side and the offers from the other side?
22     A.    Yes.
23     Q.    So I want to understand now: you are
24 upset because you don't feel like the money is there
25 like it should be?

Page 147

1      A.    Yes.
2      Q.    But you also said something about the
3  medication, that you were getting sleepy?
4      A.    Yes, with the amount of medication I was
5  on.  I mean, you've got to remember that I was taking
6  600 mls of morphine solution every week, which is 1200
7  mg of morphine.  On top of that, there was also another
8  160 mg of tablet-form morphine a day, plus you had
9  amitriptyline, diazepam, allopurinol, and there were two
10 or three others -- there was gabapentin, a gram of that
11 a day -- and the combination could just knock you off.
12     Q.    So at that point of the day, when you are
13 getting sleepy, what time of day is it?
14     A.    It can be any time.  It could be the next
15 five minutes; I could just drop off.
16     Q.    Okay.  I just want to focus on that day.
17 The mediation started at what time?
18     A.    It would be about 9 o'clock when it
19 started.
20     Q.    So 9 am, and at this time that we are at
21 in our chronology, where you are getting tired, about
22 what time is it?
23     A.    I think it was only about quarter-past or
24 half-past ten.  We had not been going for long.
25     Q.    So you are getting tired and you said you

Page 148

1  got up to get some fresh air?
2      A.    I went through to the window to try to
3  get some fresh air.
4      Q.    Opening the window?
5      A.    I went through to try, but I couldn't get
6  the window open.
7      Q.    I see, but your idea was to go to the
8  window and get some fresh air and maybe you would feel
9  a little bit more awake?
10     A.    Yes.
11     Q.    Did you take the wheelchair over there or
12 did you walk over there?
13     A.    The wheelchair.
14     Q.    You could not get the window open?
15     A.    No.
16     Q.    This is when we spoke just a few minutes
17 ago about Mr. Doolittle saying "he is losing" you or
18 something to that effect?
19     A.    Yes, "He is leaving, so you need to get
20 something done -- now".
21     Q.    So he is trying to expedite the process?
22     A.    Yes.
23     Q.    Did Mr. Doolittle say anything else at
24 that time?
25     A.    No, just that, "He is leaving.  You need

Page 149

1  to do something about it".
2      Q.    Did you hear what the response was from
3  the other room?
4      A.    No, just we heard a lot of scuffling and
5  that was all.  We didn't hear any specific words or
6  anything like that.
7      Q.    All right.  So at some point it sounds
8  like, from your prior testimony, they come back with
9  a higher offer?
10     A.    Yes.
11     Q.    What number was that?
12     A.    When they came back through, they threw
13 quite a few numbers at us.  They said that there was
14 50,000 for home improvements, 150,000 for medical,
15 250,000 advance -- what else was it now?  I think it was
16 643,000 was what was going into the annuity, and then
17 there was a $914.33 cents mentioned, and that was per
18 week, which I thought, well, that sounds like the number
19 that is close to what I am getting just now, so, you
20 know, it is a good offer.  But it turned out that it was
21 not that at all.
22     Q.    Who presented this to you -- these
23 numbers?
24     A.    Mike Murphy.
25     Q.    So your testimony today is that they

Exhibit 1                                      App. 38

## Page 150

1  specifically said it would be $914 a week in the
2  annuity?
3  A.    I heard that figure mentioned. He said
4  a week, so that was the one thing that I cottoned to.
5  I heard that figure mentioned and I thought, well, it is
6  the same or almost the same as what we are on just now,
7  so there is not a lot of difference.  So I could have
8  survived on that, no problem.
9  Q.    Were there multiple offers made at that
10 time?  In other words, did you have choices of offer A,
11 offer B or offer C, or was it just one offer and
12 sub-numbers?
13 A.    No.  It was just that they came through
14 and started listing off all the numbers that I mentioned
15 and said that would be totalled up and that is what you
16 are getting.  I think he said it came to a total of
17 943,000.
18 Q.    So you understood the total compensation
19 to be paid was 943,000?
20 A.    Yes.
21 Q.    I want to look at the $914 a week number.
22 Do you know what that was, do you know if that is taking
23 943,000 and dividing it by what?
24 A.    No, I have no idea where they got that
25 number from.

## Page 151

1  Q.    You just remember a $914 per week number?
2  A.    Yes.
3  Q.    Did you ever see that number in writing?
4  A.    I think I did see it somewhere in
5  writing.
6  Q.    During this case or back then?
7  A.    Yes, during this case I have seen it
8  somewhere.
9  Q.    I just want to make sure I am clear.  On
10 the date of mediation, did you see 914?
11 A.    I did not see it written down on that
12 day, no.
13 Q.    During this case, and I was referring to
14 "this case" as your lawsuit against Mr. Escobedo and
15 Carabin & Shaw PC.
16 A.    Yes.
17 Q.    You think you have seen it somewhere in
18 this one?
19 A.    Yes.
20 Q.    I see.  Do you remember where, or is
21 that ----
22 A.    No.  It was something to do with --
23 I think it was on an exhibit.
24 Q.    Okay.  We have talked about mediation,
25 the commencement and the activities.  At this point,

## Page 152

1  Mr. Murphy -- are you guys in the same room?
2  A.    Yes; when he started firing the numbers
3  at us, yes.
4  Q.    Okay, so he starts putting numbers to
5  you.  Did Mr. Escobedo write these numbers down?
6  A.    No.
7  Q.    So you hear these numbers and what do you
8  do?
9  A.    I just sat and listened to the numbers
10 that he was throwing at us, but none of them made any
11 sense.  To me, it was just a list of numbers.
12 Q.    What did you do?  Did you agree to those
13 figures at some point?
14 A.    Yes, at the end of it.  He said, "That is
15 the final offer.  That is all we can give you.  That is
16 the maximum the insurance company will pay out".  So
17 I thought, well, there's no choice, I have just got to
18 sign it and accept it".
19 Q.    So Mr. Murphy gives you these numbers and
20 then he says that is the final offer we are going to
21 make to you, that is the most the insurance will pay?
22 A.    Yes.
23 Q.    He used the word "offer"; is that right?
24 A.    Yes.
25 Q.    But you say you felt you had no choice?

## Page 153

1  A.    Yes.
2  Q.    Did you think the numbers were okay?
3  A.    The way he said it then, I thought, yes,
4  that sounds okay.
5  Q.    So you did not respond, "No way, that is
6  not fair, I am not going to take that" or "I refuse"?
7  You did not say anything like that?
8  A.    Not at the time, no.
9  Q.    How did you accept this?  Did you say,
10 "Well, that sounds agreeable", or, "I can do that"?  How
11 did you respond?
12 A.    I just said, "Yes, whatever you say, we
13 will go for that".
14 Q.    Did you tell Mr. Murphy that or
15 Mr. Escobedo?
16 A.    Yes.  I told everyone that was in the
17 room.
18 Q.    Was your wife with you through all this
19 period?
20 A.    Yes.
21 Q.    Were you still at the window at this time
22 or had you come back to where you were ----
23 A.    No, I had come back into the room at that
24 time.
25 Q.    At this time that these offers are

Exhibit 1                                                        App. 39

Page 154

1  presented to you, if you are at the window at 10.15 or
2  10.30 approximately, what time are we at now?
3          A.      It would be just after 10.30.
4          Q.      What documents did you bring with you to
5  mediation?
6          A.      I had everything -- every email.
7          Q.      You brought the entire stack.
8          A.      Yes, I brought everything.
9          Q.      Was this in a box?
10         A.      Yes.  It was those big grey-coloured
11 boxes with the spring holder inside -- two of them full.
12         Q.      Did you use any documents at mediation?
13         A.      No.
14         Q.      I think one document you had was a report
15 from Dr. Fulton; is that right?
16         A.      I had a letter from Dr. Fulton.
17         Q.      That is said better; you had a letter
18 from Dr. Fulton.  I just want to get this on the record.
19      (Exhibit 10 was marked for identification)
20         Q.      I am handing you exhibit 10.  Is this
21 a letter from Dr. Fulton that you brought to mediation?
22         A.      Yes.
23         Q.      Did you feel like this was a strong
24 letter supporting your position that you would never
25 work again?

Page 155

1          A.      Yes.
2          Q.      This letter is dated 4/9/13; correct?
3          A.      Yes.
4          Q.      How did this letter come about?  Did you
5  ask Dr. Fulton to prepare a letter?
6          A.      I asked him if he could write down
7  something for me to take.  We are going on his personal
8  opinion as a general practitioner.
9          Q.      In this letter he says:  "This man has
10 been my patient for the past 20 yrs.  He has been unable
11 to work for the past 8 yrs as a result of recurrent
12 orthopedic conditions and multiple orthopedic
13 operations.  It is my professional opinion that he will
14 never work again as a result of his progressive
15 problems."  Did I read that correctly?
16         A.      Yes.
17         Q.      It is signed, "Yours sincerely James F.
18 Fulton".
19         A.      Yes.
20         Q.      He does not reference a specific
21 orthopaedic condition.  He just references orthopaedic
22 conditions generally, right?
23         A.      Yes.
24         Q.      At that time you had been having problems
25 in both feet; right?

Page 156

1          A.      Yes.
2          Q.      You also testified that you felt like
3  your back and neck had been aggravated as a result of
4  your feet.
5          A.      Yes.
6          Q.      But he does not go into that detail in
7  this letter; correct?
8          A.      Yes, that is right.  He just puts part of
9  orthopaedic conditions I was under?
10         Q.      He just references "orthopedic
11 conditions".  He does not specify; right?
12         A.      Yes; he did not specify in the letter.
13         Q.      Okay.  I want to go back to the mediation
14 again.  We are at the point in the chronology or
15 timeline where you have agreed to the figures presented
16 by Mr. Murphy that totals approximately $940,000 in
17 payments; is that right?
18         A.      Yes.
19         Q.      I know that there is -- and I will pull
20 it out in a minute -- a written agreement signed.  Is
21 that what happens next, or is there something that
22 happens in between that time?
23         A.      No, that was it, apart from when we had
24 come out of the mediation with George and as we were
25 walking down the street George was really quite upbeat

Page 157

1  about the whole thing and, for some reason, said to me,
2  "I am going to give you $5,000 back off my fee" that he
3  was getting paid.  I said, "Well, George, there's no
4  need to do that".  He says, "I feel there is".  So he
5  gave me $5,000.
6          Q.      Let me make sure that I understand this.
7  Is it your testimony that George addressing his fees
8  occurred after you had left mediation and not during the
9  mediation?
10         A.      Yes; we had left mediation.
11         Q.      Was there a discussion of Mr. Escobedo's
12 fees or a reduction in his fees during the mediation?
13         A.      Something had been mentioned about the
14 fees because they had been added on to the total amount.
15         Q.      Okay.  I may not have asked my question
16 right because I am still a bit unclear.  You agreed to
17 the 943,000 approximately.
18         A.      Yes.
19         Q.      Did you sign anything at that time?
20         A.      Yes, I believe I did.
21         Q.      So you make that agreement.  Did
22 Mr. Doolittle say anything or did Mr. Escobedo or
23 Mr. Murphy say anything further at the mediation after
24 you agreed to the $943,000 approximately?
25         A.      No, just that I had done the right thing

Exhibit 1                                    App. 40

Page 158

1  and settled on the case.
2      Q.      Who was it that said you did the right
3  thing?
4      A.      Michael Murphy.
5      Q.      Did Mr. Escobedo or Mr. Doolittle say
6  anything to you after that relating to the settlement?
7      A.      No, just "Well done".
8      Q.      This mediation occurred on Friday,
9  September 6, 2013; is that right?
10     A.      Yes.
11     Q.      I think you said you believed you signed
12 something at the mediation; is that right?
13     A.      Yes.
14     Q.      I am going to hand you what has been
15 marked as exhibit 11.
16     (Exhibit 11 was marked for identification)
17     Q.      This is titled "Mediation Agreement".  Do
18 you believe this is what you signed at the mediation?
19     A.      Yes.  It certainly looks like it.
20     Q.      Is that your signature on exhibit 11?
21     A.      Yes.
22     Q.      Above the name "Robert Rollo"?
23     A.      Yes.
24     Q.      Do you remember signing your signature to
25 a document there?

Page 159

1      A.      Not really.  I cannot remember much after
2  I took the funny turn.
3      Q.      After you did what?
4      A.      After I took the turn, when I was feeling
5  like I was going to pass out.
6      Q.      When you were tired.
7      A.      I was not tired; it was more than tired,
8  it was like a feeling of, you know, you went cold but
9  you were still sweating, and I just felt like I could
10 pass out at any minute.
11     Q.      Did you ever tell anybody that you wanted
12 to stop or take a break as a result of how you were
13 feeling?
14     A.      No, I just went out.  At that moment
15 I was feeling more for what was wrong with me than what
16 was going on round about me.
17     Q.      At any time during the mediation, did you
18 tell anybody that you did not feel well and that you did
19 not feel that you could continue?
20     A.      No.
21     Q.      At any time during the mediation, did you
22 ever say that you did not feel like you were in a mental
23 state that you could continue with mediation?
24     A.      No.
25     Q.      At any time did anybody ever make

Page 160

1  a comment or question you on whether you could continue
2  with mediation?
3      A.      No, just the wife.
4      Q.      What did your wife say to you?
5      A.      She said, "You don't look well.  You have
6  no colour in your face, you are just drained of colour".
7  She said, "You just don't look well at all".
8      Q.      Did she ask anything further -- whether
9  you felt like you could continue or not?
10     A.      She said, "Do you think we should
11 leave?", and I said, "No, we should get this over with".
12     Q.      You decided to press on.
13     A.      Yes.
14     Q.      You signed the mediation agreement.  Do
15 you remember seeing Mr. Escobedo or Mr. Murphy sign
16 exhibit 11?
17     A.      No.
18     Q.      I assume, for instance, when you had your
19 mortgage, you had to sign documents for that; right?
20     A.      Yes.
21     Q.      When you went over to Iraq and Kosovo and
22 various places, you had to sign documents for that.
23     A.      Yes.
24     Q.      Prior to signing documents, is it your
25 practice to read the documents?

Page 161

1      A.      Yes.
2      Q.      Did you read your mediation agreement as
3  well?
4      A.      I might have looked at it, but it was not
5  registering; it was just words and numbers on a page.
6      Q.      You had an opportunity to read the
7  document, though?
8      A.      Yes.
9      Q.      Did you remember reading "In full
10 settlement of all past, present and future compensation,
11 medical benefits, and home modifications, and in release
12 of all claims of any nature"?  Did you remember reading
13 that language?
14     A.      I must have done, because it is there in
15 front of me.
16     Q.      That is what you were doing on that date;
17 you were settling your claim.  In other words, you were
18 resolving your claim against the insurance carrier; is
19 that right?
20     A.      Yes.
21     Q.      In the last sentence, "Carrier agrees to
22 continue payment of compensation to Claimant at the
23 current rate until this agreement is approved by the
24 Department of labor".  Do you see that?
25     A.      Yes.

Exhibit 1                                    App. 41

Page 162

1    Q.    Earlier today we talked about statements
2    Mr. Murphy said about stopping payment, but you
3    understood that if you settled at mediation, payments
4    would continue until the Department of Labor approved
5    the settlement; is that right?
6    A.    Yes.
7    Q.    So you knew that the Department of Labor
8    would have to approve that settlement.
9    A.    Yes.
10    Q.    Did you ever tell anybody that you had
11    made a recording, or a recording had been made, of
12    mediation?
13    A.    Yes.
14    Q.    Did you ever represent that it was
15    a usable recording?
16    A.    No.
17    Q.    Did you ever imply that it was a usable
18    recording?
19    A.    No, I do not think so.
20    Q.    I am almost finished with this topic and
21    then we will take a break.
22    A.    Yes, I might have done, come to think of
23    it.
24    (Exhibit 12 was marked for identification)
25    Q.    Sir, I am handing you what has been

Page 163

1    marked as exhibit 12.  Is exhibit 12 a true and correct
2    copy of an email from you to Michael Murphy dated June
3    8, 2015?
4    A.    Yes.
5    Q.    After the mediation, you had some
6    communications with Michael Murphy directly; right?
7    A.    Yes.
8    Q.    You did that through
9    mmurphy@sheehyware.com?
10    Q.    If you look at this, this is June 8,
11    2015, so this is long after the mediation; right?
12    A.    Yes.
13    Q.    Approximately two years after the
14    mediation?
15    A.    Yes.
16    Q.    If you look at the "P.S." at the bottom,
17    I was going to read it, but there is a little bit of
18    grammar error, but I will read it as is so it is
19    accurate: "P.S. Is you choose I will try to put the
20    recording of your opening speech at the meeting for
21    settlement on to a disc and send it to everyone so that
22    the only thing anyone will hear is your voice as I or
23    anyone else never uttered a word!  As we learnt many
24    years ago now the wife always holds a powerful phone
25

Page 164

1    recorder on the table in front of her!"  Did I read that
2    correctly?
3    A.    Yes.
4    Q.    Here you are representing that not only
5    did you make a recording but you would be able to hear
6    Michael Murphy's voice; right?
7    A.    Yes.
8    Q.    But that is not true?
9    A.    No.
10    Q.    We are finished with exhibit 12.  From
11    our discussion earlier today, it sounds like that
12    recording was not only illegible but it does not exist
13    any more?
14    A.    No. It did shut them up for a little
15    while, though.
16    (Exhibit 13 was marked for identification)
17    Q.    I am handing you what has been marked
18    exhibit 13.
19    A.    I have a highlighted one.
20    Q.    I will trade you; I apologise.  Is
21    exhibit 13 a true and correct copy of an email from you
22    to Mr. Michael Murphy, also dated June 8, 2015?
23    A.    Yes.
24    Q.    This one is similar to the other
25    document.  If you want to compare them that is fine, but

Page 165

1    it looks like the subject-matter in this one -- it looks
2    like the exhibits are a little bit different -- says:
3    "These documents are also required ASAP by Jose
4    Herandez. I could also try and put the recording of
5    your opening speech that I was supposed to have talked
6    all the way through-- Pity I learnt many years ago to
7    get the wife to record every meeting and doctors
8    appointments--".  Did I read that correctly?
9    A.    Yes.
10    Q.    That is in the subject line.  Who is Mr.
11    Jose Hernandez?
12    A.    He is somebody in the Department of
13    Labor.
14    Q.    So you were speaking with somebody in the
15    Department of Labor no later than June 2015?
16    A.    Yes.
17    Q.    Do you know what his title is or what he
18    does?
19    A.    No.
20    Q.    Did you speak with him by telephone?
21    A.    Yes.
22    Q.    How many conversations did you have with
23    Mr. Jose Hernandez?
24    A.    Just one -- maybe two.
25    Q.    Was he requesting documents from you?

Exhibit 1                                    App. 42

Page 166

1    A.    No.  I was offering documents to him to
2  see what he thought about the whole situation.
3    Q.    By 2015, you are unhappy with the
4  settlement.
5    A.    Oh, no, by three days after the mediation
6  I was unhappy with it.
7    Q.    So this is 2015; this is a continuing
8  saga, so to speak ----
9    A.    Yes.
10    Q.    ---- of your displeasure?
11    A.    Yes.
12    Q.    The rest of that talks about the opening
13  speech being recorded, right?
14    A.    Yes.
15    Q.    But it was not recorded in fact?
16    A.    No.  It was; it just was not legible.
17    Q.    Not usable.
18    A.    No.
19    Q.    Okay.  You talked about the medication
20  you were taking around the time of the mediation.  Do
21  you still use that same medication in the same amounts?
22    A.    Not in the same amounts, no.  There are
23  some differences that have changed because my heart
24  arrythmia has gone from -- there is a "normal" bracket,
25  there is "you are still safe but beware" bracket and

Page 167

1  then there is a "completely off the scale, you could
2  drop dead with a heart attack", and I was into that
3  bracket, so they decided to change some medication about
4  to try to get me down at least into the, "you can still
5  survive" stage.
6    Q.    When did you first understand that you
7  had arrythmia?
8    A.    It was when I was seeing the psychiatrist
9  -- the new one, which I am sure his name was
10  Dr. Campbell, but it can't be.  He is married to the
11  other doctor that is in the practice; I just can't
12  remember his name.  He is the other psychiatrist and he
13  is the one who put me on 400 mg tablets of amitriptyline
14  a day, which at the time he did not do anything, but at
15  the next appointment he wanted to check to make sure
16  that the amitriptyline wasn't affecting me too much, so
17  he got me to go through and get an ECG taken -- a heart
18  trace -- and that is when he noticed that it was way
19  out.
20    Q.    At any time prior to your settlement with
21  the carrier that we have just been talking about, did
22  any of your doctors suggest that you reduce, or try to
23  get you to reduce, the amount of medication that you
24  were taking?
25    A.    No, not before.

Page 168

1    Q.    It was after the fact?
2    A.    Yes.
3    Q.    What was the concern -- that it was
4  excessive or that it was causing problems?
5    A.    It was just because it was causing
6  problems for my heart and so on.  That is why I had to
7  change the amitriptyline to duloxetine.
8    Q.    Did any of your medical providers ever
9  offer or express to you that you were taking larger
10  amounts than is necessary or is average in terms of the
11  pain medication that you were taking?
12    A.    At the time before the mediation, no;
13  nobody said anything about the amounts being too much.
14  But afterwards -- it was probably a good two or three
15  years afterwards -- they started saying, well, your
16  morphine levels are too high, so you need to bring them
17  back down, and because of bringing them back down I am
18  getting more and more pain in my feet.  So now I am back
19  at the chronic pain clinic.  I see a doctor in there who
20  goes through all my medication on a quarterly basis.
21  I also see a psychologist in there who tries these
22  different methods to get you to deal with pain without
23  taking excessive medication.
24    Q.    Okay, so that was all after the mediation
25  .

Page 169

1    A.    Yes.  This is still ongoing.
2    Q.    I want to make sure I wrap up the
3  mediation itself and make sure I understand everything
4  that you recall.  We talked a little bit out of sequence
5  about Mr. Murphy's statement about, "If you don't accept
6  the settlement, we will stop your payments under the
7  law".
8    A.    Yes, "We can stop your payments if you go
9  to trial".
10    Q.    Was that at the mediation itself?
11    A.    As far as I can remember, yes.
12    Q.    Do you remember the sequencing?  Was it
13  before you agreed to accept the 943,000, or was it after
14  that?
15    A.    It was after.
16    Q.    But at the mediation still?
17    A.    Yes.
18    Q.    Had you signed the agreement at that
19  point?
20    A.    I think we were about to just sign it.
21    Q.    So you are about to sign it.  You had
22  agreed to it verbally and you are about to sign exhibit
23  11?
24    A.    Yes.
25    Q.    The mediation agreement.  Were you

Exhibit 1                                    App. 43

Page 170

1  expressing some question or concern?  How did that
2  arise?
3       A.      I think I had mentioned something about,
4  you know, just jokingly, "I don't think I'll bother
5  signing this".  Then that is when he said, "If you go to
6  trial, I can have your payments stopped legally", which
7  I thought, well, I am supposed to be accepting this
8  offer anyway, so it really wouldn't make much
9  difference.
10      Q.      But you had just said you may not sign
11 the agreement.
12      A.      Yes, just as a joke I said to him,
13 "I might not bother signing this".
14      Q.      And he said, "If you do that," -- in
15 other words, if you do not agree and take it to trial --
16 "they will stop your payments under the law".
17      A.      Yes.
18      Q.      So by that statement certainly you
19 understood that you did not have to sign the agreement?
20      A.      No, I was still under the impression that
21 I had to sign it.
22      Q.      Explain that?  I don't understand that,
23 when you just said a contingency, that you may not sign
24 it, and he said if you do that and you go to trial, then
25 this is what will happen.

Page 171

1       A.      Yes, but I didn't know anything that
2  would happen at trial, you know: do they discuss the
3  same figures or do they discuss different things or
4  what?
5       Q.      You knew a trial was before somebody
6  else; right?
7       A.      Yes.
8       Q.      It would be before a judge?
9       A.      Yes.
10      Q.      Did you not assume that it would be
11 similar to here, where each side presents their own case
12 and the judge decides?
13      A.      Yes and no.  The way that I had it set in
14 my head all the way before the mediation and during the
15 mediation was that I had to accept their offer, and
16 I had had the email from Robyn Bookhammer who said
17 exactly the same, you know, "You need to settle this
18 claim", underlined and highlighted.
19      Q.      So the basis for your belief is, one, you
20 just thought that you had to settle; and, second,
21 Ms. Bookhammer said in an email that you must settle.
22      A.      Yes.
23      Q.      Mr. Escobedo never told you you had to
24 settle a mediation.
25      A.      He never said anything about whether

Page 172

1  I had to settle or not.
2       Q.      We talked earlier today about the risk of
3  not settling was that the carrier would stop your
4  payments under the law.
5       A.      Yes.
6       Q.      At mediation nobody threatened you with
7  physical violence?
8       A.      No.
9       Q.      You don't strike me as a man who would
10 accept that.
11      A.      No, I wouldn't.
12      Q.      Nobody threatened you with any sort of
13 emotional abuse or other threats; is that fair?
14      A.      Yes, that's fair.
15      Q.      Nobody made fun of you or bullied you?
16      A.      No.
17      Q.      Nobody called you names?
18      A.      No.
19      Q.      I assume you would not accept that
20 either.
21      A.      No.
22      Q.      To wrap this up -- the day of the
23 mediation -- you have signed the mediation agreement and
24 you have talked about leaving mediation.  Did you, your
25 wife and Mr. Escobedo all leave together?

Page 173

1       A.      Yes.
2       Q.      Did you walk back to the hotel or what
3  happened there?
4       A.      We just walked down the street a bit from
5  where the mediation was and then me and the wife crossed
6  over to go to where our car was parked.  George, I take
7  it, went back to the hotel.
8       Q.      You parted ways then?
9       A.      Yes.
10      Q.      Is that the last time you saw
11 George Escobedo in person?
12      A.      Yes.
13      Q.      What did you and your wife do the rest of
14 the day?
15      A.      We just went home.
16      Q.      I am sorry I did not ask you:
17 approximately what time was it that you physically
18 walked out of the mediation?
19      A.      It must have been about 11 o'clock.
20      Q.      So you figure mediation took about two
21 hours?
22      A.      Yes.
23      Q.      Okay.  So you and your wife went home?
24      A.      Yes.
25      Q.      How did you feel about the settlement

Exhibit 1                                                App. 44

1  agreement as you left that day?
2      A.    We talked about it in the car on the way
3  home and the wife kept saying that "the numbers don't
4  seem to add up", but she did not see the -- was it
5  exhibit 11? She had never seen it; she had never seen
6  the figures on that. When I was trying to recall it and
7  say to her what was on there, she was saying, "Well,
8  I hope it's not what you are telling me because we will
9  never survive on that amount". I said, "Well, that is
10  what is there, so, I mean, you know, we just have to
11  take it or leave it". We went home and she sat and
12  worked things out, went through everything that we had
13  to pay out monthly and what was going to be coming in,
14  and there was a shortfall of about £3,000 or £4,000.
15      Q.    In a month?
16      A.    No, for the year, because we were only
17  getting paid this settlement figure every year. So we
18  had to work it all out for the whole year.
19      Q.    I see. So on the way home you and your
20  wife were talking about the settlement figures and you
21  were explaining to your wife what you understand the
22  settlement to be.
23      A.    Yes.
24      Q.    Is that the 943,000?
25      A.    That is what I was thinking until the

1  exhibit 11 ----
2      Q.    Okay. You understood that part of the
3  compensation was to be paid in a lump sum or upfront, so
4  to speak?
5      A.    Yes.
6      Q.    And part of it was an annuity or, as you
7  have defined it, a pension?
8      A.    Yes.
9      Q.    So you are talking to your wife and
10  telling her what you understand the amounts to be?
11      A.    Yes.
12      Q.    Do you remember specifically what you
13  told her as to the amounts?
14      A.    No. I said to her that there was
15  a figure to do with 600,000, which will be 943,000 less
16  the 300,000 advance payment that they had decided that
17  they were going to give out. Then you have got George's
18  fee that came out of that, which would take it down to
19  about 608,000. Then that gets split up into the
20  annuity.
21      Q.    And the annuity was over, was it, 25
22  years?
23      A.    Yes.
24      Q.    Okay. So you understood that 300, or
25  about 300, was paid at once?

1      A.    Yes.
2      Q.    Then there is 25 years of payments, that
3  the approximately 600,000 was being paid out over those
4  25 years?
5      A.    Yes.
6      Q.    So is that the number that your wife used
7  to run the calculation of your expenses?
8      A.    Yes.
9      Q.    So it sounds like you guys were
10  budgeting?
11      A.    Yes.
12      Q.    That was on the date of mediation?
13      A.    No. We had discussed the figures on the
14  way home in the car, but this was about two or nearly
15  three days later when she was going through the
16  calculations and seeing, you know -- it had taken her a
17  couple of days to go through and find all the figures
18  that she was needing.
19      Q.    I see, okay. Did anything else
20  significant happen on the day of mediation? Did you
21  talk to anybody else about the mediation or the figures
22  that day?
23      A.    No.
24          MR. LEE: Let us go off the record.
25          (Lunch break 13.07 - 13.39)

1  BY MR. LEE:
2      Q.    We had concluded your testimony this
3  morning, or before the break, talking about the
4  mediation.
5      A.    Mm-mh.
6      Q.    I want to continue in that discussion
7  more or less chronologically and speak with you about
8  what happens after the mediation. You talked earlier
9  about George Escobedo not bringing any documents; right?
10      A.    Yes.
11      Q.    Essentially, not doing a presentation?
12      A.    Yes.
13      Q.    Is the complaint that you had with him
14  that you felt that he did an inadequate job at the
15  mediation?
16      A.    He didn't really do much at the
17  mediation.
18      Q.    Is that one of your complaints against
19  Mr. Escobedo in this suit, that he did not adequately
20  represent you during the mediation?
21      A.    Yes.
22      Q.    Specifically, what do you believe he did
23  not do to adequately represent you?
24      A.    Everybody else seemed to be equipped with
25  the right documents, the right attachments, or at least

Exhibit 1                    App. 45

Page 178

1  a note pad, but George came with nothing and he hardly
2  spoke two words.
3      Q.    So you believe he should have brought
4  some documents to the mediation?
5      A.    Yes.
6      Q.    Were documents used at the mediation by
7  the other side?
8      A.    They had laptops and everything on the
9  other side.  They never showed us any documents.
10     Q.    Okay.  That was my question.  Did the
11 other side actually present to you or, to your
12 knowledge, present to the mediator any documents?
13     A.    I don't know about the mediator, but not
14 to us.
15     Q.    But you believe George should have
16 brought some documents and done what with those?
17     A.    At least have something there so if they
18 had said, you know, like, "You have no proof that you
19 cannot work any more", so you'd better at least have the
20 doctor's letter there that states, in his professional
21 opinion, "He cannot work any more".  There was one from
22 my doctor and also one from Professor Simpson, which
23 said almost exactly the same, but, I mean, he is the
24 orthopaedic specialist for this whole area; he trained
25 them all.

Page 179

1      Q.    Was the letter from Professor Simpson
2  given to your lawyer?
3      A.    Yes.  A copy was given to everybody.
4      Q.    What do you mean "everybody"?
5      A.    Robyn Tydelski and George Escobedo, and
6  Robyn would have forwarded it to Michael Murphy.
7      Q.    Was this before mediation?
8      A.    Yes.
9      Q.    So they had that document before
10 mediation.  It is just that George didn't show up with
11 the document; right?
12     A.    Yes.
13     Q.    Do you know the date of that Professor
14 Simpson letter?
15     A.    Not off the top of my head, no.
16     Q.    Was it dated shortly before mediation?
17     A.    It was just shortly before mediation,
18 yes.
19     Q.    Was that similar to the Dr. Fulton letter
20 that we looked at earlier today?
21     A.    Yes.
22     Q.    And does Professor Simpson say you are
23 not going to be able to work ever again?
24     A.    Yes.
25     Q.    Does he attribute that to any specific

Page 180

1  part of the body?
2      A.    No.
3      Q.    You don't know what George Escobedo
4  exchanged with opposing counsel or the carrier prior to
5  mediation; correct?
6      A.    No.
7      Q.    You don't know if the settlement would
8  have been at a different figure had George Escobedo
9  brought any documents to mediation.
10     A.    Of that, I have no idea.
11     Q.    But at mediation on September 6 of 2013,
12 you saw that George did not have any documents.  You had
13 a tonne of documents and you felt like George was not
14 adequately prepared?
15     A.    Yes.
16     Q.    We talked earlier today about how you
17 became displeased with the mediation agreement or the
18 settlement reflected therein almost immediately; right?
19     A.    Yes.
20     Q.    What was it about the settlement that
21 made you feel like the settlement was inadequate and the
22 settlement was wrong?
23     A.    It was just looking at the figures that
24 were in the final agreement.  By the time the wife got
25 home and she had gone through all the bills that we

Page 181

1  would have to pay and worked out exactly what we would
2  get on a yearly basis, we realised three days after the
3  mediation and we sent an email to George saying, "We
4  will probably last for about five years and then we will
5  start to go under".
6      Q.    So when your wife ran the numbers, within
7  three days you knew that the amount you would receive
8  under the settlement agreement was substantially less
9  than the average weekly wage figure that you had
10 presented to George previously; right?
11     A.    Yes.
12     Q.    And so it became clear to you within days
13 of mediation that the settlement compensation you had
14 agreed to was far short of what you would be getting if
15 you had continued receiving your disability payments as
16 you had been receiving them?
17     A.    Yes.
18     Q.    You came to that realisation and realised
19 that George did not adequately represent you at the
20 mediation?
21     A.    Yes.
22     Q.    I have some of the documents I am going
23 to use just to reflect this point.
24     (Exhibit 14 was marked for identification)
25     Q.    Here is exhibit 14, sir.  Is exhibit 14

Exhibit 1                                          App. 46

## Page 182

1  a string of emails that you exchanged with Ms. Besch
2  between Saturday, September 7, 2013 and Wednesday,
3  September 11, 2013?
4       A.    Yes.
5       Q.    Let us go ahead.  We are going to start
6  at the back of this one, so we are going to go through
7  this one chronologically.  If you look at the second to
8  the last page RR 0030907, this page includes an email
9  from you to Donna Besch dated September 7, 2013 at 1.18
10 am; correct?
11      A.    Yes.
12      Q.    On September 7 at 1.18 am, you had been
13 out of mediation for just over 12 hours; right?
14      A.    Yes.
15      Q.    In here you talk about starting at $1
16 million with the demand; is that right?
17      A.    Yes.
18      Q.    You said: "Every thing I said or done
19 got shot down in flames including the 2 psychologists
20 reports, the depression tablets, the length of time I've
21 been on the highly addictive Diazapan and most of that
22 came from the 1 other person in the room that was
23 supposed to be on our side the mediator!!!"  Did I read
24 that correctly?
25      A.    Yes.

## Page 183

1       Q.    What was it that you said or did that was
2  -- I guess it was -- discarded by the mediator or
3  disregarded?
4       A.    Yes.  It was just when we were talking
5  about going down by denominators of $100,000 and they
6  were only going up by $25,000 and when I mentioned,
7  "Well, why don't we just go down with the same amount?"
8  It was like, "No, no, we can't do that, no; you have to
9  go down by the $100,000 or we will be here all day".
10      Q.    I see.  So you were suggesting specific
11 counteroffers or methods by which you would make the
12 demands?
13      A.    Yes.
14      Q.    And the differences between the demands,
15 and he more or less disregarded that?
16      A.    Yes.
17      Q.    Ultimately, though, for instance, if he
18 said you should go down by $100,000, did you tell him
19 "Don't do that".
20      A.    I mentioned to him -- I said, "Why are we
21 doing that when they are only going up by $25,000 every
22 time?  Wouldn't it make more sense for us to do the
23 same?"  But he said, no, it shows a gesture of goodwill
24 if we go down by 100,000.
25      Q.    Ultimately, though, it sounds like in

## Page 184

1  terms of the negotiations back and forth, if you end up
2  with $943,000, that is pretty close to the initial $1
3  million demand, isn't it?
4       A.    Yes.  That is how we looked at it when
5  the settlement came through, but, you know, there was
6  all this going backwards and forwards.  We have no idea
7  why it ended up at that amount, because they must have
8  had that figure in mind from the insurance company who
9  had said, you know, "This is our top offer; we are not
10 going any higher than this, so this is the final offer
11 that you can give them".  So wherever we were in the
12 proceedings, when I took my fainting-type spell, they
13 automatically thought, well, he's getting up and leaving
14 so we will have to do something, and then that is when
15 they came out with this final offer, which was up near
16 to where we had started anyway.
17      Q.    Was there anything that you said or did
18 where you addressed -- I don't know -- the scope of our
19 disability, the back or the neck, those types of
20 discussions that were disregarded by others?
21      A.    No, not in the mediation.  There was
22 nothing said like that at all.
23      Q.    Okay.  That addresses that aspect of the
24 email.  If you will, go up in the document to RR
25 0030906, which is a September 9, 2013 email.

## Page 185

1       A.    Yes.
2       Q.    It looks like this is continued
3  discussions with Ms. Besch and you are talking about how
4  the offer started, the counteroffer and so forth.
5       A.    Yes.
6       Q.    Under the second paragraph you say,
7  "That's when I lost it and packed all my stuff away and
8  told the Mediator 'You and your pals go and enjoy the
9  castle, it'll be open about now!'  With in seconds the
10 offer was doubled and I got told to accept!!"  Did
11 I read that correctly?
12      A.    Yes.
13      Q.    Here it sounds like what you were telling
14 Ms. Besch was that you were going to walk out of the
15 mediation.
16      A.    Yes.  That was just a figure of speech
17 that we were using.  It was not meant literally.  It
18 didn't exactly happen that way.  I mean, I wouldn't turn
19 round to you just now and say, "Clear off to the castle,
20 enjoy yourself".  It's not the done thing when you are
21 in among attorneys.  This was just the kind of banter
22 that me and Donna Besch had together.
23      Q.    Okay.  I guess my underlying question,
24 though, is did you intend to pack up and walk out of the
25 mediation?

Exhibit 1                                    App. 47

## Page 186

1    A.    No.  She knew that as well.  She knew the
2 amount of medication I was on.
3    Q.    Further down, in the following paragraph,
4 towards the bottom, it talks about "the Mediator said
5 they could find you a job doing something like watching
6 screens all day looking for shop lifters" and so forth.
7 Was that a discussion in mediation?
8    A.    That was mentioned.  I think it was
9 Michael Murphy who mentioned that, or was it before --
10 no, that was before the mediation because it was said
11 that I could be a TV monitor for cameras, street
12 cameras, so I could look out for shoplifters and the
13 like, but then I would not be pursuing, I'd just be
14 finding them and informing the police, you know, picking
15 up the phone, and that is the kind of job that
16 I could do, and they came out with figures of, I think
17 it was, 19,500 and 25,000.  It was a wage between those
18 figures.  Basically, they were trying to say I could
19 work, but, with the medication I was taking, I could
20 not, because if I was in a room on my own I would just
21 be conked out half the time.
22    Q.    Was that discussed in mediation or was
23 that some kind of discussion prior to the mediation?
24    A.    No, I think that was before mediation.
25    Q.    So in mediation you don't remember

## Page 187

1 anybody saying, "Hey, you could get a job"?
2    A.    No, it was not.
3    Q.    Then at the bottom, the next paragraph,
4 below the one we were looking at, you reference,
5 "$665,000 spread over 25 years!!!!" and say, "What a
6 fucking rip-off and I don't know where to turn to now as
7 this was $4188.64 every 4 weeks down to $941 every
8 month!!  I don't even think I can appeal or something??"
9 Did I read that correctly?
10    A.    Yes.
11    Q.    At this point you are questioning whether
12 you can challenge the mediation agreement; right?
13    A.    Yes.
14    Q.    Because by this point, by approximately
15 12 hours after mediation, you felt like wrong had been
16 done during the mediation.
17    A.    Yes, but this email was three days after
18 the mediation.
19    Q.    Okay, you are right -- September 9.
20    A.    Yes.
21    Q.    The first email we looked at was about 12
22 hours.  This one is September 9.
23    A.    Yes.
24    Q.    So this is consistent with what you said
25 earlier today that, by approximately three days later,

## Page 188

1 you are not happy and your wife is not happy.
2    A.    Yes.
3    Q.    You believed that George had done
4 something wrong.
5    A.    Yes.
6    Q.    I may have asked this, sir, and I
7 apologise.  What is the amount that you get now?  If you
8 average the yearly amount to a monthly amount, how many
9 pounds do you get per month now?
10    A.    In pounds it is about £18,500 for the
11 year, so that will be £1,583, I think .
12    Q.    Your math is probably better than mine.
13    A.    It is about there somewhere.
14    Q.    So that is the figure in pounds that you
15 get, and I understand there are some differences in the
16 exchange rate over time, right?
17    A.    Yes.
18    Q.    But at this time you thought you would
19 only get £941 a month.
20    A.    Yes.
21    Q.    Then we read that you were asking if you
22 "can appeal or something??"  Were you asking Ms. Besch
23 if she knew whether you could appeal?
24    A.    Yes.
25    Q.    You are talking about appealing the

## Page 189

1 mediation agreement.
2    A.    Yes.
3    Q.    In other words, reversing the mediation
4 agreement?
5    A.    Yes.
6    Q.    And going back to the compensation you
7 had been receiving prior to mediation?
8    A.    Yes.
9    Q.    In that event, you would eventually try
10 the case before the Department of Labor?
11    A.    Yes.
12    Q.    Did Ms. Besch ever respond to you about
13 whether you could appeal or not?
14    A.    No, I cannot remember.  I cannot recall
15 her saying anything about that.  She may have done
16 during a telephone conversation, but she wouldn't have
17 put it in writing.
18    Q.    I will show you some more emails.  We
19 have emails between you and Ms. Besch and Mr. Escobedo
20 and some other folks.  Were there also telephone
21 communications during this time period with Ms. Besch?
22    A.    Yes.
23    Q.    Do you know how many telephone
24 conversations you had with Ms. Besch between the date of
25 the mediation and the date that the Department of Labor

Exhibit 1                                    App. 48

Page 190

1  issued its compensation order in late 2013?
2      A.    It could have been maybe a couple of
3  dozen phone calls.
4      Q.    Would it be generally consistent with
5  this email, talking about issues?
6      A.    Yes.
7      Q.    Did you talk about appeal with her, about
8  the appeal or reversing the mediation agreement, with
9  Ms. Besch orally as opposed to just by email?
10     A.    Yes, on occasion.  A lot of it was we
11 would ask her about how she was doing with building the
12 extension on the back of her house and she had problems
13 with her garden and stuff like that.  It wasn't anything
14 to do with the trial or anything, or the mediation, but
15 on the odd occasion if I had questions about it then
16 I would ask her and she would answer.
17     Q.    I see.  So you would have personal
18 communications, "How are you doing?", like friends would
19 have.
20     A.    Yes.
21     Q.    Then you would have communications with
22 her that would be more substantive, talking about, for
23 instance, after mediation, whether you can appeal or the
24 adequacy of the settlement -- that type of thing?
25     A.    Yes.

Page 191

1      Q.    Do you remember any specific
2  conversations with Ms. Besch about anything more about
3  the appeal, whether it was possible, where the appeal
4  would be to, that sort of thing?
5      A.    No.
6      Q.    As you sit here today, do you remember
7  any conversations with Ms. Besch between the date of
8  mediation and the date of the compensation order from
9  the Department of Labor regarding the adequacy of the
10 settlement or the adequacy of Mr. Escobedo's
11 representation of you?
12     A.    No.
13     Q.    If we continue on that same email, the
14 September 9 email, that continues on to the next page.
15 It says at the top:  "True Robyn shows her true side.
16 Witch!!"  Did I read that correctly?
17     A.    Yes.
18     Q.    What was that?  I sense that you'd got
19 some frustration with Ms. Bookhammer?
20     A.    Yes.  She was always trying to be really
21 friendly, you know, the best "girl next door" type of
22 thing, and she would always say she was trying to do her
23 best by you, whatever she could do to help she would do
24 it, but then when it came down to it, no, she wasn't;
25 she was just after getting promotion in the company or

Page 192

1  something -- I don't know.
2      Q.    So you felt like in conversations she was
3  friendly and trying to help you, but then when it came
4  down to the actual settlement that you felt like you got
5  cheated?
6      A.    Yes.
7      Q.    If we continue on there, it says:  "If
8  you can think off any legal routes to go I'd love to
9  hear them?  I did sign what i think wasan agreement but
10 I was so stressed and felt so I'll I'd have signed
11 a pact with the true Devil just to get out off there
12 that's how bad I was feeling!!!!????"   Did I read that
13 correctly?
14     A.    Yes.
15     Q.    I understand -- and I just read it
16 correctly -- that sometimes you said "off" instead of
17 "of" in here, but what I am trying to get at is you were
18 asking her if she was aware of any legal procedures or
19 methods by which you could dissociate yourself or negate
20 that settlement agreement.
21     A.    Yes.
22     Q.    I use "settlement agreement" and
23 "mediation agreement" interchangeably but we know we are
24 talking about that agreement that you signed
25 at mediation?

Page 193

1      A.    Yes; we do, yes.
2      Q.    Did she ever respond to you with any
3  legal routes that you could pursue?
4      A.    No, not by email or by telephone.
5      Q.    So at this point on September 9, 2013 you
6  are unhappy with the settlement agreement, you believe
7  you have been wronged by the carrier and Mr. Escobedo
8  and you are looking at potential legal procedures by
9  which you can reverse what you view as an unfortunate
10 agreement; is that fair?
11     A.    Yes.
12     Q.    One of which was appeal, which you have
13 heard of but do not know the specifics of; is that
14 right?
15     A.    Yes.
16     Q.    Then you are asking her "Is there
17 anything else?"
18     A.    Yes.
19     Q.    If we move forward chronologically, if
20 you go to page RR 0030905, Ms. Besch responds to you at
21 the bottom of that page on September 9, 2013, or in part
22 of that she says: "What is your lawyer saying?  If you
23 think this offer is short of what you need or what the
24 case is worth, you could ask someone else's opinion.
25 That will verify, or not verify the offer for you."  Did

Exhibit 1                                    App. 49

194..197

1  I read that correctly?

2      A.    Yes.

3      Q.    That was Ms. Besch's response to you

4  after you asked for potential legal procedures; right?

5      A.    Yes.

6      Q.    So she is giving, I guess, the best

7  answer that she can give you; is that right?

8      A.    Yes.

9      Q.    She is suggesting that you talk to

10  somebody else?

11      A.    Yes.

12      Q.    And she suggests that to you to verify this

13  with a third party, essentially; is that fair?

14      A.    Yes.

15      Q.    Your response, if we go up that same page

16  on September 9, is to ask:  "Can the decision be changed

17  say by the Department of Labor?  Or even better still an

18  attorney that can take control and push for more money

19  for my family?"  Did I read that portion correctly?

20      A.    Yes.

21      Q.    So you are asking her specifically if she

22  is aware if the Department of Labor can change the

23  agreement?

24      A.    Mm-mh.

25      Q.    Is that right?

1      A.    Yes.

2      Q.    Or you are thinking about potentially

3  another attorney to be more aggressive?

4      A.    Yes.

5      Q.    I take it from this you felt like

6  Mr. Escobedo was not assertive or aggressive enough in

7  the representation of you.

8      A.    Yes, that is correct.

9      Q.    That is because of the conduct at the

10  mediation and the amount of the mediation agreement?

11      A.    Yes.

12      Q.    If we go up on that same page, she

13  responds to you again on September 9, 2013:  "Those are

14  lawyer questions and few folks here are schooled in the

15  specifics of Defense Based Act, National Health

16  Insurance and WC.  What is your lawyer saying?"  Did

17  I read that correctly?

18      A.    Yes.

19      Q.    Did you know that "WC" is workers'

20  compensation?

21      A.    No; I thought she was talking about

22  a toilet.

23      Q.    I'm sorry?

24      A.    I thought she was talking about a toilet.

25      Q.    A water closet?

1      A.    Yes.

2      Q.    Okay.

3      A.    You just spoilt my whole impression of

4  it.

5      Q.    You thought she was making a joke?

6      A.    Yes.

7      Q.    You thought that she was referring to the

8  agreement as being in the water closet?

9      A.    Yes.

10      Q.    Okay, I can see that.  You think that she

11  is taking a dim view of the agreement as well, that it

12  belongs in the toilet?

13      A.    Yes, that's what I thought.  Wait until

14  I phone her tonight!

15      Q.    Let us move forward to the preceding page

16  and again on September 9 -- we are going to skip

17  a couple -- but you send an email to Ms. Besch on

18  September 9, 2013 at 2.11 pm.  Oh, I don't need to

19  address that.  We can skip that.  Going up one, Donna

20  Besch to you on September 9, 2013 at 6.29 pm, says:

21  "Deep breath!  Get the facts of the offer and we can

22  review."

23      A.    Yes.

24      Q.    So is she suggesting to you to, I guess,

25  to get more information?

1      A.    Yes.

2      Q.    Did you not have the facts of the offer?

3  You had the figures; is that right?

4      A.    Yes.

5      Q.    So you already knew at this point that

6  you were not happy with it?

7      A.    Yes.

8      Q.    She is telling you to take a deep breath.

9  I guess that is because you are friends?

10      A.    Yes.

11      Q.    If we go forward to RR 0030903, Monday,

12  September 9, 2013 at 4.13 pm, you send Ms. Besch, if you

13  look at the bottom of that page:  "No loss of earnings.

14  No loss of future earnings."  Then you relate your

15  calculation of the figures; is that right?

16      Q.    Above that she responds to you: "Is this

17  deal signed sealed and delivered?"  Correct?

18      A.    Mm-mh.

19      Q.    Is that a yes?

20      A.    Yes, sorry.

21      Q.    You respond to her that same day:  "No,

22  I have 4 - 5 days before the papers come through."  Did

23  I read that correctly?

24      A.    Yes.

Exhibit 1                                App. 50

Page 198

1    Q.    So at this point you know you still have
2  time to review the documentation that you are going to
3  be receiving before you sign it?
4    A.    Yes.
5    Q.    You know at this point that you can
6  refuse to sign the papers?
7    A.    I was starting to get round to that way
8  of thinking, yes.
9    Q.    Above that, she says to you on Tuesday,
10  September 10, so this is the next day:  "Can you talk to
11  your attorney again or is he not working in your
12  interest?  If you do not sign, what is the option?"
13  Did I read that correctly?
14    A.    Yes.
15    Q.    She is at this point questioning whether
16  Escobedo is working in your interests; right?
17    A.    Yes.
18    Q.    If we go forward to the very front of
19  this exhibit, this is a longer email, at the bottom of
20  the first page that is from you to Donna Besch,
21  September 11, 2013.  This is less than a week after
22  mediation; right?
23    A.    Right.
24    Q.    You say:  "I talked to my attorney last
25  night and all me said was it would take months to get

Page 199

1  them to court but in the mean time their attorney
2  Michael Murphy would try everything in his power to stop
3  my cheques."  Did I read that correctly?
4    A.    Yes.
5    Q.    It says "me" there, but I think what you
6  are saying is that is what George said to you.
7    A.    Yes.
8    Q.    At this point he is saying that you can
9  take them to court, that that is still an avenue that is
10  available to you?
11    A.    Yes.
12    Q.    That although you have signed this
13  mediation agreement, you can still pursue your claim
14  with the Department of Labor?
15    A.    Yes.
16    Q.    If we continue on to the next page, the
17  second paragraph on that page references, "The mediator
18  said they would find me a meaningless job like sitting
19  watching monitors all day looking for shop lifters", and
20  the paragraph continues there.  Does that refresh your
21  recollection that the other side had argued at mediation
22  that the carrier would try to find you a job?
23    A.    Yes.  They must have been talking about
24  that through at their side of the room, because they did
25  not say anything when we were all together.

Page 200

1    Q.    How did you learn about that?  How did
2  you learn about the statement from the mediator if it
3  was not said to you at mediation?
4    A.    It was an email I got from -- what was
5  his name?  He was the vocational expert that they had
6  employed.
7    Q.    A guy named Pickard?
8    A.    Yes.
9    Q.    That was years before, that he prepared
10  that report; right?
11    A.    Yes.
12    Q.    So my question to you is: how did you
13  learn about the mediator saying this?
14    A.    I didn't learn about the mediator saying
15  that.  That example had come up on several occasions.
16    Q.    Prior to mediation?
17    A.    Yes.
18    Q.    I guess I am confused because this says,
19  "The mediator said they would find me a meaningless job
20  like sitting watching monitors all day."
21    A.    No, I must have got that wrong.  It
22  certainly wasn't the mediator.
23    Q.    You don't remember the mediator saying
24  that to you or mentioning it?
25    A.    No.

Page 201

1    Q.    If we go down to the middle of that same
2  page, it refers to the Dr. Fulton letter that we have
3  already read today; right?
4    A.    Yes.
5    Q.    Then after that -- and that is about the
6  "no work" letter -- you say:  "So if he says no, he is
7  higher than God in this situation, it really does mean
8  NO!!!!"
9    A.    Yes.
10    Q.    What were you trying to convey there?
11    A.    That his word is final.  If the doctor
12  says that I am not able to go back to work, then that is
13  it -- I am not able.
14    Q.    Do you have an understanding that if
15  a case is tried before the Department of Labor there can
16  be competing doctors' opinions?  In other words, one
17  doctor can say, no, he can't work and another doctor can
18  say, yes, he can?  Do you understand that that is
19  a possibility?
20    A.    Yes.
21    Q.    Then do you understand, if that is
22  a possibility, that the judge may side with one or the
23  other or maybe mix the two?
24    A.    Yes.
25    Q.    So is that a risk you understood if you

Exhibit 1                              App. 51

Page 202

1  proceeded to the Department of Labor for trial, that
2  there was a risk that perhaps another doctor would offer
3  a competing opinion and the Department of Labor might
4  accept that and reduce your compensation?
5      A.    No, I never thought about that.
6      Q.    Then in the next paragraph: "My attorney
7  still said last night but what If you were able to do
8  something in 3 to 5 years to supplement your earning
9  then things would be better?? I thought has this
10 jackass listened to anything anyone has told him like
11 both feet are now out off action and I have a 95% of
12 being in a wheelchair between now and this time next
13 year because Professor Simpson is not doing any more
14 surgery until everything settles down..." I end the
15 quote, but the paragraph continues.  Did I read that
16 quoted portion correctly?
17     A.    Yes.
18     Q.    So it looks like you are referring to
19 Professor Simpson and he is talking about there is going
20 to be another surgery?
21     A.    Yes.
22     Q.    But, from what I take from this
23 communication, George and you had had a discussion where
24 George is saying, "Can you live on this if you go back
25 to work at some point?"

Page 203

1      A.    Yes, I could see that.
2      Q.    Did he raise that with you, "Well, can
3  you go back to work at some point, or what if you go
4  back to work at some point?"
5      A.    No; he never raised that with me.
6      Q.    Okay.  Then in this paragraph, what are
7  you talking about?  You are unhappy with him, right,
8  because you call him a "jackass"?
9      A.    Yes.
10     Q.    What are you unhappy with George about?
11     A.    Just that at the mediation he never tried
12 hard enough to get the settlement that I thought there
13 should have been.
14     Q.    So at this point you are looking back at
15 the mediation and you are ----
16     A.    Yes, between the mediation and the fact
17 that after the mediation I could not get a hold of
18 George at all by email or phone, and sometimes I would
19 be on the phone 15 times a day trying to get hold of him
20 because I wanted to speak to him and I would never get
21 him.  That's why I ended up phoning the Department of
22 Labor and spoke to Mr. Quezada.
23     Q.    We will get to there in just a minute.
24 I want to wrap this up.  At this point by September 11,
25 2013, you are upset enough with George that you are

Page 204

1  calling him a jackass because you did not feel that he
2  adequately represented your interests, and now you feel
3  like you have this mediation agreement that is unfair
4  and improper to you?
5      A.    Yes, and I am trying to get it stopped
6  from signing as soon as possible.  We couldn't get hold
7  of anybody.
8      Q.    Let us address that now.  When is it that
9  you tried to get hold of George and couldn't get a hold
10 of him?
11     A.    It was round about that time -- two or
12 three days after the mediation.
13     Q.    Do you know is that recorded or reflected
14 anywhere about the attempts that you made to contact
15 George?
16     A.    Of that, I would have no idea.
17     Q.    As to these attempts you had to make
18 contact with George, was that by email and phone or only
19 by phone?
20     A.    Most of it was by phone.  I think there
21 were one or two attempts by email.
22     Q.    Did you ever reflect that in emails?  In
23 other words, did you say, "Hey George, I have been
24 trying to contact you X number of times.  Where are
25 you?"

Page 205

1      A.    Yes.
2      Q.    Do you believe that is reflected in
3  emails?
4      A.    Yes, somewhere.
5      Q.    What do you think those emails say?  How
6  would you say it or what do you remember saying?
7      A.    It would have been something along the
8  lines of, "George, I need to speak to you about this
9  settlement agreement and seeing about getting it
10 stopped".
11     Q.    Would you have reflected the attempts
12 that you had made to contact him?
13     A.    Probably not; I wouldn't want to upset
14 him.
15     Q.    Why would you not want to upset him when
16 you are already upset?
17     A.    Just because I am upset, it doesn't mean
18 to say that somebody else has to be in the same boat.
19     Q.    If we go to the bottom of this same page
20 we have been addressing in this email, it says, "So in
21 short no cheques for about 9 months until it goes to
22 court but I still have 3 or 4 days to decide to sign or
23 not?!?!"  Did I read that correctly?
24     A.    Yes.
25     Q.    Sometimes you mix question marks and

Exhibit 1

Page 206

1  exclamations points. Are you trying to emphasise
2  something?
3         A.    Just that, yes, you can take it as
4  a statement or you can take it as a question.
5         Q.    So are you inviting her to take it as
6  either one?
7         A.    Yes.
8         Q.    So at this point, though, you still
9  recognise that you have not signed anything beyond the
10  mediation agreement and recognise that the paperwork is
11  still coming and you can decide not to sign?
12         A.    No. I thought once I had signed that
13  paper at the mediation, that was it, because then it
14  went straight up to the head guy at the Department of
15  Labor.
16         Q.    You knew there was going to be additional
17  paperwork submitted to you; right?
18         A.    Yes, I did hear that.
19         Q.    You had not received that paperwork yet?
20         A.    No; I had not, no.
21         Q.    You had an option to sign that paperwork
22  or not?
23         A.    No. I believe I got an email from George
24  saying that "You need to sign that paper and get it back
25  to me" because there is another one that he has to sign.

Page 207

1         Q.    Okay. We will look at that here in a few
2  minutes. If you go to the very front page of this
3  exhibit 14, this is from you to Donna Besch dated
4  September 11, 2013 at 2.43 pm; right?
5         A.    Yes.
6         Q.    You say: "The attorney says take it it's
7  a lot off money but if you're REALLY not happy we can
8  take them to court which I'm sure Michael Murphy will
9  get your monthly cheques stopped and he will make sure
10  it takes at least 9 months fora court hearing would get
11  started!!!!"  Did I read that correctly?
12         A.    Yes.
13         Q.    "Your attorney" -- that is, Mr. Escobedo,
14  right?
15         A.    Yes.
16         Q.    He says that if you're really not happy
17  you can still take your claim to the Department of
18  Labor?
19         A.    Yes.
20         Q.    So at this point of September 11, you
21  have spoken with George at least once since the
22  mediation; right?
23         A.    Yes -- probably by telephone.
24  (Exhibit 15 was marked for identification)
25         Q.    I am handing you what has been marked as

Page 208

1  exhibit 15. This is an email -- we are going back
2  chronologically a bit -- from you to George Escobedo
3  dated September 9, 2013; right?
4         A.    Yes.
5         Q.    The subject is, "Question-" and further
6  down in the document at about the middle, do you see the
7  stand-alone sentence that says, "Before this thing goes
8  through is there any time scale to challenge the
9  decision and take them to court?"  Did I read that
10  correctly?
11         A.    Yes.
12         Q.    He must have responded because in the
13  email that we just read, you said to Ms. Besch that
14  George said you could still take them to court; right?
15         A.    Right, yes.
16         Q.    Then you talk a little bit about the
17  mediation. At the very bottom you say: "Last night the
18  wife and I sat down and done some proper numbers and we
19  have no chance off living on less than a quarter off
20  what I'm on just now which at that rate was already half
21  off what I was earning!! When I got up yesterday and
22  realized what had happened I have gone down hill ever
23  since!"  The paragraph continues, but as to the portion
24  I read, did I read it correctly?
25         A.    Yes.

Page 209

1         Q.    So at this point you got a full
2  realisation of what those numbers mean to you, right?
3         A.    Yes.
4         Q.    You realise that this is going to be
5  a quarter of the amount you have been earning when you
6  were over in Iraq, correct?
7         A.    Yes.
8         Q.    And less than half of what you were
9  earning when you had your Department of Labor claim
10  pending and receiving compensation benefits?
11         A.    Yes.
12  (Exhibit 16 was marked for identification)
13         Q.    If we go to exhibit 16, sir, this is an
14  email from you to Paul@pauldoolittlelaw.com dated
15  September 10, 2013; is that correct?
16         A.    Yes.
17         Q.    Is Paul Doolittle the same as the
18  mediator that we discussed previously today?
19         A.    Yes.
20         Q.    How did you have his email address?
21         A.    Of that, I have no idea.
22         Q.    You also sent the email to
23  George Escobedo and a copy to Michael Murphy. Had you
24  been communicating with Michael Murphy before this?
25  I see that you have his email address.

Exhibit 1                                    App. 53

Page 210

1    A.    Yes.  I think there were a couple of
2  times that there was email traffic between us.
3    Q.    Okay, so you had his email as well and
4  you included him?
5    A.    Yes.
6    Q.    You introduce yourself, that you were the
7  Robert Rollo from the mediation the prior week; right?
8    A.    Yes.
9    Q.    Then you go on to talk about -- it looks
10  to me like, essentially, what you are arguing is that
11  you cannot go back to work; is that right?
12    A.    Yes.
13    Q.    Are you okay?
14    A.    Yes.
15         MR. ROSENHOUSE:  Do you want to take
16  a break?
17    A.    No, it's okay; it'll clear in a minute.
18         MR. LEE:  Let me just put on the record
19  that if you need a break, we will take a break.
20    A.    No, it is fine.
21    Q.    So it looks to me like, essentially, what
22  you are doing is arguing your position that you are not
23  going to be able to work; is that right?
24    A.    Yes.
25    Q.    And you felt that George should have

Page 211

1  argued that at mediation?
2    A.    Yes.
3    Q.    Why is it that you reached out to
4  Mr. Doolittle and copied Mike Murphy?
5    A.    As you said previously about the TV
6  monitoring job, Paul Doolittle must have said something
7  about that at the mediation because there would be no
8  other way I would have to contact him.
9    Q.    Let me ask you what your underlying
10  purpose of this email was.  Were you trying to
11  renegotiate the agreement or get the agreement set
12  aside?  What was the purpose?
13    A.    It was to try to see if I could get it
14  set aside.
15    Q.    So this is your way of expressing
16  displeasure with the agreement?
17    A.    Yes, without using profanity.
18    (Exhibit 17 was marked for identification)
19    Q.    I am handing you what has been marked as
20  exhibit 17.  This is another email exchange between you
21  and Ms. Besch; is that right?
22    A.    Yes.
23    Q.    If you look at the second down from the
24  top, I guess that is all part of the same -- no, it is
25  not.  Do you see the email from Robert Rollo to Donna

Page 212

1  Besch on September 11, 2013 at 12.20?
2    A.    Yes.
3    Q.    At the very last sentence:  "Just got the
4  paper through to sign but I have until the 10th October
5  to sign it then burn it!!!??"  Did I read that
6  correctly?
7    A.    Yes.
8    Q.    Is this the final settlement paperwork to
9  sign before the settlement is submitted to the
10  Department of Labor?
11    A.    Yes, it must have been.
12    Q.    At this point, by September 11, you have
13  received at least some paperwork but you have time, you
14  have another month, to sign it; is that right?
15    A.    Yes.
16    Q.    Then if we go to the email that is
17  Ms. Besch's response to you, she says:  "THAT GIVES YOU
18  MONTH TO CHECK OUT THE SETTLEMENT.  IS THAT ENOUGH TIME
19  TO TALK TO THE OTHER LEGAL GROUP?"  Did I read that
20  correctly?
21    A.    Yes.
22    Q.    Who was the other legal group she is
23  referencing?
24    A.    Of that.  I have no idea.
25    Q.    It appears that there is some discussion,

Page 213

1  or at least mention by you or her, about consulting with
2  another attorney or legal firm; is that right?
3    A.    No.
4    Q.    You do not remember?
5    A.    I cannot remember that, no.
6    Q.    We are finished with that exhibit.
7    (Exhibit 18 was marked for identification)
8    Q.    I am handing you exhibit 18, sir.  Is
9  this an email exchange that you have had with
10  Mr. Escobedo in September 2013?
11    A.    Yes.
12    Q.    I am not going to go through the entire
13  set of documents, but if you go to the second page,
14  which is your email to George Escobedo dated September
15  16, 2013, do you see that?
16    A.    September 16, yes.
17    Q.    "Hey George, Heard anything from the
18  back stabbers yet?"  Did I read that correctly?
19    A.    Yes.
20    Q.    So this is a reference to, like we talked
21  earlier, the carriers' representative; is that right?
22    A.    Yes.
23    Q.    And you call her a back stabber, like we
24  discussed before, as you are unhappy with her?
25    A.    Yes.

Exhibit 1                                    App. 54

Page 214

1  Q.  Then it says: "If you want to call the
2  labor dept., in New York and pretend you are me my
3  details are:", and the paragraph continues.  Did I read
4  that portion correctly?
5      A.  Yes.
6      Q.  Why are you suggesting that Mr. Escobedo
7  communicate with the Department of Labor?
8      A.  Simply because he would know the legal
9  terminology that they would either use or they would
10  need, whereas they could talk to me for an hour on the
11  phone and I could have no idea what they are talking
12  about.
13      Q.  When you say "talk to the Department of
14  Labor" I understand it is regarding your claim, but what
15  about your claim?
16      A.  To see if they could get it stopped.
17      Q.  He had already communicated with you,
18  right, that if you are not happy with it, you can take
19  the claim to the Department of Labor?
20      A.  Yes.
21      Q.  If you go to the first page of the
22  exhibit, this is George Escobedo to you dated September
23  17, 2013: "Bob... I talked with Mike Murphy and
24  although I didn't come out and ask him how and when he'd
25  stop your checks, he did imply that he would do it via a

Page 215

1  dispute of your case because I told him that we were
2  having second thoughts about accepting the money.  He
3  did mention that this was the largest settlement he has
4  ever done."  Did I read that correctly?
5      A.  Yes.
6      Q.  I have not asked you this specifically,
7  but George uses the words "having second thoughts" about
8  the settlement agreement, and that is fair in terms of
9  where your mental state was, correct?
10      A.  Yes.
11      Q.  At that time, not only were you having
12  second thoughts but you thought it was wrong.
13      A.  Yes.
14      Q.  Then if we continue:  "Note: I think this
15  is probably the best settlement you'll get from the
16  Carrier... can it be better?  Of course, then we'll be
17  going into unchartered territory and I think more risk
18  for you."  Did I read that correctly?
19      A.  Yes.
20      Q.  So, again, he is telling you, "Look, you
21  can take the claim to the Department of Labor but
22  I think there is a risk".  Is that right?
23      A.  Yes.
24      Q.  This is where you talked about earlier
25  that he requested paperwork be returned.  Is that in

Page 216

1  this email?
2      A.  Yes, that is it.
3      Q.  In the email he is telling you that you
4  can take your claim to the Department of Labor but he
5  thinks there is more risk for you and he is asking you
6  to return the paperwork.
7      A.  Yes.
8          (Off the record 14.31 - 14.34)
9      (Exhibit 19 was marked for identification)
10      Q.  I have handed you exhibit 19; correct?
11      A.  Yes.
12      Q.  This is an email from you to Mr. Escobedo
13  dated September 18, 2013; right?
14      A.  Yes.
15      Q.  You say:  "Is there anything else I need
16  to fill in on the paperwork before scanning it back?"
17  Right?
18      A.  Yes.
19      Q.  That first line?
20      A.  Yes.
21      Q.  From hereon out -- I guess at the
22  mediation you were around other folks, but -- in this
23  timeframe and on, if you are looking at documents,
24  sending emails or signing something, that all occurred
25  in your home; is that right?

Page 217

1      A.  Yes.
2      Q.  Michael Murphy, Robyn Bookhammer and
3  George Escobedo, they never showed up at your house;
4  right?
5      A.  That is correct; they never.
6      Q.  Then in the second paragraph you
7  reference, "I was having second thought's on agreeing to
8  the settlement figure"; is that right?
9      A.  Yes.
10      Q.  Then you reference, it looks like,
11  a dollar-pound conversion, right?
12      A.  Yes, because their figures are all wrong.
13      Q.  At any rate, you are concerned about the
14  exchange rate as well.
15      A.  Yes.
16      Q.  If you go down below the bottom of the
17  page, there is a paragraph, "I may phone the Department
18  of Labor, Long-shore and Harbor Workers Compensation and
19  say that you are no longer my attorney!  That way
20  I would get more detailed information for us to thing
21  what we should then do!?"  Did I read that correctly?
22      A.  Yes.
23      Q.  So at this point you are considering
24  telling the Department of Labor you do not any longer
25  have any attorney so you can get advice from the

Exhibit 1                                    App. 55

Page 218

1  Department of Labor?
2        A.    Yes.
3        Q.    At this point, you are not happy with the
4  advice you had received from George Escobedo; correct?
5        A.    That is correct, yes.
6        Q.    So you are looking for another outlet or
7  source for advice and information; is that right?
8        A.    Yes.
9        Q.    You knew that the Department of Labor
10  existed, because back in 2005 they are the first ones
11  that handled the claim; right?
12        A.    That is correct, yes.
13     (Exhibit 20 was marked for identification)
14        Q.    I am handing you exhibit 20.  Is this an
15  email from you to George Escobedo?
16        A.    Yes.
17        Q.    It looks like the attachments are not
18  included in this exhibit, but it looks from the email
19  like you had included several reports as attachments to
20  this email; correct?
21        A.    Yes.
22        Q.    The subject is "What do you think of this
23  one then-".  It looks to me like this is something you
24  had drafted to send to Ms. Bookhammer but you had George
25  review it first; is that fair?

Page 219

1        A.    Yes.
2        Q.    In the third paragraph, the second line,
3  do you see where it says, "I was given 2 options by the
4  D.O.L. NY none off which you would not want to go for
5  especially disputing the case down to us having second
6  thoughts!!"
7        A.    Yes.
8        Q.    Did I read that correctly?
9        A.    Yes.
10        Q.    So by this time -- this is September 21,
11  2013 -- had you contacted the Department of Labor?
12        A.    Yes.
13        Q.    Who was it in the Department of Labor
14  that you contacted?
15        A.    Mr. Quezada.
16        Q.    You referenced him earlier today.  Who
17  was he?
18        A.    He is the second in command.  He is the
19  one down below the gentleman who signed the agreement.
20        Q.    Is that the compensation order that
21  you ----
22        A.    Yes.
23        Q.    So there is a person -- we will get to it
24  -- who signed the compensation order.
25        A.    Yes.

Page 220

1        Q.    This is before the compensation order but
2  this Quezada is the second in command as you see it?
3        A.    Yes.
4        Q.    All right.  You spoke with Mr. Quezada
5  prior to September 21?
6        A.    Yes.
7        Q.    At this point you had not signed the
8  settlement agreement.  You had signed the mediation
9  agreement, but not the follow-on paperwork; is that
10  correct?
11        A.    That is correct, yes.
12        Q.    So you spoke with Mr. Quezada and I take
13  it you explained your situation to him?
14        A.    Yes.
15        Q.    Did you express that you were not
16  satisfied with the settlement agreement and did not feel
17  like your attorney had adequately represented you?
18        A.    Yes.
19        Q.    What else?  Is there anything else you
20  toll Mr. Quezada at that time?
21        A.    No, I just asked his advice on what
22  I could do next.
23        Q.    It looks like Mr. Quezada said there were
24  two options.
25        A.    Yes.

Page 221

1        Q.    What were those options?
2        A.    To either accept it or try to take it to
3  a trial.
4        Q.    So at this time, September 21, 2013, you
5  know not only from George Escobedo but from the
6  Department of Labor that you can either accept that
7  mediation agreement, which you are not happy with ----
8        A.    Yes.
9        Q.    ---- or you can reject it and proceed
10  before the Department of Labor on your claim and do your
11  best there?
12        A.    Yes.  I will just add another thing in
13  there, that is Andrea Zuflacht is one of the females
14  that did the psychological exam.
15        Q.    She was one of the San Antonio
16  psychologists who you had spoken with by phone?
17        A.    Yes.
18        Q.    And that issued a report?
19        A.    Yes.
20        Q.    All right.  Very good, thank you.  In the
21  same draft email to Ms. Bookhammer, towards the bottom
22  of the page at the last large paragraph, it says:  "But
23  since you have been fair with me I would settle for an
24  extra $300,000 which would cover all the extra expenses
25  I have had to pay out on new MRI scans, Psychologist

Exhibit 1                                                    App. 56

## Page 222

1  reports and private psychologist visits and my yearly
2  disabled equipment."  Did I read that correctly?
3       A.    Yes.
4       Q.    So here in this draft email to
5  Ms. Bookhammer you are saying that you are still willing
6  to settle but for an additional $300,000?
7       A.    Yes.
8       Q.    Is that true, that you were willing to
9  settle for an additional $300,000 in addition to the
10  mediation agreement figures?
11      A.    Yes.
12      Q.    How did you come up with the $300,000?
13  Is that with running the numbers on what you felt you
14  should have gotten?
15      A.    Yes.  That would have taken it nearer the
16  mark.
17      Q.    You do not have to continue holding that
18  one as we are finished.
19      A.    I was just looking at it.
20      (Exhibit 21 was marked for identification)
21      Q.    That, sir, is exhibit 21.  This is titled
22  "TERMS AND CONDITIONS OF PERIODIC PAYMENTS"; is that
23  right?
24      A.    Yes.
25      Q.    Do you remember receiving a document from

## Page 223

1  the annuity provider setting forth the annuity terms?
2       A.    Yes.
3       Q.    Was that this document?  I realise this
4  is not a complete document, and I will have the rest of
5  it in a moment.
6       A.    Yes, this is it.
7       Q.    Do you see under the "Payments" and under
8  "Periodic Payments" there are initials.  Do you see
9  that?
10      A.    Yes.
11      Q.    Those are your initials; correct?
12      A.    Correct.
13      Q.    Was the purpose of initialling there that
14  you understood the terms of the annuity?
15      A.    Yes.
16  (Exhibit 22 was marked for identification)
17      Q.    I am going to hand you exhibit number 22,
18  which also has an "EXHIBIT 6" on it; that was used for
19  a prior deposition, so don't worry about that.  The
20  Bates label on this is R 000074.  This is also the
21  "TERMS AND CONDITIONS OF PERIODIC PAYMENTS"; correct?
22      A.    Yes.
23      Q.    So this one is not initialled on the
24  front page, but if you turn to the second page, do you
25  see about halfway down, your signature?

## Page 224

1       A.    Yes.
2       Q.    And that is your signature; correct?
3       A.    Yes.
4       Q.    Do you remember signing this in your
5  home?
6       A.    Yes.
7       Q.    The date is September 19, 2013; is that
8  right?
9       A.    That is correct, yes.
10      Q.    Then there is a signature by somebody
11  else, also dated September 9, 2013.  So you received
12  this "TERMS AND CONDITIONS OF PERIODIC PAYMENTS" and you
13  reviewed it.
14      A.    Mm-mh.
15      Q.    Was that a yes?
16      A.    Yes.
17      Q.    You understood the terms of the annuity
18  that were reflected in this document; right?
19      A.    Yes.
20      Q.    The material thing to you was about the
21  immediate cash and about the payments to be made over 25
22  years; right?
23      A.    Yes.
24      Q.    We have talked about that previously
25  today about that is the same $24,340 annually for 25

## Page 225

1  years?
2       A.    Yes.
3       Q.    That is the annuity -- your pension?
4       A.    Yes.
5       Q.    That is also the amount that was far
6  below the monthly payments that you had been receiving
7  through the Department of Labor claim?
8       A.    Yes, that is correct.
9       Q.    How did you return this?  Did you return
10  it to Mr. Escobedo or to somebody else?
11      A.    I think this went back to the people who
12  made up the pension scheme.
13      Q.    I guess the people who were handling the
14  annuity?
15      A.    Yes.  Well, the signature on the back is
16  from the insurance company, so it probably would have
17  gone back there, I would think.
18      Q.    So you sent that, whoever it was, to
19  them; correct?
20      A.    Yes.
21      Q.    And nobody threatened you and made you
22  sign this document?
23      A.    No.
24      Q.    You signed this document in your house
25  and returned it from your house?

Exhibit 1                    App. 57

Page 226

1    A.    Yes.
2    Q.    As we are going through these emails,
3  Mr. Rollo, there are a lot of post-mediation emails in
4  which you express displeasure with the mediation
5  agreement; is that fair?
6    A.    Yes.
7    Q.    I am not using all of them, but I am
8  showing you a fair portion.
9    (Exhibit 23 was marked for identification)
10   Q.    I have handed you exhibit 23; is that
11  right?
12   A.    Yes.
13   Q.    Is this an email between you and Donna
14  Besch?
15   A.    Yes.
16   Q.    This one is actually a pre-mediation
17  email, is it not, dated August 29, 2013?
18   A.    Yes, it is.
19   Q.    Essentially, here you say that you have
20  "a lot more ammo now so the 6th Sept. might be fine"; is
21  that right?
22   A.    Yes.
23   Q.    So you were okay with mediation on
24  September 6 and you felt like at this point, with the
25  expert reports, you had some arguments that you could

Page 227

1  make?
2    A.    Yes.
3    Q.    But, ultimately, you didn't feel like
4  George Escobedo had made those arguments; correct?
5    A.    That is correct.  It explains in that
6  email exactly what it was, because Robyn was going to
7  pay for the house to be renovated to remove the three
8  steps at the end of the hall, and Professor Simpson had
9  said there would be no more surgery for a couple of
10  years so "we will try the steroid injections first".
11   Q.    In this document, in the middle it says
12  that it looks like a doctor, or you are reflecting that
13  somebody is "going hunting for Mr. Gibson, who done your
14  neck." Mr. Gibson was an orthopaedic surgeon; right?
15   A.    Yes.
16   Q.    Is it not true that Mr. Gibson said that
17  your neck injury was unrelated to your foot injury?
18   A.    Not exactly.  He said that with the use
19  of the crutches it could be apportioned to that but that
20  it is an aggression.
21   Q.    Aggravation?
22   A.    Aggravation, yes -- not cause it; it
23  wouldn't cause it, he said.
24   Q.    So your understanding or recollection is
25  that Mr. Gibson stated that the foot injury could have

Page 228

1  aggravated your neck?
2    A.    Yes, by the use of the crutches.
3    (Exhibit 24 was marked for identification)
4    Q.    I am handing you exhibit 24.  Exhibit 24
5  reflects an email from you to Ms. Besch dated September
6  23, 2013; correct?
7    A.    Yes.
8    Q.    At the bottom of that -- the first
9  paragraph is fairly long, but at the very bottom it
10  says: "I'm calling the D.O.L. NY when they open at
11  about 9am and send them all this stuff!!"  Did I read
12  that correctly?
13   A.    Yes.
14   Q.    Is this consistent with what you said
15  earlier today, that you had called the Department of
16  Labor and ended up speaking with Mr. Quezada?
17   A.    Yes.
18   Q.    So you planned on doing that.  Had you
19  already spoken with Mr. Quezada or is this a second
20  time?
21   A.    This would have been the second time.
22   Q.    So this time you are going to not just
23  speak with him but provide back-up documents?
24   A.    Yes.
25   Q.    Then at the very bottom of the page:

Page 229

1  "I'm off to find a right hard attorney who will kick
2  butt real hard or see what the D.O.L. say!!"
3    A.    Yes.
4    Q.    This is, again, that you were
5  dissatisfied, it felt like Mr. Escobedo had provided
6  flawed services to you?
7    A.    Yes.
8    Q.    And you wanted somebody more aggressive
9  who was going to do something for your claim?
10   A.    Yes.
11   Q.    Did you attempt to find another attorney
12  at that time back in the September 2013 timeframe?
13   A.    I did try, but every time I tried to get
14  one it failed miserably.
15   Q.    Let me address the first clause there.
16  You made attempts to find another lawyer to represent
17  you before the Department of Labor?
18   A.    Yes.
19   Q.    Did you make contacts with lawyers here
20  in Scotland or the UK, or was it in the States?
21   A.    No; it was in the States.
22   Q.    Do you know how many attorneys you
23  attempted to contact?
24   A.    Maybe about half a dozen or so.
25   Q.    Was that by telephone or by email?

Exhibit 1                                   App. 58

Page 230

1    A.    By telephone, but they all said the same,
2 because the minute you mentioned it was going to the DoL
3 they all said, "No, we are not touching it".
4    Q.    They did not want to deal with the
5 Department of Labor?
6    A.    Yes.
7    Q.    Okay.  So you had explained the situation
8 that you had an attorney, you wanted a new attorney but
9 when you said that the claim was before the Department
10 of Labor, they didn't want to take it?
11    A.    Yes, exactly.
12    Q.    What did you say?  Did you go into any
13 more detail other than that you are not happy with your
14 current attorney and you want a new one?
15    A.    No, just the fact of how long the case
16 had gone on to start with, and that seemed to put them
17 oven more.
18    Q.    They expressed some concern?
19    A.    Yes; a case that has been ongoing for
20 that length of time, they are not willing to take it on
21 after that.
22    Q.    Was there ever any discussion about what
23 you were going to ask them to do?  In other words, did
24 you express to them that you wanted them to try your
25 case before the Department of Labor and get this

Page 231

1 mediation agreement set aside?
2    A.    Yes.
3    (Exhibit 25 was marked for identification)
4    Q.    I have handed you exhibit 25.  Is exhibit
5 25 an email from Michael Murphy to you dated September
6 23, 2013?
7    A.    Yes.
8    Q.    His email is in response to a direct
9 email from you to Mr. Murphy also dated September, 2013;
10 is that right?
11    A.    Yes.
12    Q.    You are essentially going back and forth
13 about what happened at the mediation.
14    A.    That is correct, yes.
15    Q.    You are questioning him as to why weren't
16 important documents looked at on the day of mediation;
17 right?
18    A.    Yes.
19    Q.    In your email you copy Mr. Escobedo and
20 essentially let him know that you are not satisfied that
21 he did not use certain documents in the mediation;
22 right?
23    A.    Yes.
24    Q.    You identify the reports; is that right?
25    A.    It was on both sides; it wasn't just

Page 232

1 George.  It was Michael's side as well.
2    Q.    Okay, fair enough.  You are unhappy with
3 both of them.
4    A.    Yes.
5    Q.    Then Mr. Murphy's response to you is:
6 "Sir, you could barely be quiet during my opening
7 statement."  It sounds like from your testimony this
8 morning that you disagree with that assertion.
9    A.    Yes.  There was not a sound in that room.
10    Q.    Then he says:  "Rest assured as well that
11 if we do not settle this claim, AIG will IMMEDIATELY do
12 what it can do within the law, as proper under the DBA
13 but again, we wish to be free of each other.  We want a
14 divorce from you."  Did I read that correctly?
15    A.    Yes.
16    Q.    Is this what you were talking about
17 earlier, where they said they want a separation,
18 essentially?
19    A.    Yes.
20    Q.    So did you take this as an assertion that
21 they were going to attempt to stop payments to you if
22 you do not proceed with the mediation agreement?
23    A.    Yes.
24    Q.    So at this point on September 23 you are
25 still deciding whether to sign or proceed with the

Page 233

1 mediation or settlement agreement or whether to take
2 your claim to the Department of Labor; is that fair?
3    A.    Yes, that is fair.
4    Q.    Mr. Murphy is responding or letting you
5 know that they will do what is within the law, but they
6 may stop cheques; right?
7    A.    Yes, that is it.
8    (Exhibit 26 was marked for identification)
9    Q.    I am handing you exhibit 26.  Is exhibit
10 26 an exchange of emails between you and Mr. Escobedo on
11 September 24, 2013?
12    A.    Yes.
13    Q.    This is a true and correct copy of those
14 emails, is it not?
15    A.    Yes.
16    Q.    If we go chronologically, at the bottom,
17 George tells you that the carrier "said yes to the
18 additional $50k"; is that right?
19    A.    That is right, yes.
20    Q.    As I understand it, this was, I guess,
21 designated as home repairs or improvement?
22    A.    That is correct, yes.
23    Q.    He says:  "I will send you the paperwork
24 today."  Is that correct?
25    A.    That is correct.

Exhibit 1                                    App. 59

Page 234

1     Q.     To your recollection, did he send it to
2 you that day?
3     A.     As far as I know he did, yes.
4     Q.     In that paperwork that is referenced
5 there, and there are no attachments here, but is that
6 the 8(i) settlement agreement that was submitted to the
7 Department of Labor, to your knowledge?
8     A.     I have no idea.
9     Q.     It is settlement-related papers?
10     A.     Yes, it is.
11         MR. ROSENHOUSE:  I am going to object to
12 the form of that.  All the email says is "I will send
13 you the paperwork today", so there is no actual
14 paperwork at issue here.  So there it assumes ----
15         MR. LEE:  If you will just object on the
16 basis of "assumes facts" or something like that under
17 the rules, I would appreciate it.
18 BY MR. LEE:
19     Q.     In the email above that, September 24,
20 you are responding to George; is that right?
21     A.     He yes.
22     Q.     It says:  "Thanks very much George, I
23 have not seen a bigger smile on the wife's face after
24 winding her up a bit pondering on whether to accept or
25 not then when I said off coarse we are settling she had

Page 235

1 a grin from ear to ear followed by a big sigh of
2 relief." Did I read that correctly?
3     A.     Yes, that is correct.
4     Q.     You also say, "Thanks for everything and
5 by the way what have I to do with the other paper work
6 you sent me?  Fill it all in or just sign it?"  Did
7 I read that correctly?
8     A.     Yes.
9     Q.     On September 24 it looks like this is
10 where you decide that, yes, you are going to proceed and
11 accept the mediation agreement; is that right?
12     A.     Yes.
13     Q.     You ultimately did settle the claim;
14 right?
15     A.     Yes.  It was starting to get a bit long
16 in the tooth, you know.  There was too much to'ing and
17 fro'ing, backwards and forwards, that we decided it
18 would be better just to sign it and then take it from
19 there.
20     Q.     When you say you thought it was better to
21 sign it, this was the settlement paperwork?
22     A.     Yes.
23     Q.     Then with "and take it from there", what
24 did you mean by that?
25     A.     Well, just try to work through it slowly

Page 236

1 and see what there is that can be done, because we were
2 not getting anywhere the way it was going.  Everybody
3 was contradicting everybody else and, to me, it was just
4 becoming like a rodeo.
5     Q.     So here we are at September 24, which is
6 about two and a half weeks after the mediation; right?
7     A.     Yes.
8     Q.     So it looks like at this point you have
9 decided you are going to proceed with the settlement; is
10 that right?
11     A.     Yes.
12     Q.     Your wife was on board with that as well?
13     A.     Yes.
14     Q.     Was it your intent then to challenge the
15 settlement agreement at a later time?
16     A.     Yes.
17     Q.     At this time on September 24, you had
18 agreed to take the money under the mediation agreement,
19 proceed with the settlement and take that money but then
20 see what could be done afterwards to reverse it?
21     A.     Yes.
22     Q.     On the top of that email, that is
23 Mr. Escobedo's response to you on September 24, 2013,
24 the second sentence there, "On the paperwork, just sign
25 and send back to me... We'll fill in the rest."  Did

Page 237

1 I read that correctly?
2     A.     Yes.
3     Q.     Did Mr. Escobedo or anyone else at any
4 time provide any physical threats or emotional threats
5 to get you to sign the settlement agreement?
6     A.     No.
7     Q.     Did you sign the settlement agreement in
8 your home?
9     A.     Yes.
10     Q.     Okay.  That is exhibit 26.  You knew that
11 the paperwork had to be submitted to the Department of
12 Labor.  They told you that; right?
13     A.     Mm-mh.
14     Q.     Is that yes?
15     A.     Yes.
16     Q.     George had told you that too?
17     A.     Yes.
18     Q.     You also knew that the settlement
19 agreement had to be approved by the Department of Labor;
20 correct?
21     A.     Yes.  There was one of them that was
22 supposed to be signed in the presence of someone else,
23 but it was not.
24     Q.     I think I know what you are talking about
25 and we will get to that in a few minutes and you will

Exhibit 1                                    App. 60

Page 238

1  see it.  If I forget to ask you, you can remind me.
2      (Exhibit 27 was marked for identification)
3      Q.      This is exhibit 27.  It is an email or
4  a series of emails, but ultimately between Mr. Escobedo
5  and you; is that right?
6      A.      Yes.
7      Q.      If we go to chronologically the first
8  document, but linearly it is the last document, so if
9  you go to the last page, it looks like someone named
10 Sarah Nickelotte emailed Mr. Escobedo and copied
11 Mr. Murphy with the 8(i) proposed settlement agreement;
12 do you see that?
13     A.      Yes.
14     Q.      What I see next is Mr. Escobedo sending
15 to you on September 24, 2013, that same day, a copy of
16 the 8(i) settlement agreement; is that correct?
17     A.      Yes.
18     Q.      He says:  "Please print and review and
19 email back to me at your earliest convenience."  Do you
20 see that?
21     A.      Yes.
22     Q.      So he sent to you that settlement
23 agreement language.  Let us go to the front page.  This
24 is a long email from you to Mr. Escobedo dated September
25 25, 2013; is that right?

Page 239

1      A.      Yes.
2      Q.      So it looks like the next day you are
3  respond to go Mr. Escobedo and you say:  "If I sign this
4  pile of fabricated crap will it effect my settlement
5  figure??"  Correct?
6      A.      Correct.
7      Q.      You identify a number of complaints that
8  you have with the draft settlement agreement; is that
9  right?
10     A.      Yes.
11     Q.      I am not going to go through all of
12 these, but you reviewed the settlement agreement before
13 you prepared this email; correct?
14     A.      Yes.
15     Q.      The purpose of that was to make sure that
16 you understood it; is that right?
17     A.      Yes.
18     Q.      It looks like your concern is the effect
19 that it may have on the settlement figure, in other
20 words the settlement dollars that you had already agreed
21 to; is that right?
22     A.      Yes.
23     Q.      Were you worried that they were trying to
24 pull a fast one and reduce the payments to you?
25     A.      Yes.

Page 240

1      Q.      Right below that first sentence, it says:
2  "Dr. Fulton is already talking about legal action
3  against so called 'Dr' Jeff Richmond...", and I am not
4  going to read the rest of it, but my question is what
5  was Dr. Fulton's complaint, or supposed legal action,
6  against Dr. Richmond?
7      A.      He did not really say exactly what it
8  was, but he certainly did not see Dr. Jeff Richmond as
9  someone who was capable to be practising as a doctor.
10     Q.      Was it your impression from speaking with
11 Dr. Fulton that Dr. Fulton's view of Dr. Richmond was
12 that he was not well qualified?
13     A.      Yes.
14     Q.      But he did not identify specific reasons
15 therefor, just that he did not have a high view of
16 Dr. Richmond?
17     A.      Yes.  He didn't go into details or
18 anything.
19     Q.      So when you received the settlement
20 agreement and reviewed it, you went through it carefully
21 to see what you disagreed with in that settlement
22 agreement; is that right?
23     A.      Yes.
24             MR. ROSENHOUSE:  I need to ask for
25 another break.

Page 241

1      (Short break 15.06 - 15.08)
2      (Exhibit 28 was marked for identification)
3      Q.      I am handing you exhibit 28.  This is
4  a continuation of the last exhibit 27 series of emails;
5  is that right?
6      A.      Right.
7      Q.      This is George's response to you dated
8  that same date, September 25, 2013; correct?
9      A.      Yes.
10     Q.      After you express, or refer to it as a
11 "pile of fabricated crap", George says, "No worries..
12 even though the language and words may be wrong or at
13 least they don't tell all the truth, it is done so the
14 DOL will approve the settlement.  Bottom line, it will
15 not affect your money."  Did I read that correctly?
16     A.      Yes.
17     Q.      So he has recognised that it may not be
18 a complete statement of the facts, but it is not going
19 to affect your money and that is what you asked; right?
20     A.      Yes.
21     (Exhibit 29 was marked for identification)
22     Q.      Sir, I am handing you what has been
23 marked as exhibit 29.  This is an email exchange between
24 you and Mr. Escobedo between September 30, 2013 and
25 October 2, 2013; is that right?

Exhibit 1                                    App. 61

Page 242

1    A.    Yes.
2    Q.    In the bottom email, September 30, he is
3  sending you, it looks like, paperwork an information
4  request form, regarding the annuity; is that right?
5    A.    Yes.
6    Q.    Do you believe that document he sent to
7  you on September 30 is the "TERMS AND CONDITIONS OF
8  PERIODIC PAYMENTS" that we have previously discussed?
9    A.    I believe so, yes.
10    Q.    Exhibit 22?
11    A.    Yes.
12    Q.    And that you signed on -- well, that
13  can't be right because you signed that one on September
14  19, 2013.  Do you know what document George is referring
15  to?
16    A.    This is for the annuity payment.
17    Q.    So it probably is at least some version
18  of that document, you believe?
19    A.    Yes, it has to be.
20    Q.    All right.  Then you respond on October
21  2, in the middle there:  "I'm sure I've signed every
22  thing so just a couple of bits of your tiny non shaking
23  writing to go on!!"  Did I read that correctly?
24    A.    Yes.
25    Q.    At some point you had provided a document

Page 243

1  to Mr. Escobedo that you had signed but asked for him to
2  complete some information.
3    A.    Yes.
4    Q.    Okay.  I think we can clear this up.
5    (Exhibit 30 was marked for identification)
6    A.    I hand you what has been marked as
7  exhibit 30.  Is exhibit 30 what you believe was
8  transmitted back and forth on that prior exhibit?
9    A.    Yes.
10    Q.    Did you understand that one of the
11  benefits of having an annuity is if you died that the
12  benefits would then be paid to your beneficiary?
13    A.    No, I did not.
14    Q.    Do you have an understanding today that
15  if you die that your wife, or whoever you have
16  identified as a beneficiary, and here it says "Linda
17  Rollo", will receive the payments?
18    A.    No.  I do now.
19    Q.    Prior to today, you do not remember ever
20  hearing or talking about that?
21    A.    No, only the one time when I mentioned
22  about the offer that Robyn Bookhammer had made about the
23  $600,000 would stop the minute I died, or the lesser
24  amount of $480,000, I think it was, that would continue,
25  after I died, on to the wife for the allotted time -- 25

Page 244

1  years, or whatever it was.
2    Q.    Just so I make sure we are on the same
3  page, prior to today, you do not remember anybody
4  telling you that with respect to your Department of
5  Labor claim if you had proceeded to trial, received an
6  award and died your payments would stop, whereas
7  with the settlement in this annuity, if you died, the
8  payments would continue?
9    A.    That is correct.  I did not know before
10  today.
11    Q.    On this exhibit 30, that is your
12  signature; correct?
13    A.    Yes.
14    Q.    That is dated October 9, 2013 and that is
15  a little over a month after your mediation?
16    A.    Yes.
17    Q.    This document, sir, exhibit 30, towards
18  the bottom refers to a "beneficiary" and identifies your
19  wife.  Your wife's name is Linda, right?
20    A.    Yes.
21    Q.    She is sitting outside today?
22    A.    Yes.
23    Q.    It identifies her as a beneficiary.  Do
24  you also have a life insurance policy?
25    A.    Yes.

Page 245

1    Q.    Who is the beneficiary under that policy?
2    A.    It just goes to the children, I believe.
3    Q.    So you designated the children on your
4  life insurance policy as the beneficiaries?
5    A.    Yes; we have these over-50 plans.
6    Q.    I am sorry?
7    A.    We have these over-50 plans.
8    Q.    Oh, because you are over 50?
9    A.    Yes.
10    Q.    Okay.  When did you make that designation
11  or obtain the insurance to make the designation?
12    MR. ROSENHOUSE:  Objection -- relevance.
13    A.    It was only a couple of years ago.
14  BY MR. LEE:
15    Q.    After this -- exhibit 30?
16    A.    Yes.
17    (Exhibit 31 was marked for identification)
18    Q.    I have handed you what has been marked as
19  exhibit 31.  This is an email between you and
20  Ms. Bookhammer dated February 23, 2012; right?
21    A.    Yes.
22    Q.    So this is well before mediation?
23    A.    Yes.
24    Q.    We are not going to go through this
25  entire document, but you say:  "I have been in touch

Exhibit 1                                    App. 62

Page 246

with the Scottish Law Society to see if they can get
someone to assist with helping me as my brain ain't
working properly enough to dis-cypher things these
days!!"  Did I read that correctly?
    A.    Yes.
    Q.    Do you know what is the Scottish Law
Society?
    A.    It is like a library of lawyers that can
help on different subjects and give you advice.
    Q.    Is it somebody you pay or is it a benefit
you have as a citizen?
    A.    It is just a benefit; it is just like
a library, that is all.
    Q.    It is not people?
    A.    Yes, it is people, but it is people that
are in a library situation.  You phone up and you ask:
you want help with a certain subject, then they will
find a lawyer that can help you and they will just give
advice over the phone to help you out.
    Q.    I see.  So prior to mediation, did you
ever contact the Scottish Law Society relating to any
matters concerning your claim before the Department of
Labor?
    A.    No.
    Q.    Then after the mediation, did you ever

Page 247

contact the Scottish Law Society regarding any aspect of
your claim before the Department of Labor or the
settlement?
    A.    No.  I got the wrong number; it was the
Citizens Advice Bureau that I was actually in touch
with.
    (Exhibit 32 was marked for identification)
    Q.    I am handing you what has been marked as
exhibit 32.  Exhibit 32 is an email from you to Glenn
Patterson dated November 11, 2013; is that right?
    A.    That is correct, yes.
    Q.    Glenn Patterson is the representative or
had some capacity regarding the annuity; is that right?
    A.    Yes.
    Q.    He is the same guy who attended the
mediation?
    A.    Yes.
    Q.    To your knowledge, did he make any
arguments at mediation, or was he just there?
    A.    As far as I know, he was just there.  He
was in the other room with Mike Murphy.
    Q.    You are asking for a very straight
answer; right?
    A.    Yes.
    Q.    You say at the bottom:  "Going on that

Page 248

few things that were totally lied about on the report do
you think what was offered was fair or should I do
something about it?????"  Did I read that correctly?
    A.    Yes.
    Q.    So here you are still questioning the
settlement; correct?
    A.    Yes.
    Q.    You are reaching out to another person to
get opinions from a different person?
    A.    Yes.
    Q.    Did you speak or ask for advice from
anyone else regarding whether you should accept this
settlement or not or any improprieties related to the
settlement other than we have talked about --
Mr. Escobedo, Mr. Murphy, Donna Besch and now Mr.
Patterson?
    A.    The only other one was the Citizens
Advice Bureau, which I thought was the Scottish Law
Society, but it was not; I got the wrong number.
    Q.    So they could not help you at all?
    A.    No.
    Q.    Did you start telling them that you were
dissatisfied and the problems you were having and they
said, "Whoa"?
    A.    Yes, they did -- "What are you talking

Page 249

about?"
    Q.    Then we also talked about Mr. Quezada
before and you raised the issues with him; right?
    A.    Yes.
    Q.    Was there anyone besides these folks that
you spoke with regarding the settlement agreement or
your dissatisfaction with it between the date of the
mediation and the date that the compensation order was
entered by the Department of Labor?
    A.    Nobody else, no.
    Q.    Then on that same exhibit, 32, at the
bottom, the part that I read, you are asking about what
was offered.  So you are referring to the offer from the
insurance company; right?
    A.    Where are you?
    Q.    I forgot to ask you.  I am on the same
sentence that I read to you, that we read into the
record.  It refers to an offer, but that is the offer
from the insurance company.
    A.    Right, yes.
    (Exhibit 33 was marked for identification)
    Q.    I am handing you what has been marked as
exhibit 33.  Is exhibit 33 an exchange between you and
Ms. Besch in November 13, 2013?
    A.    Yes.

Page 250

1    Q.    Let us deal with your email at the top.
2  You say that you "Have it in writing from Dr. Fulton"
3  that you will never work again.  Is that right?
4    A.    Yes.
5    Q.    Then you say you are, "Getting the same
6  letter from Professor Simpson in a couple off weeks."
7  So it looks to me like at that time, at the time of the
8  mediation, you did not have a letter from Professor
9  Simpson saying that you will not work again?
10    A.    Mm-mh.
11    Q.    Is that correct?
12    A.    Yes, it looks like that way.
13    Q.    What you had at mediation regarding never
14  working again was the report that we had looked at
15  earlier -- I am sorry, the handwritten letter from ----
16    A.    From Dr. Fulton, yes.
17    Q.    At the very bottom of your email there
18  you say: "They're all a BIG JOKE.  I might still stop
19  the D.O.L. from signing the Ai form!"  It says "Ai"
20  form; right?
21    A.    Yes.
22    Q.    But did you mean 8(i)?
23    A.    8(i), yes.
24    Q.    That is the settlement agreement that we
25  will look at in a minute that you called a pile of

Page 252

1  a different email address.  It looks like it is
2  bobrollo65@yahoo.co.uk?  Is that a different address?
3    A.    No, it is the same one.
4    Q.    November 18 is Mr. Escobedo sending you
5  the signed order.  He says "Payment will be made
6  shortly".
7    A.    Yes.
8    Q.    The "Signed Order", was that the order
9  that you find on the second and third pages, the
10  "APPROVAL OF AGREED SETTLEMENT - Sections 8(i)"
11  compensation order?
12    A.    Yes.
13    Q.    And the signature from Richard Robilotti
14  is November 15, 2013?
15    A.    Yes.
16    Q.    Did you ever speak with Mr. Robilotti?
17    A.    No.  I tried several times but got
18  nowhere.
19    Q.    When did you try to speak with
20  Mr. Robilotti?
21    A.    At the same time I spoke to Mr. Quezada.
22    Q.    In September 2013?
23    A.    Yes.
24    Q.    And then ----
25    A.    ---- because I tried to get Mr. Robilotti

Page 251

1  fabricated crap; right?
2    A.    Yes.
3    Q.    So as of November 13, 2013 you are still
4  thinking about stopping the DoL from approving the
5  agreement?
6    A.    Yes.
7    Q.    Did you tell anybody else that?
8    A.    Not that I can remember, no.
9    Q.    At this time, even in November, mentally,
10  are you still waffling back and forth about whether to
11  accept the agreement?
12    A.    Yes.
13    Q.    And that is for reasons that we have
14  talked about before, that you felt like you were cheated
15  and that you were not treated fairly?
16    A.    Yes, and the fact that within five years
17  we would be down the tubes.
18    Q.    What you mean by that I think is that you
19  would financially be in trouble?
20    A.    Yes -- up the Clyde without a paddle.
21  (Exhibit 34 was marked for identification)
22    Q.    Sir, I am handing you exhibit 34.  Is
23  exhibit 34 an email from Mr. Escobedo to you?
24    A.    Yes.
25    Q.    It looks like in this one you are using

Page 253

1  first, but when I could not get him they put me through
2  to Mr. Quezada.
3    Q.    How long was your communication?  It
4  sounds like there were two.  Were there more than two
5  communications with Mr. Quezada up to the time of this
6  email?
7    A.    No.  There were only two, I believe.
8    Q.    Can you estimate how many minutes each
9  conversation was?
10    A.    The first one would have been about 10 or
11  15 minutes and the second one would have been about the
12  same length of time.
13    Q.    So you received the compensation order on
14  November 18, 2013.  That is the first time you received
15  it; right?
16    A.    Yes.
17    Q.    Would you have reviewed it on November
18  18, 2013 or shortly thereafter?
19    A.    Just shortly thereafter, I would have
20  thought.
21    Q.    Did you also receive that order directly
22  from the Department of Labor?
23    A.    Through a letter, yes.
24    Q.    I am sorry -- through a letter?
25    A.    Yes.

Exhibit 1                                        App. 64

Page 254

1    Q.    So you received that through the mail?
2    A.    Yes.
3    Q.    And then George had also sent that to you
4  that by email?
5    A.    Yes.
6    Q.    Do you remember there being an amended
7  compensation order issued?
8    A.    No.  Is that the one that adds the 50,000
9  on?
10    Q.    Let me show it to you and I will ask you.
11  (Exhibit 35 was marked for identification)
12    Q.    I have handed you a large document, which
13  is exhibit 35.  This has in handwriting "amended" above
14  "COMPENSATION ORDER"; do you see that?
15    A.    Yes.
16    Q.    It has your claim "Robert Rollo -
17  Claimant"; do you see that?
18    A.    Yes.
19    Q.    Then if we skip to the next page it is
20  signed "November 21, 2013".
21    A.    Yes.
22    Q.    There is a certificate of filing in
23  service, which is on the following page, and it looks
24  like it was sent by mail to you.
25    A.    Yes, that is correct.

Page 255

1    Q.    Is that your home address?
2    A.    Yes.
3    Q.    And signed by Mr. Robilotti; do you see
4  that?
5    A.    Yes.
6    Q.    Let us go back to the front.  On the
7  first page there are findings of fact and it identifies
8  in number 4, "The parties have agreed on the pertinent
9  issues and desire to settle the claim on the following
10  basis and incorporate in full the terms of settlement
11  application $943,500."  Do you see that?
12    A.    Yes.
13    Q.    Then it is structured, or identified in
14  subpoints 1 through 5 and includes amounts therewith.
15  Do you see that?
16    A.    Yes.
17    Q.    I guess you would have received this
18  after November 21, 2013?
19    A.    Yes.
20    Q.    Do you believe you received this in
21  November 2013?
22    A.    Yes, it would have been round about
23  there.
24    Q.    And you reviewed it in November 2013?
25    A.    Yes.  It was wrong then and it is still

Page 256

1  wrong now.
2    Q.    When you say "it is wrong", what do you
3  mean?
4    A.    Number 4, next to the $943,500, you have
5  "$250,000 Compensation lump sum" and then below that you
6  have "$50,000 Medical lump sum".  That was home
7  improvements lump sum, not medical.  Medical is
8  underneath that, "Structured Medical: $150,000."
9    Q.    So your position is that the $50,000 was
10  for home improvement, not a medical lump sum?
11    A.    Yes.
12    Q.    You did receive a lump sum of $300,000;
13  is that right?
14    A.    Yes.
15    Q.    Did you receive that lump sum in 2013?
16    A.    I believe so, yes.
17    Q.    Up to this point, after the mediation up
18  to the date of receiving the lump sum, you were still
19  receiving the weekly, or I guess it was paid monthly,
20  compensation payments; is that right?
21    A.    Yes.
22    Q.    Once you received the lump sum, those
23  compensation payments ceased; is that right?
24    A.    Yes, that is correct.
25    Q.    So while you are waffling about whether

Page 257

1  or not you are going to stop the Department of Labor or
2  not sign documents, you are still receiving your regular
3  compensation payment?
4    A.    Yes.
5    Q.    Is there anything else you see is wrong
6  associated with this $943,500?
7    A.    No.  That was the only thing I saw when I
8  first got it.
9    Q.    Let us go ahead.  We have talked a lot
10  about the settlement agreement.  If you turn to Bates
11  label R 000004, which is the "AGREED SETTLEMENT PURSUANT
12  TO SECTION 8(i) OF THE LONGSHORE AND HARBOR WORKERS'
13  COMPENSATION ACT"; correct?
14    A.    Yes.
15    Q.    That is what we have been talking about
16  or discussing in reference to the "settlement
17  agreement".
18    A.    Yes.
19    Q.    This was what you were referring to as
20  the fabricated pile of crap; right?
21    A.    Yes.
22    Q.    That is what you reviewed and came to
23  that assessment.  You had various disagreements with
24  positions in this document.
25    A.    Yes.

Exhibit 1                                    App. 65

Page 258

1    Q.    If you turn, sir, to Bates page 10, it is
2    the signature page on the settlement agreement.  The
3    settlement agreement itself is page 7, but it is the
4    Bates label R 000010?
5    A.    Okay, I have it.
6    Q.    That is dated October 9, 2013 and that is
7    your signature, is it not?
8    A.    Yes.
9    Q.    It has Mr. Escobedo's signature and
10   Mr. Murphy's signature; is that right?
11   A.    Yes, that is correct.
12   Q.    Is October 9, 2013 the date that included
13   your signature on this document?
14   A.    I believe so.  I mean, that is....
15   I signed it, but I don't know who put that date on
16   because I certainly didn't.
17   Q.    So you didn't put the date in?
18   A.    No.
19   Q.    But you did sign the document?
20   A.    Yes, I did sign it.
21   Q.    Do you have any reason to believe that
22   you signed the document prior to October 9, 2013?
23   A.    It could have been; I really have no
24   idea.  I can't remember that far back.
25   Q.    Sure.  What I am getting at is, as you

Page 259

1    sit here today, is there anything that strikes you or
2    you think about that you probably signed this before
3    October 9, 2013?
4    A.    Yes, just because of things like the
5    date, which is completely different from my handwriting
6    ----
7    Q.    Okay, so you didn't include the date.
8    A.    ---- on both sets.
9    Q.    Somebody included the date after you
10   signed it.
11   A.    Yes.
12   Q.    So you signed the settlement agreement
13   and you sent it back to Mr. Escobedo?
14   A.    I am not sure if it was Mr. Escobedo or
15   whether it was straight back to the Department of Labor.
16   Q.    In any event, you signed the settlement
17   agreement and sent it off to somebody?
18   A.    Yes.
19   Q.    You did that voluntarily.
20   A.    Yes.
21   Q.    You intended to sign the document?
22   A.    Yes.
23   Q.    Even though you knew it was wrong?
24   A.    Yes.
25   Q.    Or you felt it was wrong.

Page 260

1    A.    Well, I got told to sign it and send it
2    back, so that is exactly what I did.
3    Q.    That was after you asked if it was going
4    to affect your settlement agreement; right?
5    A.    Yes.
6    Q.    The settlement figure.
7    A.    Yes.
8    Q.    To your knowledge, it did not, because
9    the compensation order is for $943,500; right?
10   A.    Yes.
11   Q.    Then earlier you talked about a document
12   that you believe you were supposed to sign before
13   somebody and you didn't?
14   A.    Yes.
15   Q.    Is that on the next page, Bates label
16   R000011?
17   A.    Yes.
18   Q.    This is titled "AFFIDAVIT OF ROBERT
19   ROLLO"; is that right?
20   A.    That is correct, yes.
21   Q.    You read this page and you understood
22   that it was supposed to be signed before somebody; is
23   that correct?
24   A.    Yes.
25   Q.    At least that is the way it reads, that

Page 261

1    you are supposed to go before somebody and sign it?
2    A.    Yes.
3    Q.    Have you done that before?  Have you gone
4    before a notary or somebody who can attest to your
5    signature?
6    A.    Yes.
7    Q.    But that is not what happened here.  Is
8    that your testimony?
9    A.    Yes, that is correct.
10   Q.    This one, if you look at the bottom, is
11   by Claudia M. Sanchez, and you didn't appear before her?
12   A.    No.
13   Q.    You didn't go to Texas?
14   A.    No.
15   Q.    But you signed this -- the top portion;
16   is that right?
17   A.    Yes.
18   Q.    So that is part of the document that you
19   read.
20   A.    Yes.
21   Q.    You signed it, but is that your date
22   there or is that again not your date?
23   A.    That is not my date, no.
24   Q.    But it is your signature?
25   A.    Yes.

Exhibit 1                                    App. 66

Page 262

1    Q.    And you signed pages 7 and 8 (or we have
2  been talking Bates pages 10 and 11); those are both your
3  signature and you included both of those to either the
4  Department of Labor or Mr. Escobedo?
5    A.    Yes.
6    Q.    You signed that in your home?
7    A.    Yes.
8    Q.    You intended to sign it and then decided
9  to send it to Mr. Escobedo?
10   A.    Yes.
11   Q.    You understood that this document would
12 then be submitted to the Department of Labor with the
13 request for the Department of Labor to issue an order or
14 approval of the settlement?
15   A.    Yes.
16   Q.    You talked about before that you had
17 decided or made up in your mind that you were going to
18 sign the agreement and then try to do something about it
19 later.
20   A.    Yes.
21   Q.    That did not change up until at least the
22 time of the compensation order; right?
23   A.    Yes.
24   Q.    I mean, you did not tell the Department
25 of Labor, "Hey, don't enter this; I don't agree with it

Page 263

1  any more"?
2    A.    No, not at all.
3    Q.    So the compensation order was entered and
4  you received that compensation order; right?
5    A.    Yes.
6    Q.    And you read it?
7    A.    Yes.
8    Q.    Did your wife read it as well?
9    A.    Yes.
10   Q.    Did you and her have any discussion about
11 it?
12   A.    Yes; that is when she started to get
13 really worried about the fact that it was only going to
14 last five years.
15   Q.    Is that when you guys put pen to paper to
16 figure out how long the money would last?
17   A.    We had done that previously, but she
18 brought it up again when it came to signing this
19 document.
20   Q.    Because, as I understand it, within three
21 days of the mediation, she had done, or you guys had
22 done, the numbers?
23   A.    Yes, we had done them then.
24   Q.    Did you do it again before receiving the
25 compensation order?

Page 264

1    A.    No; she just brought it up again when she
2  saw that had to be signed.
3    Q.    She was concerned and she raised it with
4  you.
5    A.    Yes.
6    Q.    When you received the compensation order,
7  nothing changed.  You still felt like the amount was
8  inadequate.
9    A.    Yes.
10   Q.    And you still felt that Mr. Escobedo had
11 provided flawed services and not represented you
12 adequately?
13   A.    Yes.
14   Q.    You still felt that the insurance carrier
15 and their representatives, whether Ms. Bookhammer or
16 Mr. Murphy, had also essentially done wrong and ended up
17 getting too fair of a deal for them?
18   A.    Yes.
19   Q.    Or too good of a deal is maybe a better
20 way to put it.  Is that it?
21   A.    Definitely.
22   Q.    You still knew at that time that the
23 annuity only ran for 25 years.
24   A.    No.  I was still was under the impression
25 that it was 28 years until I saw it broken down and it

Page 265

1  said 25 years on there -- on this document.
2    Q.    On this compensation order?
3    A.    Yes.  It was either this one or the one
4  previous to that.
5    Q.    When you reviewed the terms and
6  conditions that we looked at earlier -- we can pull it
7  out again if you need to -- that also identified 25
8  years, did it not?
9    A.    Yes; that is the one I am talking about,
10 the one from earlier.
11   Q.    Back in either late September or early
12 October of 2013?
13   A.    Yes, because somehow it went from 32
14 years to 28 and then down to 25.
15   Q.    When you say that "it went from", was it
16 your understanding at the mediation that the
17 compensation, the annuity, would last for 32 years?
18   A.    Yes.
19   Q.    Did somebody say it would last for 32 or
20 is that just a figure you had in your head?
21   A.    Robyn said it was 32 years.
22   Q.    Was Robyn at the mediation?
23   A.    No.
24   Q.    Did she participate in the mediation in
25 any way?

Exhibit 1                                        App. 67

Page 266

1    A.    No.
2    Q.    When did she say, then, that it was 32
3    years?
4    A.    Probably about a week or two weeks before
5    the mediation.
6    Q.    Was this by telephone or by email?
7    A.    Telephone.
8    Q.    Do you know or are you sure that she said
9    that any annuity would be for 32 years or was she
10   talking generally, "It can run 32 years"?
11   A.    She said, with my age, it should run for
12   32 years.
13   Q.    Then at mediation, what was said about
14   how long it would go for?
15   A.    28 years.
16   Q.    So at mediation somebody said it would be
17   28 years?
18   A.    Yes.
19   Q.    Do you know who that was?
20   A.    I'm not 100% sure, no.
21   Q.    It wasn't Mr. Escobedo; right?
22   A.    No.
23   Q.    Then later on, through the terms and
24   conditions, you find out that it is only 25 years.
25   A.    Yes.

Page 267

1    Q.    Did that cause you some alarm?
2    A.    It did, because I wondered where the
3    years were going -- when you start off with 32 and,
4    before you know it, you are down to 25.
5    Q.    Did you raise that with anybody -- "What
6    happened to the 28 years?  Why is it 25 now?"
7    A.    I asked and they just said that is what
8    the annuity runs for.
9    Q.    Who was this -- the annuity person?
10   A.    Yes.  They said, "Don't worry, it will be
11   taken into account and the three years that you are
12   missing on will be added into the payments that you get
13   over the 25 years".
14   Q.    Do you know whether or not that happened?
15   A.    I have no idea.
16   Q.    When you received this compensation order
17   in the $943,500, you felt like somebody else could have
18   done a better job for you in representing you?
19   A.    Yes, I think so.
20   Q.    I want to make sure I understand the
21   funds.  It sounded like 300,000 was by a lump-sum
22   payment somewhere around the end of 2013 or early 2014?
23   A.    Yes.
24   Q.    You accepted that money?
25   A.    Yes.

Page 268

1    Q.    I assume you spent the money or paid off
2    the house?
3    A.    We paid off the mortgage, yes.
4    Q.    So you spent that money.  That 300,000 is
5    still not just lying around somewhere?
6    A.    Oh, no; it has gone.
7    Q.    Have you ever rejected a payment from the
8    insurance carrier after the amended compensation order
9    was entered?
10   A.    No.
11   Q.    Have you ever paid back any portion of
12   the money or offered to pay back any portion of the
13   money that is reflected in the compensation order?
14   A.    No.
15   Q.    What time of year are you paid on this
16   annuity?
17   A.    It is the end of October every year.
18   Q.    So it is later this month?
19   A.    Yes.
20   Q.    And you have not told them, "Hey, don't
21   pay me; I am challenging this."?
22   A.    No.
23   Q.    Are you okay to keep going?
24   A.    Yes.
25   (Exhibit 36 was marked for identification)

Page 269

1    Q.    Sir, I have handed you an email string
2    marked exhibit 36.  Is this a set of emails between you
3    and Donna Besch?
4    A.    Yes.
5    Q.    This is in December 2013.  This is after
6    you have received the compensation order; right?
7    A.    Yes.
8    Q.    You are talking to Ms. Besch and it looks
9    like this is a continuation of a November communication
10   that you picked up on and responded to her.  Do you see
11   the November 14, 2013 on the second page at the top?
12   A.    Yes.
13   Q.    She says:  "If you do not sign it do you
14   go to a hearing in Scotland?"  Is that, to your
15   knowledge, referencing the settlement agreement?
16   A.    Yes.
17   Q.    Then you respond, and it looks like you
18   just grabbed that email for a response on December 11,
19   2013, at the bottom of the first page, you reference it
20   being only four Americans and you.  Did you raise the
21   four Americans and you -- did you feel like you were
22   ganged up on, so to speak?
23   A.    Kind of, yes.
24   Q.    Did you feel like at that time that they
25   had colluded or conspired with each other to take

Exhibit 1                                    App. 68

Page 270

1  advantage of you?
2      A.    Well, of that I am not really sure
3  because there were certain elements like why, when I go
4  for a breath of fresh air, did Mr. Doolittle run to
5  Michael Murphy and start shouting at him, "He's packing
6  his bags, he's leaving, you need to do something?" Why
7  didn't he go and say to George, "What's wrong?  Is there
8  something we can do to help?", or something like that,
9  but it wasn't; it was straight through to the other
10 side.
11     Q.    So there are certain things that you were
12 not familiar with and just had questions about?
13     A.    Yes.
14     Q.    As you sit here today, do you know or
15 have an allegation that Mr. Escobedo was not only
16 incompetent or failed to provide proper services but
17 that he actually conspired with or engaged in some kind
18 of wrongdoing to agree with the other side to cheat you
19 essentially?
20     A.    I wouldn't think so.  I would hope he
21 wouldn't do something like that, but I honestly don't
22 know.
23     Q.    Do you have any facts that would indicate
24 that Mr. Escobedo fraudulently engaged in an agreement
25 or conspiracy with the other side?

Page 271

1      A.    No.
2      Q.    At least to your knowledge, your
3  complaint is that his services were inadequate, he
4  should have done a better job?
5      A.    Yes; that is about it.
6      Q.    If we go to the bottom of that first
7  page, at the very end you say, "I ain't finished yet as
8  both Dr. Fulton AND Professor Simpson have both written
9  letters to say I will never work again!" Did I read
10 that correctly?
11     A.    Yes.
12     Q.    I know about the Dr. Fulton letter, so at
13 this point is there a Professor Simpson letter?
14     A.    Yes.
15     Q.    I haven't seen that document, or at least
16 I haven't noticed it.  Can you describe it?
17     A.    It is typed out; it is not handwritten.
18 I think where it said "Dear Mr. Rollo", that has been
19 scribbled out with pen, and then it says underneath, "To
20 whom it may concern", and then it goes on to say this
21 person is not fit for work.
22         MR. ROSENHOUSE:  I can tell you where to
23 find it if you want.
24         MR. LEE:  Go ahead.
25         MR. ROSENHOUSE:  I believe it is attached

Page 272

1  to the motion for a protective order.
2         MR. LEE:  I appreciate that.
3         MR. ROSENHOUSE:  If you cannot find it
4  there, send me a notice or a letter or something.
5         MR. LEE:  Thank you.
6      Q.    So there is a letter from a Dr. or a
7  Professor Simpson saying that you will not work and we
8  talked about earlier that you were still trying to get
9  the letter but it looks like now you have it, so that
10 probably occurred in late 2013?
11     A.    Yes.
12     Q.    Was the purpose of that letter
13 essentially to use as leverage or as your argument to
14 challenge the settlement agreement?
15     A.    Yes.
16     Q.    So it looks like at this point of
17 December 11 you now have that document.
18     A.    Yes, that is correct.
19     Q.    These questions are probably going to
20 focus on post-compensation order communications and
21 documents.
22     (Exhibit 37 was marked for identification)
23     Q.    I have handed you exhibit 37.  It looks
24 like this is an email from you to Richard Robilotti
25 dated July 30, 2014; is that correct?

Page 273

1      A.    That is correct, yes.
2      Q.    This is the same Robilotti who is at the
3  Department of Labor?
4      A.    Yes.
5      Q.    Did you find his email address from the
6  website or did you call?
7      A.    I think it was from the website, or it
8  could have been from Mr. Quezada.
9      Q.    It looks like in here that you are
10 attaching, or you say, "This was an email that my AIG
11 adjuster sent to everyone involved", and I don't have
12 that with this exhibit, but it looks like you are
13 providing to Mr. Robilotti some additional information?
14     A.    Yes.
15     Q.    What was the purpose of providing
16 Mr. Robilotti additional information and raising your
17 claim?
18     A.    Because, one, it was the first time I had
19 actually managed to get in touch with him and I wanted
20 to try to see if I could change his mind and reverse his
21 decision.
22     Q.    When you say the "decision", you are
23 talking about that compensation order?
24     A.    Yes.
25     Q.    The amended compensation order that was

Exhibit 1                                          App. 69

Page 274

1  issued?
2      A.    Yes.
3      Q.    So your effort here is to try to get
4  Mr. Robilotti to reverse that?
5      A.    Yes, that is correct.
6      Q.    Again, you believe that that compensation
7  order was the result of wrongdoing by your attorney and
8  others involved in the claim.
9      A.    Yes, that is correct.
10     Q.    It looks like this is just a general
11 reference to the mediation, correct, and what happened?
12     A.    Yes, that is correct.
13     Q.    If you go to the next page, you say:
14 "I have seen settlement figures of around $3 million for
15 a broken foot or leg and I work for the US Army for 3
16 wars and get rubbish especially with the way the
17 exchange rate is going and everything over here cost
18 over 3 times more!!  I personally know a Judge and when
19 I explained it all to him he could not believe it!!!!"
20 Did I read that correctly?
21     A.    That is correct, yes.
22     Q.    My question to you is: what settlement
23 figures did you see?  Did you do some research online?
24     A.    Yes.  I was just looking at different
25 insurance companies and I had examples up of

Page 275

1  compensation payments that went out to people.  You just
2  put in, you know, that you want to find them with a
3  broken foot or an amputation of one foot and try to get
4  an idea of what settlements are out there.  Obviously,
5  you find one or two that are excessive, but they are
6  good examples to use.
7      Q.    I am trying to understand.  Was this on
8  insurance company websites or some other websites?
9      A.    Yes -- websites.
10     Q.    Where they report what they have settled
11 for?
12     A.    Yes.
13     Q.    Is that the insurance company doing that?
14     A.    Yes.
15     Q.    Do you happen to have any printouts or
16 searches as a result of the work that you did for this?
17     A.    I did have, but that was a few years ago
18 now.  I didn't see the point in keeping things like
19 that.
20     Q.    So back in, this is, mid-2014 -- July
21 2014, by that time -- you are doing research and finding
22 reports of settlements that are far in excess of yours.
23     A.    Yes.
24     Q.    So now you are probably really upset.
25     A.    Yes.

Page 276

1      Q.    You felt like the compensation was
2  inadequate before and now you feel like it is probably
3  grossly inadequate?
4      A.    Yes, especially for that one being for
5  a foot and it is $3 million.  Then what would it be for
6  a foot, a back and neck?
7      Q.    Do you remember any specific names of
8  insurance companies or claimants?
9      A.    No.
10     Q.    I wouldn't think so, but I just have to
11 ask.  You don't have any notes of what specifically you
12 were looking at?
13     A.    No.
14     Q.    Then you say, "I personally know a Judge
15 and when I explained it all to him he could not believe
16 it!!!".  Who was that judge?
17     A.    He is a local judge.  He used to practise
18 down at Haddington, but he got de-robed for being drunk
19 on duty.
20     Q.    As I understand it, he was a local judge
21 in your town?
22     A.    Yes.
23     Q.    Do you know what kind of judge he was?
24     A.    No.  His main thing he used to do was
25 prosecuting drunk drivers.

Page 277

1      Q.    That is what he did as a practice?
2      A.    Yes.
3      Q.    Was he what in the States we call
4  a prosecutor?  To your understanding, did he do that --
5  he tried to put people in jail?
6      A.    Yes.
7      Q.    Do you know if he practised personal
8  injury litigation?
9      A.    No, he didn't.
10     Q.    Is he a friend of yours or an
11 acquaintance?
12     A.    No.  I had known him for years --
13 everybody knows him -- and I used to drink with him in
14 the pub now and again.
15     Q.    You explained it to him and he just
16 expressed to you his disbelief.
17     A.    Yes.
18     Q.    Do you know, did he have any experience
19 of prosecuting Department of Labor claims?
20     A.    No.  We don't have, like, a Department of
21 Labor over here.  We have, basically, the Job Centre, we
22 call it; we don't have a Department of Labor as such.
23     Q.    To conclude this exhibit, 37, this is
24 a continued effort to reverse the settlement agreement?
25     A.    Yes.

Exhibit 1                                          App. 70

## Page 278

1 (Exhibit 38 was marked for identification)
2      Q.     I am handing you exhibit 38.  This is an
3 email from Mr. Quezada to you and to Mr. Robilotti,
4 copied to Ms. Tydelski; is that right?
5      A.     Yes.
6      Q.     This is the same Mr. Quezada who you
7 spoke with in September of 2013; is that right?
8      A.     Yes.
9      Q.     Do you know what triggered this email to
10 you from Mr. Quezada?
11      A.     No.
12      Q.     He is talking to you about -- he says he
13 is the "claims examiner" and that he reviewed the "8i
14 Structure settlement dated October 09, 2013"; right?
15      A.     Yes.
16      Q.     Do you believe that you communicated with
17 Mr. Quezada or do you think this may have been
18 a response to an email you had sent to the Department of
19 Labor?
20      A.     It could have been a response to a phone
21 call I had made to him.
22      Q.     The previous exhibit is July 30.  Did you
23 also make a phone call about that time?
24      A.     I could have done, yes.  I used to try to
25 phone him on a regular basis, but he was a very hard man

## Page 279

1 to get hold of.
2      Q.     So you would phone them on a regular
3 basis because you could not get a hold of them?
4      A.     Yes.
5      Q.     Again, you would phone them on a regular
6 basis to try to reverse the compensation order and
7 settlement agreement?
8      A.     Yes.
9      Q.     It says, "In the settlement it clearly
10 says that the pursuant periodic payments are intended to
11 settle any and all intervivos claims for past, present
12 and future disability compensation and future medical
13 benefits."  Did I read that right?
14      A.     Yes.
15      Q.     If you go down to about the fourth line
16 or fourth paragraph below that:  "Per the settlement
17 agreement the carrier was discharge from liability under
18 this Act for future compensation and future medical
19 care."  Did I read that correctly?
20      A.     Yes.
21      Q.     Did you understand from this that he is
22 telling you, essentially, that you have no more claim
23 against the carrier?
24      A.     Basically, yes -- reading that bit, yes.
25      Q.     So you had decided to sign the settlement

## Page 280

1 agreement, allow the compensation order to be entered
2 and your plan was to try to get some additional money or
3 relief, and it looks like from here he is saying that
4 that is it, that is final, the compensation order is
5 final; is that right?
6      A.     Yes.
7      Q.     He signs it, "Joselito Quezada, Claims
8 Examiner" at the Department of Labor; right?
9      A.     Yes.
10      Q.     That is July 31, 2014.  What did you do
11 at that time?  What was your next strategy?
12      A.     I believe I laid off it for a little
13 while, but not too long.
14      Q.     You strike me as a guy who doesn't let
15 things go?
16      A.     No, I don't.
17 (Exhibit 39 was marked for identification)
18      Q.     I am handing you exhibit 39.  This is an
19 email from you to, again, Mr. Robilotti at the
20 Department of Labor.  This is August 5, 2014; correct?
21      A.     Correct.
22      Q.     Towards the bottom of the first page you
23 say:  "If there is nothing you can do can you suggest
24 anything I could do or am I too later??"  Did I read
25 that correctly?

## Page 281

1      A.     Yes.
2      Q.     Again, what you are looking at here is to
3 see if there is any recourse or option you have to
4 reverse the prior settlement agreement that you had made
5 and the compensation order?
6      A.     Yes.
7      Q.     You are looking for legal remedies or any
8 type of remedy at all.
9      A.     Yes.
10      Q.     Then you reference the 32 years down to
11 25 years at the bottom of that page.  Is that what we
12 talked about earlier today?
13      A.     Yes.
14      Q.     Then you provide on the next page, about
15 a third of the way down, or you are asking, "Please tell
16 me what I can do?"  Right?
17      A.     Yes.
18      Q.     You are asking for advice on how to get
19 your remedy.  Then you say you have "permission to get
20 in touch with any one who has recently wrote reports";
21 right?
22      A.     Yes.
23      Q.     So you are essentially inviting him to
24 look into it.
25      A.     Mm-mh, yes.

Exhibit 1                                          App. 71

Page 282

1    Q.    Again, these continued efforts by you and
2  the avenues you are trying to pursue is because you felt
3  the settlement was inadequate and that you were treated
4  wrongly; right?
5    A.    Yes.
6    Q.    Back in this July or mid-2014 timeframe,
7  you are trying to obtain a remedy, but at this point you
8  have not filed suit yet; right?
9    A.    No; I haven't, no.
10    Q.    Was your strategy to try to pursue relief
11  short of filing suit first?
12    A.    Yes.
13    Q.    Up to this point, had you talked to
14  attorneys other than anybody who is an attorney at the
15  Department of Labor?
16    A.    No.
17    Q.    We have looked at up through August 2014.
18  Do you recall any conversations with the Department of
19  Labor that we have not discussed yet?
20    A.    No.
21    Q.    Have you discussed your case or claim
22  with any attorney other than what we have already talked
23  about today?
24    A.    No.
25    Q.    I am going to hand you exhibit 40.

Page 283

1    (Exhibit 40 was marked for identification)
2    Q.    I am going to hand you exhibit 40.  Does
3  exhibit 40 reflect emails exchanged between you and
4  Mr. Escobedo on August 19, 2014?
5    A.    Yes.
6    Q.    You are going back to Mr. Escobedo at
7  this point and asking him if there is something that
8  "we" can do?
9    A.    Yes.
10    Q.    You say:  "I have [been] speaking to
11  a judge and a couple of attorney's that only deal with
12  accidents that occur in war zones."  Who were you
13  speaking with?  The judge we already talked about,
14  right?
15    A.    Yes.
16    Q.    Who were the attorneys that you are
17  referencing?
18    A.    I cannot fully remember who they were or
19  could have been.
20    Q.    Do you have any recollection as we sit
21  here today of speaking with attorneys?
22    A.    No.
23    Q.    You say you spoke with attorneys.  Do you
24  believe you did?
25    A.    I may have done, but I cannot remember

Page 284

1  round about that time.
2    Q.    The point I am trying to get at is if you
3  said you spoke with attorneys, does it not stand to
4  reason that you spoke with attorneys by that time?
5    A.    Yes, it could well be.  If it says that
6  there, then it must be right, but I cannot remember.
7    Q.    Sure, and I am not asking what you
8  remember now but am just looking at what you said, and
9  if you said you spoke with attorneys, you wouldn't have
10  said that if you had not done so?
11    A.    Yes.
12    Q.    Let us go to the second page and close
13  this out.  You asked Mr. Escobedo in the middle: "Is it
14  too late to take them to court or do I need to go
15  a different way??"
16    A.    Yes.
17    Q.    So you are still trying to find out what
18  to do to rectify the situation as you see it?
19    A.    Yes.
20    Q.    Mr. Escobedo responds that same day:
21  "Mr. Rollo, I apologize you re having such a difficult
22  time and I my condolences for your mother.
23  Unfortunately, there s nothing more that we can do since
24  we reached the agreement and settled your case."  Do you
25  see that?

Page 285

1    A.    Yes.
2    Q.    Again, there are some grammar issues in
3  there, but the point he is making is that, in his
4  opinion, there is nothing more that can be done.
5    A.    Yes.
6    Q.    In his opinion the claim was settled and
7  the claim is closed.
8    A.    Yes.
9    Q.    So by August 19, 2014 you knew that
10  Mr. Escobedo's opinion is that you are stuck with your
11  settlement agreement, the compensation order; right?
12    A.    Yes.
13    Q.    You had hired Mr. Escobedo to pursue the
14  compensation claim before the Department of Labor;
15  right?
16    A.    Yes.
17    Q.    To represent you before the Department of
18  Labor and in your claim?
19    A.    Yes.
20    Q.    When the amended compensation order was
21  issued, there was no longer a claim before the
22  Department of Labor; right?
23    A.    Right.
24    MR. ROSENHOUSE:  Objection -- legal
25  conclusion.

Exhibit 1                                    App. 72

Page 286

1 BY MR. LEE:
2      Q.      According to your understanding, when
3 the amended compensation was issued, your claim had
4 resolved.
5      A.      Yes.
6      Q.      So there was no further purpose and
7 Mr. Escobedo had fulfilled his obligations under the
8 contract.
9      A.      Yes.
10      Q.      I am not trying to play games; I am not
11 saying that you agree that his services were adequate,
12 but, with what he was hired to do, that happened.
13      A.      Yes.
14      Q.      Up until Mr. Rosenhouse filed materials
15 with the Department of Labor, no other attorney or
16 person had filed anything with the Department of Labor
17 on your claim; is that your understanding?
18      A.      That is my understanding, yes.
19      Q.      Is your understanding that Mr. Escobedo
20 concluded his representation in late 2013 of you?
21      A.      Yes.
22      Q.      Mr. Escobedo never represented to you
23 that he would represent you after the amended
24 compensation order was entered; right?
25      A.      That is right.

Page 287

1      Q.      In fact, you stated in 2014 that
2 Mr. Escobedo was no longer your attorney; right?
3      A.      Yes.
4      (Exhibit 41 was marked for identification)
5      A.      I have handed you exhibit 41, sir.  That
6 is an email from you to a Chris Walker at AIG; is that
7 correct?
8      A.      That is correct, yes.
9      Q.      It looks like Mr. Walker is associated
10 with AIG, but do you know who he is and how did you get
11 his information?
12      A.      He was one of the bosses in AIG.
13      Q.      How did you come to that information?
14      A.      I got it through Robyn Tydelski.
15      Q.      Before this email, did you ask
16 Ms. Tydelski who her boss was?
17      A.      Yes.
18      Q.      And she provided that information to you?
19      A.      Yes.
20      Q.      If we look at this document, this is
21 dated October 24, 2014, right?
22      A.      Yes.
23      Q.      So this is a little over a year after the
24 mediation agreement?
25      A.      Yes.

Page 288

1      Q.      In the middle you say:  "I no longer have
2 an attorney so I can go down other routes especially
3 since our family have been flat broke for the past 2 and
4 a half months!"  Did I read that correctly?
5      A.      Yes, that is correct.
6      Q.      You had exhausted your funds that you had
7 received?
8      A.      From the previous year, yes.
9      Q.      Your purpose of reaching out to
10 Mr. Walker was what?
11      A.      Just to see if he could do anything.
12      Q.      When you say "if he could do anything",
13 is that to set aside or negate the settlement agreement
14 and compensation order?
15      A.      Yes.
16      Q.      Ultimately, you are attempting to receive
17 more money.
18      A.      Yes.
19      Q.      Do you remember, did he ever respond to
20 you?
21      A.      I believe so.
22      Q.      Was it productive at all?
23      A.      No.
24      Q.      I am handing you what has been marked as
25 exhibit 42.

Page 289

1      (Exhibit 42 was marked for identification)
2      Q.      Sir, I have handed you exhibit 42.  This
3 exhibit 42 is an email from you to Mr. Escobedo dated
4 June 8, 2015; correct?
5      A.      Yes.
6      Q.      If we go back to exhibit 40, that was an
7 email between you and Mr. Escobedo on August 19, 2014;
8 right?
9      A.      Yes.
10      Q.      Do you know if you had any communications
11 with Mr. Escobedo between exhibit 40, the August 19,
12 2014 email, and between the date of exhibit 42, June 8,
13 2015?
14      A.      I believe not.
15      Q.      This is more or less nine months or so
16 later and you are reaching back out to Mr. Escobedo and
17 you say:  "I know it's been a long time since we last
18 spoke and I do realise you are no longer my attorney."
19 Did I read that correctly?
20      A.      Yes.
21      Q.      In this you state you have been
22 instructed to ask for documents by Mr. Jose Hernandez.
23 Is that a different person than Mr. Quezada and
24 Mr. Robilotti?
25      A.      Yes.

Exhibit 1                    App. 73

Page 290

1    Q.    Who is Mr. Jose Hernandez?
2    A.    He was mentioned earlier on in the
3  proceedings.  He is the person from Longshore, District
4  and Harbour Office.
5    Q.    How did you come to know him or receive
6  his name?
7    A.    The same way as every other one, through
8  going into Google -- putting it in a search engine.
9    Q.    So it looks like you made some contact
10  with Mr. Hernandez.
11    A.    Yes.
12    Q.    What was the discussion with
13  Mr. Hernandez?
14    A.    It was just to see if he could do
15  anything about the situation.
16    Q.    Do you think your contact with
17  Mr. Hernandez occurred shortly before exhibit 42?
18    A.    Yes.
19    Q.    Was it essentially consistent with what
20  we have talked about before with your communications
21  with Mr. Quezada and Mr. Robilotti, that you are
22  explaining your situation and what you are trying to do?
23    A.    Yes.
24    Q.    And seeing if he can help you?
25    A.    Yes.

Page 291

1    Q.    He asked you for documents?
2    A.    Yes.
3    Q.    You then contact George and ask for
4  documents.
5    A.    Yes.
6    Q.    What specific documents were you asking
7  George for?
8    A.    I believe it was the agreements that were
9  signed.
10    Q.    The mediation agreement?
11    A.    Yes.
12    Q.    Did you not have a copy of that?
13    A.    There was one of them that I did not have
14  -- the last one that we looked at that had the different
15  dates on it.
16    Q.    Was that the settlement agreement?
17    A.    Yes.
18    Q.    Okay.  You had signed the settlement
19  agreement and read it but you did not keep a copy for
20  yourself?
21    A.    No.
22    Q.    I see.  But you had a copy of the
23  mediation agreement and ----
24    A.    Yes.
25    Q.    ---- you had a copy of the compensation

Page 292

1  orders?
2    A.    Yes.
3    Q.    Did you have a copy of the settlement
4  agreement but not all the exhibits thereto, or you did
5  not have a copy of the settlement agreement at all any
6  more?
7    A.    No, I didn't have a copy of it at all.
8    Q.    Was the settlement agreement attached to
9  any of the emails that you still had, do you know?
10    A.    It could well have been but, as I've
11  said, there were so many emails that it would have taken
12  me years to find it.
13    Q.    So, in any event, it was not easy for you
14  to put your hand on the settlement agreement.
15    A.    Yes, that is correct.  I believe there
16  was something to do with the MMI agreement as well.
17    Q.    The MMI agreement -- the maximum medical
18  improvement?
19    A.    Yes.
20    Q.    The date that you were issued?
21    A.    No, exactly what it was, exactly what had
22  been put on the document.
23    Q.    The lack of the MMI did not change your
24  opinion, and you thought you were totally disabled.
25    A.    Yes.

Page 293

1    Q.    And you thought the money that you
2  received was inadequate?
3    A.    Yes.
4    Q.    Are you okay to continue?
5    A.    Yes.
6    MR. ROSENHOUSE:  How are we time-wise?
7    MR. LEE:  Well, it is 4.16 now and we
8  started at 9 and 9-5 is ----
9    THE REPORTER:  It was before 9.  We have
10  been going more than six hours, but I don't want to
11  promise that this is exact without looking at it
12  carefully.
13    MR. LEE:  Let us take a break and
14  calculate it precisely.
15    (Short break 16.18 to 16.26)
16    MR. LEE:  I am going to go for ten
17  minutes and then turn it over.  That will be 4.36.
18    A.    Right in the rush-hour traffic.
19    Q.    I'm sorry, sir -- I really am.  I know at
20  some point you had hired a new attorney.
21    (Exhibit 43 was marked for identification)
22    Q.    Exhibit 43 is an email from you to
23  Mr. Walker dated November 30, 2014, right?  You
24  reference:  "I have been given one question from my new
25  law firm" in that first full paragraph; do you see that?

Exhibit 1                                    App. 74

Page 294

1     A.    Yes.

2     Q.    My only question with this exhibit is by
3  November 30, 2014, were you talking to other lawyers
4  about taking your case further?

5     A.    Yes.  I talked to two or three different
6  ones and there was one that said they could take the
7  case on.

8          MR. ROSENHOUSE:  I am going to instruct
9  the client not to answer further on the basis of
10  attorney-client privilege.

11  BY MR. LEE:

12     Q.    Do not give me the specifics if you had
13  material conversations with them.  My only question is:
14  did you communicate with attorneys by November 2014
15  about trying to find someone to pursue your claim?

16     A.    Yes.

17     Q.    Do you know when that first contact with
18  an attorney occurred?

19     A.    It would have been round about near 25
20  November.

21     Q.    So you were looking at somebody to pursue
22  your claim and file a lawsuit by November 2014?

23     A.    Yes.

24     Q.    When did you first -- and don't tell me
25  what specifically was said -- contact Mr. Rosenhouse,

Page 295

1  and approximate is fine?

2     A.    That was 2017.

3     Q.    When you were looking in November 2014
4  for an attorney to pursue the claim, I was referring to
5  this lawsuit, essentially pursuing Mr. Escobedo and
6  Carabin & Shaw?

7     A.    Yes.  It was this and settlement.

8     Q.    Everything?

9     A.    Yes.

10     Q.    And again ----

11     A.    But that one fell through.  That is all
12  I would say on that.

13     Q.    You felt like Mr. Escobedo had
14  inadequately represented you, that the carrier had taken
15  advantage of you and the settlement was improper, so you
16  were looking at somebody to pursue the settlement, issue
17  the Department of Labor claim and try to get relief from
18  Mr. Escobedo; right?

19     A.    Yes.

20     (Exhibit 44 was marked for identification)

21     Q.    I am handing you exhibit 44.  This is
22  a document you received from the Department of Labor
23  dated April 11, 2017; is that right?

24     A.    Yes.

25     Q.    Essentially, what they are doing is

Page 296

1  telling you that the order approving the settlement was
2  final.  In other words, the compensation order was final
3  30 days after the date of filing.

4     A.    Yes, which they were asked about that
5  before the 30 days and they said it was still denied.

6     Q.    I am sorry, I did not understand that.
7  What was that about before 30 days?

8     A.    I knew there was a cut-off point that you
9  had to claim by if you were going to take it further,
10  and they had been asked about that as well, the
11  Department of Labor, and they still denied it.  That is
12  when I started getting in touch with Joselito Quezada.

13     Q.    I am not sure I understand.  You were
14  aware prior to this date that there was a deadline to
15  challenge the compensation order?

16     A.    Yes.

17     Q.    When did you become aware of that or talk
18  with somebody about that issue?

19     A.    It was when I got in touch with
20  Mr. Quezada.

21     Q.    In 2013?

22     A.    Yes.

23     Q.    So he told you, and I know we talked
24  about September 2013 communications ----

25     A.    Yes.

Page 297

1     Q.    He told you there was a deadline by which
2  you had to challenge the compensation order?

3     A.    I am sorry, no, he had told me in
4  September that it was still denied.  Unless
5  Mr. Robilotti had not signed the agreement before the 30
6  days, then there was a chance, but if he had signed it
7  before that, then there was no chance.  I think it was,
8  I believe it might have been, Donna Besch or someone
9  like that who told me in a telephone conversation.

10     Q.    That there was a deadline to challenge?

11     A.    Yes.

12     Q.    Okay, so you were aware that there was
13  a deadline to challenge if you were going to challenge
14  the compensation order?

15     A.    Yes.

16          MR. ROSENHOUSE:  Objection -- legal
17  conclusion.

18  BY MR. LEE:

19     Q.    That was your understanding; right?

20     A.    Yes.

21     Q.    We talked about how you felt like
22  Mr. Escobedo inadequately represented you and caused you
23  to receive less than you should have received.  Do you
24  have any other complaints with Mr. Escobedo?

25     A.    Just on the fact that it always seemed to

Exhibit 1                              App. 75

298..301

Page 298

1  be left up to me to get in touch with the insurance
2  company all the time on anything at all.  It didn't
3  matter what it was about, it was left for me to get in
4  touch and there was some times I could go three or four
5  months without hearing or talking to George on the
6  phone.  Then I had to send him all the emails that had
7  been sent backwards and forwards between myself and
8  Robyn or myself and Donna Besch.  If there were any
9  attachments, then they had to be forwarded to George as
10 well.
11     Q.      So during the course of his
12 representation of you, you felt like you essentially had
13 the labouring burden of having to communicate with the
14 carrier instead of Mr. Escobedo?
15     A.      Yes.
16     Q.      During that time you were having all
17 these conversations, or communications, with the
18 carrier, you were aware that Mr. Escobedo was not having
19 the communications you wanted?
20     A.      Yes.
21     Q.      Do you have any idea how much money you
22 have spent on medical expenses since the date of the
23 compensation order?
24     A.      Not a lot on medical expenses.  The only
25 expenses are really the fuel expenses running up and

Page 299

1  down to the appointments.
2     Q.      I see.  Have you made a calculation of
3  how much you believe you have been damaged by
4  Mr. Escobedo?
5     A.      No.
6  (Exhibit 45 was marked for identification)
7     Q.      I am handing you exhibit 45.  I am not
8  going to go into this in detail, but is this a true and
9  correct copy of a document that you received from
10 Mr. Gibson?
11     A.      Yes.
12 (Exhibit 46 was marked for identification)
13     Q.      Is exhibit 46 also a true and correct
14 copy of a letter that you received from Mr. Gibson?
15     A.      Yes.
16     Q.      We were talking about the lawsuit.  You
17 felt like back in 2013 that Mr. Escobedo did an
18 inadequate job representing you; right?
19     A.      Yes.
20     Q.      Why is it that you waited until, I think
21 it was, 2016 to file suit against Mr. Escobedo?
22     A.      It wasn't for the lack of trying.
23 I mean, I had been down every route that I could go
24 without adding more expense to what I was trying to do
25 before I had to employ Mr. Rosenhouse.

Page 300

1          MR. LEE:  All right.  I am stopping my
2  time there, with I think seven minutes left, so I will
3  pass the witness.
4          MR. ROSENHOUSE: First, for the record,
5  I would like to get a copy of the transcript.  I am
6  going to reserve my questions for trial.
7          QUESTIONS BY MR. FULLER
8  BY MR. FULLER:
9     Q.      Mr. Rollo, I have a couple of questions
10 for you, sir.  Do you remember earlier today Mr. Lee
11 asking you some questions about a tape recording ----
12     A.      Yes.
13     Q.      ---- that you and your wife attempted to
14 make at the mediation?
15     A.      Yes.
16     Q.      Why did you do that, sir?
17     A.      Just to keep track of what was going on.
18     Q.      All right.  Have you ever tape recorded
19 anybody else at any other time for any other purpose?
20     A.      No.
21     Q.      There were a couple of exhibits wherein
22 you had mentioned to people that you were going to use
23 that tape, and I believe Mr. Lee asked you whether or
24 not those things were true, that those threats, or those
25 intentions to use that tape were true and you said no,

Page 301

1  they were not true.
2     A.      No.
3     Q.      Why did you lie about that in those
4  emails?
5     A.      Just to try and put some pressure on
6  people to see if I could get some answers.
7     Q.      Any other reason?
8     A.      No.
9          MR. FULLER:  All right.  I will pass the
10 witness.
11         FURTHER QUESTIONS BY MR LEE
12 (Exhibit 47 was marked for identification)
13 BY MR. LEE:
14     Q.      I am going to hand you exhibit 47.
15 I am going to walk through these documents with
16 you without any great detail.  These were produced
17 to us, and you see the Bates label RR at the
18 bottom.
19     A.      Yes.
20     Q.      So they were produced by your lawyer.
21 The first one is a healthcare record.  Was Dr. Lawson at
22 one time providing some care to you?
23     A.      Yes.
24     Q.      It looks like you had cervical and lumbar
25 dysfunction in 2003; is that right?

Exhibit 1                                    App. 76

Page 302

1    A.    Not to my knowledge, I didn't.
2    Q.    This is your address, right, on the
3 record?
4    A.    Yes.
5    Q.    And your name and your date of birth?
6    A.    Yes.
7    Q.    So this, at least according to this
8 record, shows you had cervical and lumbar dysfunction
9 back in 2003; is that right?
10    A.    There must have been some kind of
11 dysfunction, but nothing that could have been spoken
12 about, because it was exactly two months after that date
13 that I was in Houston at Brown & Root's head office
14 getting a full medical to go to Iraq.
15    Q.    All right.  If you go to the next page,
16 again it looks like the GP is Dr. Lawson, if you look at
17 the middle about the right.  It says, I think, "several"
18 and I am not sure what the second word says, but it
19 says, "neck, shoulder and back pain".  Do you see that,
20 in the middle, of "presenting problem"?
21    A.    Yes, I see that.
22    Q.    Do you remember going to see Dr. Lawson
23 for neck, shoulder and back pain?
24    A.    No.
25    Q.    It is described as "severe" below that;

Page 303

1 okay?  If you will go to the next page, sir, this is
2 a record, and again it says to Dr. Lawson from East
3 Lothian Physiotherapy Centre.  In the "Outcome" it says:
4 "Complaining of right shoulder pain, occasional left
5 shoulder pain and occasional C7 ache of thirteen years
6 duration."  Do you remember going to see about that?
7    A.    Yes; that was frozen shoulder.
8    Q.    Did you have that over a period of 13
9 years on and off?
10    A.    Yes.
11    Q.    If you go to the next page, it looks like
12 this is an old record from 1986, number "9)" on the left
13 side, patient problems, says, "CARPAL TUNNEL SYNDROME".
14 Do you see that?
15    A.    Yes.  It turned out there was no carpal
16 tunnel syndrome.
17    Q.    Later on you were told it was not?
18    A.    Yes; there was none there.
19    MR. LEE:  Let us go off the record.
20    (Off the record 16.42 - 16.44)
21    MR. LEE:  Sir, those are all the questions
22 I have for you.  Thank you for being here today.
23    (The deposition concluded at 16.44)
24
25

Page 304

1         UNITED STATES DISTRICT COURT
2          WESTERN DISTRICT OF TEXAS
3            SAN ANTONIO DIVISION
4
ROBERT ROLLO                    )
5         Plaintiff       )NO.SA-17-CA-645-FB
6 v.                             )
7                                )
GEORGE P. ESCOBEDO; CARABIN &   )
8 SHAW, PC; CARABIN SHAW         )
9         Defendants      )
10
11         REPORTER'S CERTIFICATE
12         ORAL DEPOSITION OF
13         ROBERT ANDREW ROLLO
14          OCTOBER 4, 2018
15
16    I, Nia Davidson MBIVR, Accredited Verbatim
Reporter in the UK, hereby certify to the
17 following:
18    That the foregoing transcript is a true
19 record of the testimony given by the witness
20 ROBERT ANDREW ROLLO;
21    That, pursuant to FCRP Rule 30(f)(1),
22 request to review the transcript was not made by
23 either deponent or party before the deposition was
24 completed;
25    That pursuant to information given at the

Page 305

1 time said testimony was taken, the following
2 includes all parties of record and the amount of
3 time used by each party at the time of the
4 deposition:
5
6 Mr. Gary Fuller (57m)
7 Mr. Brent Lee (5h,8m)
8 Mr. Michael A. Rosenhouse, having reserved his
9 questions for trial, (0)
10    I further certify that I am neither
11 counsel for, related to nor employed by any of the
12 parties in the action in which this proceeding was
13 taken, and further that I am not financially or
14 otherwise interested in the outcome of this
15 action.
16 Certified by me on this 16th day of October 2018
17
18
19
20
21
22         Nia Davidson MBIVR
          For Optima Juris
23         18881 Von Karman Avenue, Suite 340
          Irvine, CA 92612, United States
24
25

Exhibit 1                    App. 77

1
2           **UNITED STATES DISTRICT COURT**
           **WESTERN DISTRICT OF TEXAS**
3              **SAN ANTONIO DIVISION**

4
**ROBERT ROLLO**                           )
5                                   )
          **Plaintiff**         )**NO.SA-17-CA-645-FB**
6 **v.**                                    )
                                  )
7                                   )
**GEORGE P. ESCOBEDO; CARABIN &**  )
8 **SHAW, PC; CARABIN SHAW**           )
                                  )
9           **Defendants**        )

10

11              **REPORTER'S CERTIFICATE**

12               **ORAL DEPOSITION OF**

13             **ROBERT ANDREW ROLLO**

14                **OCTOBER 4, 2018**

15
      I, Nia Davidson MBIVR, Accredited Verbatim
16 Reporter in the UK, hereby certify to the
17 following:
18       That the foregoing transcript is a true
19 record of the testimony given by the witness
20 ROBERT ANDREW ROLLO;
21       That, pursuant to FCRP Rule 30(f)(1),
22 request to review the transcript was not made by
23 either deponent or party before the deposition was
24 completed;
25       That pursuant to information given at the

Exhibit 1                                    App. 78

1  time said testimony was taken, the following
2  includes all parties of record and the amount of
3  time used by each party at the time of the
4  deposition:
5
6  Mr. Gary Fuller (57m)
7  Mr. Brent Lee (5h,8m)
8  Mr. Michael A. Rosenhouse, having reserved his
9  questions for trial, (0)
10         I further certify that I am neither
11  counsel for, related to nor employed by any of the
12  parties in the action in which this proceeding was
13  taken, and further that I am not financially or
14  otherwise interested in the outcome of this
15  action.
16
17  Certified by me on this 16th day of October 2018
18
19
20
21
22         Nia Davidson MBIVR
            For Optima Juris
23         18881 Von Karman Avenue, Suite 340
            Irvine, CA 92612, United States
24
25

Exhibit 1                                    App. 79

# THE ORCHARD MEDICAL PRACTICE
## JF FULTON, L REED, RDC CAMPBELL, F FERGUSON
### NEWTON PORT SURGERY, HADDINGTON, EAST LOTHIAN. EH41 3NF.

Tel: (01620) 825497 Fax: (01620) 824622



4/9/13.



0104659092   H
ROLLO
Robert
14 Station Road
Gifford          01620 810404
EH41 4QL

To whom it may concern,

This man has been my patient for the past 20 yrs. He has been unable to work for the past 8 yrs as a result of recurrent orthopedic conditions and multiple orthopedic operations. It is my professional opinion that he will never work again as a result of his progressive problems

Yours sincerely

James J Ful.

```
EXHIBIT
  10
```

---

**PARTNERS:** Dr Jim Fulton, Dr Linda Reed, Dr Rob Campbell,  Dr Fiona Ferguson
**GP REGISTRAR:**  Dr Sarah Wright – ST1          **PRACTICE NURSES:**  Mrs Colette Clark
                                                  **HEALTH VISITORS:**  Mrs Maureen Thomson
**SENIOR MANAGER:**  Mrs Frances Brock
**STAFF MANAGER:**  Mrs Lynn Cunningham

Exhibit 1-A          App. 80
RR 0017320

## Mediation Agreement

**Robert Rollo, Claimant**

    **V**

**KBR/SEII, Employer**

**And**

# Insurance Co. of the State of Pennsylvania, Carrier/Servicing Agent

In full settlement of all past, present and future compensation, medical benefits, and home modifications, and in release of all claims of any nature as a result of all injuries and conditions stemming from Claimant's employment with Employer herein, the Employer/Carrier agrees to pay, and Claimant agrees to accept, $665,000 (U.S.), in addition to $35,000 (U.S.) for fees and costs. Of the $665,000, the sum of $250,000 will be paid in a lump sum and $415,000 shall be paid in an annuity. Carrier agrees to continue payment of compensation to Claimant at the current rate until this agreement is approved by the Department of labor.

Robert Rollo

George Escobedo

Michael Murphy



EXHIBIT

GPE000541

**From:** George P. Escobedo (gescobedo@carabinshaw.com)
**Sent:** Tuesday, September 17, 2013 1:54:12 PM
**To:** Robert Rollo (bobrollo65@yahoo.co.uk)
**Subject:** RE: ROBERT ROLLO

Bob... I talked with Mike Murphy and although I didn't come out and ask him how and when he'd stop your checks, he did imply that he would do it via a dispute of your case because I told him that we were having second thoughts about accepting the money. He did mention that this was the largest settlement he has ever done.

Note: I think this is probably the best settlement you'll get from the Carrier... can it be better? Of course, but we'll be going into unchartered territory and I think more risk for you.

Also, please send me back the paperwork I sent you last week signed by you. I need to sign it too.

*George P. Escobedo*
*Attorney & Counselor at Law*

**The Law Office of George P. Escobedo & Associates**
630 Broadway
San Antonio, Texas 78215
*Of Counsel to Carabin & Shaw, P.C.*
(210) 222-2288 Telephone
(210) 222-1480 Facsimile
gescobedo@carabinshaw.com

This is not an open record. This e-mail message and its attachments are privileged and confidential attorney-client communications and are transmitted for the exclusive information and use of the addressee. It is not to be released to the public unless conspicuously labeled and initialed "approved for public release." Persons responsible for delivering this communication to the intended recipient and anyone who received this communication in error are admonished that this communication may not be copied or disseminated except as directed by the addressee. If this communication is received by error, please contact the Law Office of George P. Escobedo to arrange for the return of the original and any copies of this communication.



EXHIBIT
19

Exhibit 1-C          App. 82

-----Original Message-----
**From:** Robert Rollo [mailto:bobrollo65@yahoo.co.uk]
**Sent:** Monday, September 16, 2013 11:39 AM
**To:** George P. Escobedo
**Subject:** Re: ROBERT ROLLO

Hey George,

Heard anything from the back stabbers yet?
If you want to call the labor dept., in New York and pretend you are me my details are:

| OWPC No.: | 02-142316 | D.O.B: | |
|-----------|-----------|--------|---|
| ys/old | | | |
| D/Accident | 01/29/2005 | Address: | 14 Station Road |
| Claim No.: | 601-006117 | | Gifford |
| | | | East Lothian |
| | | | Scotland |
| | | Zip/Postal Code: EH41 4QL | |

DOL New York Tel Non.,      1 202 693 0038

Think this is on the claim details if you want to call to ask the questions about the wage structure and the chance off stopping the cheques and things like that?
If not I'll try them later when I get back from the Dr's at Roodlands Hospital!?

Bob

**From:** George P. Escobedo <gescobedo@carabinshaw.com>
**To:** Robert Rollo <bobrollo65@yahoo.co.uk>
**Sent:** Thursday, 12 September 2013, 4:18
**Subject:** Re: ROBERT ROLLO

Lets talk tomorrow. I have an 830 am hearing. I should be back in the office at around 1 pm... 6 pm your time. Call me at 6 pm. Thanks.

George P. Escobedo

Exhibit 1-C                    App. 83

(210) 296-5069 cell

Sent from my iPhone

On Sep 11, 2013, at 9:13 PM, Robert Rollo <bobrollo65@yahoo.co.uk> wrote:

What's your honest opinion on signing or not??
I have been without a brain since last Friday when I started
taking the new depression pills and I'm having thoughts again
that would scare the devil in to hiding!??!
Spoke to Dr Fulton and he said just like it was hard when
slowly coming off the other one then having a gap and starting
the new pills would be very difficult to start with!?

Now I don't want maybe's or might's I just want take it or not
and if not what's the plan? I've already told Dr Fulton I think I
need to see a Psychiatrist which he said he wants to see me first
on Friday and take in the 2 reports from the psychologists.
He said he may need to section me for a while to get some real
treatment and the worst thing about that was I didn't here him
laughing as he usually does when he's joking!!!!

bob

From: George P. Escobedo <gescobedo@carabinshaw.com>
To: 'Robert Rollo' <bobrollo65@yahoo.co.uk>
Sent: Wednesday, 11 September 2013, 14:54
Subject: FW: ROBERT ROLLO

see below and attachment...

This is not an open record. This e-mail message and
its attachments are privileged and confidential
attorney-client communications and are transmitted
for the exclusive information and use of the
addressee. It is not to be released to the public
unless conspicuously labeled and initialed "approved
for public release." Persons responsible for
delivering this communication to the intended
recipient and anyone who received this communication
in error are admonished that this communication may

Exhibit 1-C                                                                App. 84

not be copied or disseminated except as directed by
the addressee.   If this communication is received by
error, please contact the Law Office of George P.
Escobedo to arrange for the return of the original
and any copies of this communication.

-----Original Message-----
**From:** Lisa Larsen [mailto:llarsen@epssg.com]
**Sent:** Wednesday, September 11, 2013 8:29 AM
**To:** gescobedo@carabinshaw.com
**Cc:** mmurphy@sheehyware.com; Glenn Patterson
**Subject:** ROBERT ROLLO

Attorney Escobedo:

Good morning.   I work with Glenn Patterson and assisting with the
settlement documents in this matter to submit to MetLife.  Please find
attached an Information Request Form for Mr. Rollo s completion. If
you would email the signed, completed Form to me,  I will complete
Mr. Rollo s Reinsurance Agreement/ direction of periodic payments to
provide to MetLife.   (an original is not necessary and emailed copy
would suffice).  Please don t hesitate to contact me or Glenn with any
questions. Thank you.  Lisa

Lisa M. Larsen, CSSC
EPS Settlements Group
18 Cottage Street
Hingham, MA 02043
401/431-6205
Llarsen@epssg.com

<image001.jpg>

No virus found in this incoming message.
Checked by AVG - www.avg.com
Version: 9.0.932 / Virus Database: 3222.1.1/6152 - Release Date:
09/10/13 13:25:00

No virus found in this incoming message.
Checked by AVG - www.avg.com
Version: 9.0.932 / Virus Database: 3222.1.1/6172 - Release Date: 09/16/13 13:38:00

Exhibit 1-C                                    App. 85

From: Robert Rollo (bobrollo65@yahoo.co.uk)
Sent: Saturday, September 21, 2013 11:15:39 AM
To: George Escobedo (gescobedo@carabinshaw.com)
Subject: What do you think of this one then-
Attachments: Dr Fultons final statement.pdf; Dr. Ed Davis Report.pdf; Psychological Exam by Andrea Zuflacht, LPC.doc; Rollo R 010465 - 300813 Report(1).docx

Mrs R. Bookhammer,

I am sure you have heard all the news about last Friday including the thought off having a second thought on the offer this is simply due to all the hard work that was put in on the last couple off months before the mediation just for not ONE person to look at it the only people that were interested was the New York Department of Labor, Long-shore & Harbor Workers Compensation who I call just to get the rules set in stone and stop the rumors that were getting thrown at me!! I got some very interesting information and asked me to send the last few documents just for proof! I told them I would speak to you first!!!!

The last document Rollo R 010465 - 300813 needs the password Sciennes to open it. No one else was interested in even looking at then let alone asking what they were.

So this was why the second thought was mentioned.
I was given 2 options by the D.O.L. NY none off which you would not want to go for especially disputing the case down to us having second thoughts!!
The other option is that we sort it out? The figures the D.O.L. NY. were coming out with would be nice but I'm not a greedy person even though it would it would be nice I don't want that much I just want enough to keep me and the wife and kids going for the proprer amount off years!?!

I know you you are sick fed up hearing from me so send me a figure with the A1 form and unlike others if it's enough I will sign it and send it back with no further action but I sure don;t want anywhere near the amount the D.O.L. NY were saying ! Because there"s no pain and suffering your lose of earning before AND after things are settled even though the camp was no longer there because I was earning the same in Kosovo that is what it's to be. But since you have been fair with me I would settle for an extra $300,000 which would cover all the extra expenses I have had to pay out on new MRI scans, Psychologist reports and private psychologist visits and my yearly disabled equipment.

If not please still send the A1 through and I'll go from there.

You want to get me out your hair don't you!???



EXHIBIT
20

RR 003105

Exhibit 1-D                    App. 86

Mr R Rollo
601/006117

RR 0031054

Exhibit 1-D App. 87

## TERMS AND CONDITIONS OF PERIODIC PAYMENTS

### Payments

In consideration of the Agreement, Insurance Company of the State of Pennsylvania ("Insurer") agrees to make the following payments due at the time of settlement:

$300,000.00 immediate cash payment to Robert Rollo. 

### Periodic Payments

In consideration of the Agreement, Insurer agrees to make future Periodic Payments as follows (the "Periodic Payments"):

Payable to Robert Rollo 

$24,340.00 annually, guaranteed 25 years, beginning on October 30, 2014. The last payment will be made on October 30, 2038.

All sums set forth herein constitute damages on account of personal injuries and sickness in a case involving physical injury or physical sickness within the meaning of Section 104(a)(1) of the Internal Revenue Code of 1986, as amended.

### Right to Payments

Payee acknowledges that the Periodic Payments cannot be accelerated, deferred, increased or decreased by any payee; nor shall any payee have the power to sell, mortgage, encumber, or anticipate the Periodic Payments, or any part thereof, by assignment or otherwise.

### Periodic Payment Reinsurance Agreement

The obligation to make the future periodic payments above to the Payee may be transferred to MetLife Insurance Company of Connecticut (the "Reinsurer") through a Reinsurance Agreement. Payee agrees to look to MetLife Insurance Company of Connecticut for the Periodic Payments set forth above. MetLife Insurance Company of Connecticut shall mail payments directly to the Payee. The Payee shall be responsible for maintaining a current mailing address with MetLife Insurance Company of Connecticut. Should MetLife Insurance Company of Connecticut fail to make the above mentioned future periodic payments, Insurer will be responsible for the Periodic Payments.



EXHIBIT
2.1

GPE000733

Exhibit 1-E                App. 88

## TERMS AND CONDITIONS OF PERIODIC PAYMENTS

### Payments

In consideration of the Agreement, Insurance Company of the State of Pennsylvania ("Insurer") agrees to make the following payments due at the time of settlement:

$300,000.00 immediate cash payment to Robert Rollo.

### Periodic Payments

In consideration of the Agreement, Insurer agrees to make future Periodic Payments as follows (the "Periodic Payments"):

Payable to Robert Rollo

$24,340.00 annually, guaranteed 25 years, beginning on October 30, 2014. The last payment will be made on October 30, 2038.

All sums set forth herein constitute damages on account of personal injuries and sickness in a case involving physical injury or physical sickness within the meaning of Section 104(a)(1) of the Internal Revenue Code of 1986, as amended.

### Right to Payments

Payee acknowledges that the Periodic Payments cannot be accelerated, deferred, increased or decreased by any payee; nor shall any payee have the power to sell, mortgage, encumber, or anticipate the Periodic Payments, or any part thereof, by assignment or otherwise.

### Periodic Payment Reinsurance Agreement

The obligation to make the future periodic payments above to the Payee may be transferred to MetLife Insurance Company of Connecticut (the "Reinsurer") through a Reinsurance Agreement. Payee agrees to look to MetLife Insurance Company of Connecticut for the Periodic Payments set forth above. MetLife Insurance Company of Connecticut shall mail payments directly to the Payee. The Payee shall be responsible for maintaining a current mailing address with MetLife Insurance Company of Connecticut. Should MetLife Insurance Company of Connecticut fail to make the above mentioned future periodic payments, Insurer will be responsible for the Periodic Payments.



EXHIBIT

22

EXHIBIT 6

R 000074

Exhibit 1-F                                    App. 89

R 0000651

## Discharge of Obligation

The obligation assumed by the Reinsurer with respect to any required payment shall be discharged upon the mailing on or before the due date of a valid check in the amount specified to the address of record for Payee, or by direct deposit or electronic funds transfer if so requested.  However, if a check is lost or otherwise not received, the Reinsurer, upon notification of said check being lost, or not received, shall promptly reissue said check, subject to verification of "stop payment" that Payee has not negotiated said check.

## Payee Beneficiary

Any payments to be made after the death of any Payee(s) pursuant to the terms of this document shall be made to such person or entity as shall be designated in writing by Payee(s) to the Reinsurer. If no person or entity is so designated by Payee(s), or if the person designated is not living at the time of the Payee's death, such payments shall be made to the estate of the Payee. No such designation, nor any revocation thereof, shall be effective unless it is in writing and delivered to the Reinsurer. The Designation must be in a form acceptable to the Reinsurer before such payments are made, but in no event shall the request of the payee be unreasonably withheld or denied.

Robert Rollo

9/19/2013
Date

Insurer: Insurance Company of the
State of Pennsylvania

By: Kathy G Martin
Authorized Representative

Date: 9/19/2013

EXHIBIT 6

R 000075

| From: | Robert Rollo (bobrollo65@yahoo.co.uk) |
| Sent: | Wednesday, September 25, 2013 12:42:30 PM |
| To: | George P. Escobedo (gescobedo@carabinshaw.com) |
| Subject: | Re: Fwd: Robert Rollo - 8(i) |

Hey George,

If I sign this pile of fabricated crap will it effect my settlement figure??
Dr Fulton is already talking about legal action against so called "Dr" Jeff Richmond so
you might get more work!! reasons are as followed:-

1. P1/8 - In March of 2006, Dr. McKinley performed a left osteotomy on Claimant s
left foot. It was a Mr McDonald!!

2. P 2/8 - on May 15, 2012, Dr. Fulton performed a fusion of Claimant s left foot,
naviculo cuneiform. This same physician also fused Claimant s right foot on April 9,
2013, which Carrier disputes as being related to the subject claim. See all relevant
medical records attached as Exhibit 1. Dr Fulton is a General Practitioner and defiantly
NOT a surgeon and he is not too happy with "Dr" Jeff Richmond!!

3. P 3/8 - Claimant was working as an ice plant foreman at B1     Al Assad, Iraq on the
date of the incident. He was earning $2,176.03 per week while employed in Iraq and
he had been employed in Iraq for over 26 weeks at the time of the incident. Claimant
continued working post-incident until his regularly scheduled leave. He originally saw
Dr. Hogg in March of 2005 but returned to work again and did not seek additional
medical treatment until June 21, 2005 with Dr. Burnett. Only after that exam did
Claimant sustain any lost time from work. I had been over there for 91 weeks & 2 days
from when I went over to when I got injury not 26weeks!! Someone needs an abacus
for his Christmas!! We had already built 3 ice plants before Al Asad, Iraq!!??

4. P 3/8 - The American government no longer operates the Al Assad base in Iraq and
the last of civilian personnel were airlifted from Al Assad base on December 16,
2011. The base officially closed on December 31, 2011. In view of this non-existent
worksite in Iraq, Carrier asserts Carrier has a strong Kubin argument. Carrier
essentially argues that Claimant has two  chapters  of his wage-earning capacity,
before and after December 31, 2011. Despite this argument, Carrier has continued to
pay Claimant at the maximum compensation rate and will continue with such
payments until this 8(i) agreement is approved by the OWCP. But as Paul Doolittle
said it's all crap because I worked in Kosovo before then!!??

5. P 3/8 - Per Dr. Richmond s report of September 15, 2013, attached as Exhibit 3,
Claimant reached maximum medical improvement between November 2012 and
January 2013. In his most recent report, Dr. Richmond notes that he examined
Claimant both in New York and in Edinburgh, Scotland. He also confirms that the
sedentary job of Closed Circuit TV operator is an appropriate job for Claimant. The
doctor assigns a 35% permanent physical impairment rating to the left lower

**EXHIBIT**

27

RR 0031301

Exhibit 1-G

App. 91

extremity. Even giving Claimant the benefit of the doubt and assuming Claimant is entitled to the maximum compensation rate for his permanent physical impairment rating, a 50% loss of the left foot would yield an entitlement to 102.5 weeks of the scheduled payment or

$1,047.16 x 102.5 weeks = $107,333.90. Did you see a report from "Dr " Jeff Richmond from the 15th Sept. 2013? I haven't seen him since about 2010!!??
6. P 3/8 - In June of 2011, Carrier retained Tangiers International Ltd., which issued its extensive vocational rehabilitation report and labor market survey establishing a wage-earning capacity for Claimant, attached as Exhibit 4. Dr. Richmond has confirmed that Claimant can currently work as a closed circuit TV security operator, which pays between £19,500-23,500 annually as of 2011. As seen at page 12 of the labor market survey, this is simply a video monitoring job which does not involve any interface directly with any supposed wrongdoers. How do I get out the house with stairs at both bloody ends of the house!???

7. P 5/8 - Carrier is also paying an additional $50,000.00 lump sum payment to Claimant, direct, to enable Claimant to secure home modifications. This payment is in addition to the $150,000.00 set aside for future medical care. Claimant will receive a $250,000.00 lump sum payment and guaranteed future payments of $458,500.00 representing settlement of Claimant s indemnity, or $708,500.00 in indemnity. Can someone add this up less g\eorges $35,000?? How do I get $908,500 - $35,000 = $873,500??????

I'll get to the other later!!??

Bob

P.S. Told you the guy was a clown and not a Dr!! My Doctor Fulton said he may need a good one if he catches him hahaha. Got to see Dr Fulton on Friday feels like a needle stuck in the middle of the lower back and I can't wait. Can't call a carer in as they cost too much money, at least the one I tried.

Have a great day

Bob

From: George P. Escobedo <gescobedo@carabinshaw.com>
To: Robert Rollo <bobrollo65@yahoo.co.uk>
Sent: Tuesday, 24 September 2013, 19:27
Subject: Fwd: Robert Rollo - 8(i)

RR 0031302

Bob.... Here you... Please print and review and email back to me at your earliest convenience.    Please call me should you have any questions.  I've read it and it includes the additional $50,000 for home repairs.  Good job!

Sent from my iPad

Begin forwarded message:

> **From:** Sarah Nickelotte <snickelotte@sheehyware.com>
> **Date:** September 24, 2013, 11:53:17 AM CDT
> **To:** "gescobedo@carabinshaw.com" <gescobedo@carabinshaw com>
> **Cc:** Michael Murphy <mmurphy@sheehyware.com>, Jessica Lowrance <jlowrance@sheehyware.com>
> **Subject: Robert Rollo - 8(i)**

Mr. Escobedo,

Please see attached for the proposed 8(i) agreement in the above-referenced matter. We will send the exhibits to the 8(i) separately.

Sarah Nickelotte
Sheehy, Ware & Pappas, P.C.
2500 Two Houston Center
909 Fannin
Houston, Texas 77010
713.951.1088 - direct
713.951.1199 - facsimile